TODD W. BURNS
California State Bar No. 194937
todd@burnsandcohan.com
Burns & Cohan, Attorneys at Law
501 West Broadway, Suite 1510
San Diego, California 92101
Telephone: (619) 236-0244
Facsimile: (619) 768-0333

Counsel for Capt. James Dolan (Ret.)

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

(HONORABLE JANIS L. SAMMARTINO)

UNITED STATES OF AMERICA,  )          Case No. 17-cr-0623-JLS
                           )
              Plaintiff,   )
                           )
        vs.                )
                           )
DAVID NEWLAND, *et al.*,   )
                           )
              Defendants.  )
                           )
                           )
                           )
_____)


**DEFENDANTS' JOINT[1] RESPONSE IN OPPOSITION TO**

**MOTION TO QUASH SUBPOENA *DUCES TECUM***

**ISSUED TO AUDIATION, INC. (DOC. #635)**

---

[1]  This opposition is being filed jointly by Defendants James Dolan, David Newland, David Lausman, Steven Shedd, Mario Herrera, and Bruce Loveless.

# TABLE OF CONTENTS

*Page*

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

EVIDENCE SOUGHT TO BE OBTAINED . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ANY JOURNALIST'S PRIVILEGE WAS WAIVED . . . . . . . . . . . . . . . . . . . . 5

OVERVIEW OF RELEVANT LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    I.    *Branzburg v. Hayes* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    II.   *Farr v. Pitchess* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    III.  *Shoen I And Shoen II* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

THE REPORTER'S PRIVILEGE DOES NOT BAR DISCLOSURE OF THE
FRANCIS RECORDINGS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    I.    Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    II.   *Farr* Indicates That (1) The Court Should Apply A Balancing Test
            Here, But (2) Regardless Of What Test The Court Applies,
            Audiation Cannot Successfully Invoke The Journalist's Privilege . 14

          A.   Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

          B.   *Farr* Indicates That Its Balancing Test Applies Here Because
              This Is A Criminal Case . . . . . . . . . . . . . . . . . . . . . . . . . 15

          C.   Regardless Of The Test Applied, The Facts And Outcome In
              *Farr* Compel The Conclusion That Audiation Cannot
              Successfully Invoke The Reporter's Privilege . . . . . . . . . . . 16

    III.  Audiation's Privilege Claim Also Fails Under *Shoen II's* Test For
            Civil Cases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

          A.   "Unavailability Through Reasonable Alternative Sources" . . 20

          B.   "Noncumulative" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

          C.   "Relevant To An Important Issue In The Case" . . . . . . . . . . 21

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

**INTRODUCTION**

In granting authority to issue a subpoena for production of audio/video-recordings of Leonard Francis interviews excerpted in the *Fat Leonard* podcast, this Court found the recordings are relevant, admissible, specifically identified and not available from any other source. *See United States v. Nixon*, 418 U.S. 683, 699-700 (1974).  Nonetheless, Audiation, Inc., and Project Brazen ("Audiation") move to quash the subpoena issued based on the "journalist's privilege."  Doc. #635.

As explained more fully below, whatever limited privilege exists for journalists is not available to Audiation.  Where, as here, there is no issue of a confidential source, and the evidence is sought by the defense for use in a criminal trial, the defendant's Fifth and Sixth Amendment trial rights prevail over a journalist's "more elusive" First Amendment interests.  Accordingly, courts have routinely held that a reporter's claimed right to withhold evidence that is relevant to a criminal trial is outweighed by a defendant's constitutional rights.  That balance weighs especially heavily in favor of disclosing the Francis recordings considering the nature of Francis's statements and because he is the central player in the case.

The legal analysis relied on by Audiation to counter this conclusion is founded on cases dealing with civil litigation, and thus is irrelevant.  But even under that analysis, the motion to quash must be denied.

Finally, Audiation intentionally timed the release of the podcasts to coincide with the beginning of the Defendants' trial, and the podcasts repeatedly mention the trial.  The podcasts also repeatedly argue that Francis corrupted Navy officers, based in large part on selectively revealed portions of Francis's interviews.  This combination of timing and content coincide to threaten the Defendants' right to a fair trial, due to pre-trial publicity.  Under these circumstances, the producers should not be permitted to use the reporter's privilege as a shield, thus any privilege was waived.

The discussion below proceeds as follows.  First, Defendants discuss examples of what they seek from the production.  Second, they oppose Audiation's invocation

of the journalist's privilege because it has been waived.  Third, they provide an overview of relevant Supreme Court and Ninth Circuit case law.  Finally, they explain why the journalist's privilege doesn't preclude disclosure of the Francis recordings.

### EVIDENCE SOUGHT TO BE OBTAINED

A review of the podcasts makes clear the important, relevant, and irreplaceable evidence the full-length recordings contain.  Some examples are illustrative.

1.   The first example relates to benefits Mr. Francis was given by the government for his "cooperation," evidence that is powerful and admissible.  *See, e.g., Phillips v. Ornoski*, 673 F.3d 1168, 1184-87 (9th Cir. 2012); *United States v. Schoneberg*, 396 F.3d 1036, 1042 (9th Cir. 2005).  Toward the end of podcast episode 5, the narrator, Tom Wright, asks Morena De Jesus about Mr. Francis's kidnapping the two children they had together.  Wright then shifts to a separate interview of Francis and asks about the kids:

> WRIGHT:  The loss of her children.  How are you able to get the kids to the U.S?
>
> FRANCIS:  Everybody came legally. Everybody knows, Uncle Sam knows what I'm doing for them.  My children are my children.  My wellbeing is more important than anything else.  I am their star witness.

*Fat Leonard*, Episode 5 (at 72 in attached PDF of transcripts).[2]  The podcast returns to this subject in episode 6, which includes this narration by Mr. Wright:

> Incapacitated by grief, with no money in fighting a more powerful opponent, Morena began her long struggle to get her children back. . . .  Back in Manila, Morena began legal proceedings against Leonard borrowing money from a friend.  A year later, a Philippines regional court ordered Leonard to return the children.  And that decision was upheld by the Singapore family court.  But by then, Leonard had been arrested in San Diego. His mother in 2013 had fled Singapore to Kuala Lumpur in Malaysia with the children.  Morena couldn't locate them.  The court orders were unenforceable.  Since Leonard's arrest, Morena has been trying to find her children presuming they were in Kuala Lumpur.   What really happened to them?   She never could have imagined.

---

[2] Transcripts of the podcasts prepared by Audiation are attached hereto.

*Fat Leonard*, Episode 6 (at 82 in attached PDF of transcripts).  Next a voice actor sets the scene as "San Diego, 2021," and the following exchange occurs:

> WRIGHT:  How are you able to get the kids to the US?
>
> FRANCIS:  Everybody came legally.  Everybody knows, Uncle Sam knows, you know what I'm doing?  Not say they don't know about it.
>
> WRIGHT:  Of course.
>
> FRANCIS:  For them, my children, my wellbeing is more important than anything else. I am the star witness.

*Id.* Wright then returns to narrating and says:

> After Leonard was arrested, his mother looked after Morena's children and another infant from a different Filipino woman.  When Leonard moved from prison to house arrest in San Diego over three years ago, he sent for his three infant children.

*Id.* at 83.  The podcast then goes to Leonard, who says:

> The kids want to be with me of course, I'm super daddy, mommy, granddaddy, grand, everything my kids understand.  They all know I'm a very open dad.  I don't hide anything.

*Id.*

These portions of the podcast illustrate key reasons the Defendants seek the full recordings.  First, in setting up the story and moving it along Wright "speaks" for Francis, but the relevant thing for trial is what Francis actually said.  Second, because Francis's interviews are cut-up and excerpted, the Defendants cannot assess the overall context to be sure they correctly understand what Francis said.  While these dynamics appear throughout the podcasts, the example above is especially illustrative.  That is because it is clear that Francis stated that one of the benefits the government gave him for his cooperation is allowing his kidnapped children to come to the United States and live with him in pre-trial detention, but Francis's lawyer denies that.  In that regard, a November 21, 2021 article in the San Diego Union-Tribune says:

> [In the podcast Francis] says "Uncle Sam" knows what he's doing and suggests the U.S. government has allowed the children to live with him as a perk for his cooperation in the investigation.  [Devin] Burstein[, Francis's lawyer,] said that is "outright false."

San Diego Union-Tribune, *'Fat Leonard' Brags, Shows No Remorse, in Surprise Podcast* (Nov. 21, 2021). The complete recordings will clarify this conflict.

Another quote from Mr. Burstein in the U-T article is also relevant in this regard, specifically, "I think [the podcast] lacks objectivity. I think it's more hit piece than true journalism." This foreshadows Mr. Francis's likely claim during his cross-examination that the podcast took his remarks out of context, or blatantly misstated what he told Wright. The only way to get to the truth is to hear the complete recordings.

2. In another portion of the podcast, Wright says, "I'm not even sure how long he has to live given his late stage kidney cancer. He never gave me a straight answer." *Fat Leonard*, Episode 9 (at 131 in attached PDF of transcripts). The following exchange ensues:

> WRIGHT: I didn't want to ask you this before because it seems private, but I hope you don't mind me asking, so are you dying?
>
> FRANCIS: No. If I'm dying, I wouldn't be talking to you this way, right? But as long as I'm on my medication, I'll be alive. Because the medication is what keeps your cancer and everything in check, immunology medication, here in the United States, it's very advanced.
>
> WRIGHT: Is your cancer in remission?
>
> FRANCIS: No. I have to maintain my medical condition because that's what keeps me out. That's why I have my liberty. If I am well, I'm definitely not going to be here.

*Id.* The inescapable reading is that Francis is misrepresenting his medical condition to this Court so he can remain on "medical furlough." But the language is somewhat vague, thus to fully understand what Francis said it is necessary to have the complete recordings.

3. Another illustrative example from the podcast relates to Francis's evident willingness to violate the terms of his plea agreement. That will be highly relevant because the government has said it intends to convey to the jury that the agreement obligates Francis to tell the truth, and he is merely doing that. In this regard, the following excerpt from the first podcast episode is relevant:

4

WRIGHT [SETTING UP FRANCIS CLIP]:  I've been trying to work out his motives for opening up to me.  He's pleaded guilty.  And as a star witness in the ongoing cases of other Navy officers, many of whom have denied wrongdoing, his plea deal bars him from talking about the case.  And he could face much more time in prison because of this podcast.  One element could be that he's sick and so has nothing to lose.

FRANCIS:  It's a huge risk for me to do what I'm doing, but I'm so upset with it.  Well, I'm portrayed as the bad guy and I wasn't the bad guy.  *I did everything that they wanted me to do.*  I've lived my life.  I've been up this close to heaven and down to hell.  I've seen it all.  So my legacy's important too.  We're all going to die one day.  And I only fear God, I don't fear nobody else.  And of course, I've got to face my judge one day and it's all in her hands, that's about it.  How many life sentences can you give me?  1, 2, 10?

*Fat Leonard*, Episode 1 (at 10 in attached PDF of transcripts) (emphasis added).  In addition to indicating that Francis is willing to violate the terms of his plea agreement for his own purposes, there are other implications of this exchange that could undercut Francis's trial testimony, not least that he's done "everything [the government] wanted [him] to do," regardless of the truth.  But to fully understand what was conveyed, it is necessary to hear the complete recordings.

4.   In another, somewhat related example, in episode 4 Francis says that, contrary to this plea agreement, he has withheld video evidence from the prosecutors.  When pressed by Wright, "Why not give this stuff to the DOJ," Francis replies, "This is what I found out, Tom.  The more I talk, the more I give, the deeper I get.  Look it here.  I'm nine years.  I'm stuck here.  I mean, this could have all ended a long time ago."  *Fat Leonard*, Episode 4 (at 52-54 in attached PDF of transcripts).  The strong implication is that Francis is withholding evidence for his own reasons, and contrary to his plea agreement obligations, which reflects poorly on his honesty.  But again, to fully understand what was conveyed it is necessary to hear the complete recordings.

The Defendants now turn to the waiver issue.

## ANY JOURNALIST'S PRIVILEGE WAS WAIVED

"[L]ike other privileges," the journalist's privilege "may be waived."  *Ayala v. Ayers*, 668 F. Supp. 2d 1248, 1250 (S.D. Cal. 2009).  In *Ayala*, Judge Moskowitz

gave two examples when, "[i]n the interests of fairness," a waiver should be found: (1) "a journalist/author should not be permitted to disclose information to advance the interests of one litigant and then invoke the journalist's privilege to prevent discovery of this same information by another litigant;" and (2) "the party attempts to use the privilege both as a shield and a sword by making selective disclosures." *Id.* (citing *Sims v. Blot*, 534 F.3d 117, 132 (2d Cir. 2008)); *see also Michael v. Estate of Kovarbasich*, 2015 WL 8750643, *4 (C.D. Cal. 2015) (recognizing that "courts may find that a journalist has impliedly waived the privilege when" publication of limited materials prejudiced a party).   Here, there are several reasons any journalist's privilege should be found to have been waived.

First, Audiation has already broadcast several hours of the interviews, covering a vast range of subject matter.

Second, the podcasts include several statements by the narrator, Tom Wright, about what he learned during his interviews with Francis, statements well beyond what is contained in the excerpts of Francis speaking.   In this way, Mr. Wright "speaks" for Francis, and in doing so he has already disclosed much of the content of the interviews that was not broadcast.   Accordingly, releasing the recordings will serve more to clarify what was said and/or prevent Mr. Francis from getting away with falsely claiming that the podcasts took his statements out of context.   On the other hand, maybe the recordings will show that, at least in some contexts, Mr. Wright has misrepresented what Mr. Francis told him, but concealing false or bad journalism is not a good basis for enforcing the journalist's privilege.

There are two aspects to the third point:  (1) during the podcasts, Mr. Wright expresses an exceedingly credulous view of Mr. Francis's claims; and (2) the podcasts began airing three weeks before trial was scheduled to commence, and repeatedly refer to the pending trial to ramp-up the drama.   Putting out this skewed content so close to trial comes with a cost to the Defendants and society.   Indeed, during a recent hearing the Court tacitly acknowledged that the podcasts could taint

the jury pool, when it asked if the parties wanted to amend the jury questionnaire to address the podcasts.  The Defendants declined because referring to the podcasts in the questionnaire seems likely to increase the potential for unfair prejudice.  Having created these circumstances in their effort to boost their commercial endeavor, Audiation should not be heard to complain about disclosing recordings that deal with the subject matter covered in five hours of podcasts.

Fourth, and relatedly, the content of the podcasts is glaringly biased toward the government's trial case.  The Defendants cannot say for sure that the podcasts' creators collaborated with the government, though, given Francis's reportedly strict conditions of detention one wonders how else Mr. Wright could manage to do twenty hours of interviews with Mr. Francis.  Considering these circumstances, and the circumstances set out in the preceding paragraph, "[i]n the interests of fairness" the podcasts' producers "should not be permitted to disclose information to advance the interests of one litigant and then invoke the journalist's privilege to prevent discovery of this same information by another litigant." *Ayala*, 668 F. Supp. 2d at 1250.

Finally, when he made the recordings Mr. Wright knew:  (1) Francis had a cooperation agreement that requires him to produce materials to the government; and (2) Francis could (and maybe did) easily record the remotely-conducted interviews.  Thus, Mr. Wright could not reasonably have believed the recordings would remain protected by any sort of privilege.

For all these reasons, the journalist's privilege was waived.  In the event the Court rejects that argument, the Defendants turn to addressing why the journalist's privilege doesn't preclude production of the Francis recordings.

## OVERVIEW OF RELEVANT LAW

First, it is useful to discuss four cases:  the Supreme Court's opinion in *Branzburg* and the Ninth Circuit's opinions in *Farr*, *Shoen I*, and *Shoen II*.  The first two are criminal cases, the other two are civil.  They are relied on by Audiation in its motion to quash, but are not meaningfully discussed.

7

## I. *Branzburg v. Hayes*

In *Branzburg v. Hayes*, 408 U.S. 665, 667-75 (1972), the Court addressed three cases in which information was sought by a grand jury, and in each case the grand jury sought to learn the reporters' confidential sources. The reporters argued that they should not be required to comply with the grand jury subpoenas because:

> [T]o gather news it is often necessary to agree either not to identify the source of information published or to publish only part of the facts revealed, or both; that if the reporter is nevertheless forced to reveal these confidences to a grand jury, the source so identified and other confidential sources of other reporters will be measurably deterred from furnishing publishable information, all to the detriment of the free flow of information protected by the First Amendment.

*Id.* at 679-80. The Supreme Court noted that "the Constitution does not, as it never has, exempt the newsman from performing the citizen's normal duty of appearing and furnishing information relevant to the grand jury's task," *id.* at 691, and held the reporters could not legally refuse to answer "relevant and material questions asked during a good-faith grand jury investigation." *Id.* at 708.

The majority opinion in *Branzburg* did, however, give a nod to the press's interests, and, more important, one of the five justices in the majority, Justice Powell, wrote a concurring opinion that laid the foundation for courts to later recognize a qualified journalist's privilege. In that short concurrence, Justice Powell wrote:

> As indicated in the concluding portion of the [majority] opinion, the Court states that no harassment of newsmen will be tolerated. If a newsman believes that the grand jury investigation is not being conducted in good faith he is not without remedy. Indeed, if the newsman is called upon to give information bearing only a remote and tenuous relationship to the subject of the investigation, or if he has some other reason to believe that his testimony implicates confidential source relationship without a legitimate need of law enforcement, he will have access to the court on a motion to quash and an appropriate protective order may be entered. The *asserted claim to privilege should be judged on its facts by the striking of a proper balance between freedom of the press and the obligation of all citizens to give relevant testimony with respect to criminal conduct*. The balance of these vital constitutional and societal interests on a case-by-case basis accords with the tried and traditional way of adjudicating such questions.

*Id.* at 709-10 (Powell, J., concurring) (emphasis added).

8

1  **II.**   *Farr v. Pitchess*

2     A few years later, in *Farr v. Pitchess*, 522 F.2d 464, 467 (9th Cir. 1975), the

3  Ninth Circuit held that *Branzburg* "fashioned at least a partial First Amendment

4  shield available to newsmen who are subjected to various demands to divulge the

5  source of *confidentially secured information*," though that "privilege is a limited or

6  conditional one." (Emphasis added.)  *Farr* was a criminal case with the following

7  facts:  (1) during criminal proceedings related to Charles Manson's "family,"

8  prosecutors obtained a written witness statement that implicated a defendant; (2) the

9  trial judge ruled the statement inadmissible and barred the parties from releasing the

10 statement or its contents to anyone, lest that create unfair pretrial publicity; (3) a few

11 days later, a reporter "obtained two copies of the statement;" (4) shortly thereafter,

12 the reporter was questioned by the trial judge and refused to divulge his sources; (5)

13 the next day, an article written by the reporter appeared in the Los Angeles Herald

14 Examiner, detailing the suppressed statement; (6) "[s]even months later, and one

15 month after a jury verdict against the Manson defendants had been entered, the trial

16 judge ordered the reporter to show cause why he should not be compelled to disclose

17 the names of the persons who had supplied him with copies of the suppressed

18 statement;" and (7) when the reporter "continued to refuse to" identify his source he

19 "was adjudged to be in contempt and ordered incarcerated until he divulged the

20 names." *Id.* at 466-67.

21     Faced with these facts, the Ninth Circuit in *Farr* held that "application of the

22 *Branzburg* holding to non-grand jury cases seems to require that the *claimed First*

23 *Amendment privilege and the opposing need for disclosure be judicially weighed in*

24 *light of the surrounding facts and a balance struck* to determine where lies the

25 paramount interest." *Id.* at 468 (emphasis added).  With respect to the interests

26 favoring disclosure of the reporter's confidential source, the Ninth Circuit said:

27     In a criminal case the trial judge has a duty and obligation to attempt to
       protect the right of the defendants to a fair trial, free of adverse
28     publicity.  Where the case is a notorious one, that burden on the court is

9

1
2
3
heavy. The most practical and recommended procedure to insure against dissemination of prejudicial information is the entry of an order directing that attorneys, court personnel, enforcement officers and witnesses refrain from releasing any information which might interfere with the right of the defendant to a fair trial.

4   *Id.* at 468.  The court then stated that a court that enters such an order has a "duty . .

5   . to protect its processes and to guarantee due process to the accused person," and

6   reasoned that those constitutional and institutional interests led to the conclusion that

7   the reporter was "not constitutionally protected in his refusal to identify" his

8   confidential sources.  *Id.*

9       As will be discussed in detail below:  (1) *Farr* sets out the controlling test when

10  the reporter's privilege is invoked to preclude disclosure of information or materials

11  subpoenaed by a criminal defendant; and (2) regardless of what test is applied (*Farr's*

12  balancing test or *Shoen II's* three-factor test for civil cases), the facts and holding in

13  *Farr* compel the conclusion that the reporter's privilege cannot be validly invoked to

14  preclude production of the Francis recordings.

15  **III.   *Shoen I And Shoen II***

16      Audiation bases most of its argument on two Ninth Circuit civil cases, *Shoen*

17  *I* and *Schoen II*.

18      The *Shoen* litigation involved a lawsuit amongst members of the Shoen family,

19  which owned U-Haul Corporation. Ronald Watkins, an author of investigative books,

20  had published *Birthright*, which chronicled the bitter feud within the Shoen family.

21  His primary source was Leonard Shoen, the family patriarch and founder of U-Haul.

22  In exchange for several in-depth interviews, Watkins agreed that Leonard Shoen

23  would receive a percentage of book royalties and proceeds from any sales of movie

24  rights.  Prior to his interviews with Watkins, Leonard Shoen made several public

25  statements implicating his sons Mark and Edward in the death of Eva Berg Shoen, the

26  wife of their brother Sam.  In the ensuing civil litigation, Mark and Edward sought

27  to hold their father liable for the alleged damage to their reputations caused by these

28  statements.  Although Mark and Edward did not allege that their father made any

libelous statements to the journalist/writer Watkins, they nonetheless served Watkins with a subpoena *duces tecum* ordering him to appear for deposition and to produce all documents and recordings concerning the Shoen family feud.  Watkins refused based on the journalist's privilege, the district court held him in contempt, and the first appeal followed. *See Shoen v. Shoen*, 48 F.3d 412, 413-14 (9th Cir. 1995) (*Shoen II*) (summarizing background).

In *Shoen I*, the court began by noting that in *Farr* it had "interpreted *Branzburg* . . . as establishing . . . a qualified privilege for journalists," and adopted a balancing test for addressing when that privilege could be validly invoked. *Shoen v. Shoen*, 5 F.3d 1289, 1292 (9th Cir. 1993) (*Shoen I*).  The court in *Shoen I* also "confronted" an "issue[] . . . of first impression in this circuit," specifically whether the privilege could "shield information provided by a source without an expectation of confidentiality." *Id.* at 1293.  The court decided the answer was yes, but also held "that the absence of confidentiality may be considered in the balance of competing interests as a factor that diminishes the journalist's, and the public's, interest in non-disclosure." *Id.* at 1296.

Although the court in *Shoen I* then turned to balancing interests, it did not get far.  It began by noting that a party requesting disclosure must first "demonstrate a sufficiently compelling need for the journalist's materials to overcome the privilege. At a minimum, this requires a showing that the information sought is not obtainable from another source." *Id.*  The court concluded that the "plaintiffs ha[d] not satisfied this threshold requirement because they failed to take Leonard Shoen's deposition before trying to penetrate the journalist's shield," even though they acknowledged "that their father [was] an obvious alternative source for discovering what he said to Watkins in their conversations." *Id*.  The district court's contempt order was therefore reversed and the case was remanded.

On remand, the plaintiffs deposed Leonard Shoen and then again moved to compel Watkins to disclose the materials and information sought.  The district court

found the plaintiffs had exhausted all reasonable alternative sources and granted the motion to compel Watkins to comply with plaintiffs' subpoena.  Watkins again refused and was held in contempt and the second appeal followed.  *See Shoen II*, 48 F.3d at 414.

In *Shoen II*, the Ninth Circuit began by rejecting Watkins's claim that to overcome the limited journalist's privilege a party seeking disclosure must show that the "requested information goes to the heart of the seeker's case." *Shoen II*, 48 F.3d at 415 (quotation omitted).  (As will be discussed below, Audiation nonetheless asserts that the heightened "heart of the case" relevance test applies here.)

Next, the court in *Shoen II* cited *Farr's* balancing test and said "we have yet to formalize this balance by identifying the specific showing required to pierce the journalist's privilege.  *Id.*  The court went on to state that "the appropriate test for determining whether a *civil litigant's* interest in disclosure is sufficient to override a journalist's privilege," and thereafter repeatedly reiterated that the test set out applied to civil cases.  *Id.*; *see also id.* at 416 (referring three times to a "civil litigant's interest" and the showing required of a "civil litigant").

Before setting out that test, however, the court in *Shoen II* pointed out that "Leonard Shoen was neither a confidential source nor did he insist that the details of his discussions with Watkins not be disclosed." *Id.*  The court noted that "[n]o circuit ha[d] adopted an explicit test applicable where the information sought from a journalist is not confidential.  Instead, the cases setting forth tests for determining whether the needs of a civil litigant should prevail over the privilege involve confidential informants." *Shoen II*, 48 F.3d at 416.  The court gave as an example the Second Circuit's "conjunctive test for determining whether a journalist must disclose a confidential source in a civil case," under which "disclosure may be ordered only upon a clear and specific showing that the information is:  highly material and relevant, necessary or critical to the maintenance of the claim, and not obtainable

from other available sources."[3]   *Id.*   The court recognized that it had already concluded in *Shoen I* that the "the lack of a confidential source may be an important element in balancing the . . . need for the material sought against the interest of the journalist in preventing production in a particular case," therefore in *Shoen II* it rejected the more stringent test for cases involving an attempt to compel a reporter to reveal confidential sources. *Id.*   Instead, the court held that "where information sought is not confidential, a *civil litigant* is entitled to requested discovery notwithstanding a valid assertion of the journalist's privilege by a nonparty only upon a showing that the requested material is . . . (1) unavailable despite exhaustion of all reasonable alternative sources; (2) noncumulative; and (3) clearly relevant to an important issue in the case." *Id.* (emphasis added).

With this case law in mind, the Defendants turn to the central issue presented.

## THE REPORTER'S PRIVILEGE DOES NOT BAR DISCLOSURE OF THE FRANCIS RECORDINGS

## I.   Introduction

In its moving papers, Audiation fails to address two key facts:   (1) the subpoena in this case was issued to realize the Defendants' Sixth Amendment confrontation right and Fifth Amendment due process right to present a defense; and (2) the Defendants are not seeking the identity of a confidential source.   Those considerations are so important that, after addressing the exact same press interests Audiation relies on here, the Fifth Circuit flatly rejected the claim that "reporters possess a qualified privilege not to divulge nonconfidential information in criminal cases." *United States v. Smith*, 135 F.3d 963, 968-71 (5th Cir. 1998); *see also, e.g., Riley v. City of Chester*, 612 F.2d 708, 716 (3d Cir. 1979) (stating that journalist's

---

[3] The Second Circuit (like the other circuits) has since held that when "the protection of confidential sources is not involved, the nature of the press interest protected by the [journalists'] privilege is narrower, and the privilege is more easily overcome." *Gonzales v. NBC*, 194 F.3d 29, 35-36 (2d Cir. 1999).

privilege is given "greater weight" in "civil cases than in criminal cases," and noting that case did "not place in apposition the journalist's privilege and the constitutional right of a criminal defendant to be afforded every reasonable opportunity to develop and uncover exculpatory information"). The Defendants submit the Court should come to the same conclusion.

The Court need not go that far, however, because under the Ninth Circuit's *Farr* opinion Audiation cannot successfully invoke the privilege. But even if the Court applies the *Shoen II* test – which the Ninth Circuit repeatedly emphasized applies in civil cases – the outcome is the same. Both points are discussed below.

**II.    *Farr* Indicates That (1) The Court Should Apply A Balancing Test Here, But (2) Regardless Of What Test The Court Applies, Audiation Cannot Successfully Invoke The Journalist's Privilege**

**A.    Introduction**

Before addressing *Farr*, it bears noting that in *Branzburg* the Supreme Court rejected the claim that reporters could withhold *confidential* evidence from a grand jury, and there is no principled reason that holding shouldn't extend to an attempt to withhold *non-confidential* evidence from a petit jury. Furthermore, it bears recalling what was said in Justice Powell's concurrence in that case, which was pivotal in the later recognition of the privilege:

> Indeed, if the newsman is called upon to give information bearing only a remote and tenuous relationship to the subject of the investigation, or if he has some other reason to believe that his testimony implicates confidential source relationship without a legitimate need of law enforcement, he will have access to the court on a motion to quash and an appropriate protective order may be entered. The asserted claim to privilege should be judged on its facts by the striking of a proper balance between freedom of the press and the obligation of all citizens to give relevant testimony with respect to criminal conduct. The balance of these vital constitutional and societal interests on a case-by-case basis accords with the tried and traditional way of adjudicating such questions.

*Id.* at 709-10 (Powell, J., concurring) (emphasis added). Accordingly, a court should only entertain a motion to quash, and resort to a balancing test in a criminal case, when "the newsman is called upon to give information bearing only a remote and

14

tenuous relationship to the subject of the investigation, or if he has some other reason to believe that his testimony implicates confidential source relationship without a legitimate need of law enforcement." Those are not the circumstances here, which is the end of the inquiry.

However, in the event the Court rejects that argument, the Defendants now turn to addressing the impact of *Farr*, which indicates that, because this is a criminal case, this Court should apply a balancing test to assess the reporter's privilege claim, and under that test disclosure of the Francis recordings is required. But regardless of what test the Court applies, the facts and outcome in *Farr* compel the conclusion that Audiation cannot successfully invoke the reporter's privilege. Both points are addressed below.

## B. *Farr* Indicates That Its Balancing Test Applies Here Because This Is A Criminal Case

As discussed above: (1) in *Farr*, a criminal case, the Ninth Circuit "require[d] that the claimed First Amendment privilege and the opposing need for disclosure be judicially weighed in light of the surrounding facts," and in balancing those interests the court found most important the defendants' "due process right" to a "fair trial," and consequently ordered disclosure, 522 F.2d at 468; whereas (2) *Shoen II*, a civil case, applied a three-factor test that amounts to a list of requirements a party seeking disclosure must meet to overcome the journalist's privilege. Notably, *Shoen II* repeatedly emphasized that it was setting out a test for "civil" cases, and it did not take into account the constitutional rights of the party seeking disclosure, because in the civil context there are no constitutional rights in play. Accordingly, it is evident that his Court should apply *Farr's* holistic, totality of circumstances balancing test to assess the reporter's privilege claim here.

The Defendants' Fifth Amendment due process and Sixth Amendment confrontation rights weigh determinatively in favor of disclosure, because Francis is the government's "star witness" and is wrapped up in all of the indictment's

15

allegations.  Furthermore, as the examples from the podcasts discussed above show, the full-lengthy recordings contain evidence that is important, relevant, and irreplaceable.  Also supporting disclosure are the facts discussed in the context of waiver, including that:  (1) the podcast's producers released a substantial amount of Francis's statements already, either verbatim or through Mr. Wright's narration; and (2) the podcast's producers deliberately timed their release of their badly skewed version of the facts so they would benefit from the trial, thereby imperiling the Defendants' right to a fair trial.  Considering all of these circumstances, especially the Defendant's constitutional rights, Audiation's privilege claim fails.

**C.      Regardless Of The Test Applied, The Facts And Outcome In *Farr* Compel The Conclusion That Audiation Cannot Successfully Invoke The Reporter's Privilege**

Regardless of whether the Court applies *Farr's* balancing test, the combination of the facts and outcome in *Farr* compel the conclusion that disclosure of the Francis recordings must be ordered.  To reiterate, in *Farr*:  (1) the trial court entered a "gag" order to protect the defendants' constitutional rights to a fair trial; (2) someone evidently violated that order by leaking a witness statement, which a reporter published; (3) months after the trial, the district court held the reporter in contempt when he refused to divulge his confidential source who; and (4) the Ninth Circuit held the reporter's privilege didn't preclude compelling the reporter to disclose the leaker's identity.  *See Farr*, 522 F.2d at 466-67.  The disclosure sought here is not such an after-the-fact disciplinary effort.  Instead, it is necessary to realize the Defendants' constitutional rights in their upcoming trial – that is, the Defendants' rights here are more tangible and at risk than were the rights of the defendants in *Farr*.  Accordingly, the outcome in *Farr* compels the conclusion that the Francis recordings must be produced, particularly because that production does not reveal a confidential source.

That conclusion, as well as the propriety of applying a balancing test, is also supported by the First Circuit's opinion in *United States v. LaRouche Campaign*, 841

F.2d 1176, 1177 (1st Cir. 1988).  The defendants in that case were charged with mail and wire fraud.  Forrest Fick was a "key" trial witness for the government, and he had given an hour-and-forty-minute interview to NBC News, one minute of which was broadcast.  *See id.*  The Defendants subpoenaed a recording of the entire interview, NBC News moved to quash based on the reporter's privilege, and the district court rejected that motion.  *See id.* at 1178.

The First Circuit began its analysis of the reporter's privilege in that case by noting the parallels between its case and *Nixon*:

> Rejecting a claim of absolute privilege, the Court [in *Nixon*] recognized a "presumptive privilege," 418 U.S. at 708, accorded to Presidential communications, an interest that "is weighty indeed and entitled to great respect," *id.* at 712, but, being "based only on the generalized interest in confidentiality . . . must yield to the demonstrated, specific need for evidence in a pending criminal trial." *Id*. at 713.

*LaRouche Campaign*, 841 F.2d at 1180-81.  The court then turned to "scrutiniz[ing] NBC's claim of privilege, as posed against the interests of defendants in a criminal trial." *Id.* at 1181.  The court began by noting that where that where "there is no confidential source or information at stake, the identification of First Amendment interests is a more elusive task," and stated that it had "been referred to no authoritative sources demonstrating or explaining how any chilling effect could result from the disclosure of statements made for publication without any expectation of confidentiality." *Id.*  The court nonetheless accepted as valid NBC's claim of four other interests implicated by the disclosure – the same four interests on which Audiation relies on the first page of its November 30 memorandum – and said that in those interests it "discern[ed] a lurking and subtle threat to journalists and their employers if disclosure of outtakes, notes, and other unused information, even if nonconfidential, becomes routine and casually, if not cavalierly, compelled." *Id.* at 1182.  The court then turned to the Defendants' rights and interests and stated:

> At stake on the defendants' side of the equation are their constitutional rights to a fair trial under the Fifth Amendment and to compulsory process and effective confrontation and cross-examination of adverse

17

1
2
3
4

witnesses under the Sixth Amendment.  No one or all of NBC's asserted First Amendment interests can be said to outweigh these very considerable interests of the defendants. . . .  We therefore hold that the district court correctly determined that any First Amendment interest of NBC did not outweigh the defendants' interests in the production of the subpoenaed material.

5

*Id.*; *see also United States v. Burke*, 700 F.2d 70, 77 (2d Cir. 1983) ("a criminal

6

defendant has more at stake than a civil litigant and the evidentiary needs of a

7

criminal defendant may weigh more heavily in the balance").[4]  The court in *LaRouche*

8

*Campaign* also rejected NBC's argument that its holding would allow for production

9

of press materials in the "ordinary run of cases," stating:

10
11
12
13

The factors narrowing our holding are that this is a criminal case; the materials sought concern a major witness who was closely connected with the defendants in activities that are the subject of their indictment; the witness is predictably – from his past testimony – hostile; and the material sought is an extensive interview likely to offer the basis for impeachment.

14

*Id.* at 1182.  This holding and reasoning, including application of the balancing test,

15

applies with equal force in this case.

16

The Third Circuit's opinion in *United States v. Criden*, 633 F.2d 346 (3d Cir.

17

1981), is to the same effect, though it dealt with disclosing a confidential source.

18

There the court "emphasized that special circumstances exist in a criminal case that

19

must be considered in evaluating a witness' claim of journalists' privilege.

20

Specifically, the trial court must consider whether the reporter is alleged to possess

21

22
23
24
25
26
27
28

[4] In its reply, Audiation will likely rely on *Burke*, a rare criminal case in which a court upheld invocation of the reporter's privilege.  However, the basis for the holding in *Burke* was that the materials sought were cumulative, 700 F.2d at 77-78, which is not so here.  Furthermore, in *United States v. Cutler*, 6 F.3d 67, 73 (2d Cir. 1993), the Second Circuit said *Burke* "should . . . be considered as limited to its facts," rejected assertion of the reporter's privilege, and ordered the production of a reporter's notes and interview outtakes.  *See also United States v. Treacy*, 639 F.3d 32, 43-45 (2d Cir. 2011) (holding that criminal defendant's Sixth Amendment confrontation rights trumped the reporter's privilege).

evidence relevant to the criminal proceeding and the effect of disclosure on two important constitutionally based concerns:  the journalist's privilege not to disclose confidential sources and *the constitutional right of a criminal defendant to every reasonable opportunity to develop and uncover exculpatory information*." *Id.* at 348 (emphasis added).  The court then noted that the Supreme Court had repeatedly stated that "evidentiary privileges in litigation are not favored," because they "are in derogation of the truth," *id.* at 357 (cleaned up), and pointed out that the Supreme "Court has placed particular emphasis on the production of evidence in criminal trials.  It has grounded this need for evidence on both the confrontation and compulsory process clauses of the sixth amendment and on the due process clause of the fifth amendment.  To protect these constitutionally-founded rights, courts must assure that all relevant and admissible evidence is produced." *Id.* (citing *Nixon*, 418 U.S. at 711).  Applying these principles, the court held that a journalist was required to appear as a trial witness.  633 F.2d at 359-60; *see also United States v. Cuthbertson*, 630 F.3d 139, 147-48 (3d Cir. 1980) (same); *cf. Delaney v. Superior Court*, 50 Cal. 3d 785, 805 (1990) (same with respect to California's "shield law").  Again, this reasoning and holding applies with equal force in this case.

## III.   Audiation's Privilege Claim Also Fails Under *Shoen II's* Test For Civil Cases

As mentioned, Audiation anchors its argument to the test set out in *Shoen II*, even though (1) the Ninth Circuit repeatedly stated in that opinion that the test set out therein applies in civil cases, and (2) *Branzburg*, *Farr*, and the other cases discussed above indicate that in the criminal case context a court should balance the claimed press needs against the criminal defendant's compelling constitutional rights.  But even if the Court applies *Shoen II's* three-factor test, disclosure of the Francis interview recordings is still required.  Below, the Defendants address Audiation's arguments with respect to each of *Shoen II's* factors.

### A.   **"Unavailability Through Reasonable Alternative Sources"**

With respect to the first factor, Audiation claims the Defendants "cannot demonstrate that [they have] exhausted all reasonable alternative sources for the information [they] seek[]" because "Francis himself is an obvious alternative source of the information." 11/30/21 Audiation Memo. at 8 (Doc. #635-1). There are two responses.

First, the Defendants are not just seeking "information," they are seeking recordings of prior statements made by Francis. As the Third Circuit recognized in *United States v. Cuthbertson*, 630 F.3d 139 (3d Cir. 1980), recorded verbatim statements, are, "[b]y their very nature . . . not obtainable from any other source:"

> They are unique bits of evidence that are frozen at a particular place and time. Even if the defendants attempted to interview all of the government witnesses and the witnesses cooperated with them, the defendants would not obtain the particular statements that may be useful for impeachment purposes at trial. Thus, we think that the defendants have met their burden of establishing that the information that the district court ordered produced for in camera review is not available from another, unprivileged source.

*Id.* at 148; *see also Doe v. Kohn Nast & Graf, P.C.*, 853 F. Supp. 147, 150 (E.D. Pa. 1994) (same). This conclusion has extra weight here because of Francis's penchant for dishonesty.

Second, Audiation supports its argument in this context by citing two civil cases in which the courts held that the parties seeking information couldn't overcome the journalist's privilege because they could obtain the information by deposing a non-reporter witness. *See* 11/30/21 Audiation Memo. at 8 (Doc. #635-1) (citing *Shoen I*, 5 F.3d at 1297-98, and *Carushka, Inc. v. Premiere Products, Inc.*, 1989 WL 253565, *3 (C.D. Cal. Sept. 1, 1989)). That isn't possible here. Furthermore, in neither case cited by Audiation were the parties seeking recorded verbatim prior statements of a key trial witness.

//

//

### B. "Noncumulative"

Audiation next claims the Defendants "cannot meet [their] burden of demonstrating that" the "interview recordings are non-cumulative because the interview recordings merely repeat Mr. Francis's testimony." 11/30/21 Audiation Memo. at 8 (Doc. #635-1).

As an initial matter, the Defendants don't know what Audiation means by "repeat[ing] Mr. Francis's testimony." If Audiation means that Francis's future trial testimony will cover everything that is covered in the complete recordings of his interviews, that is hard to believe. But if true, Audiation has no interest in "protecting" information Francis will reveal during his trial testimony.

At any rate, it is obvious that many of the things the Defendants will raise with Mr. Francis on cross-examination based on the recordings will not be covered – at least forthrightly – in his direct examination. Furthermore, and as discussed above, Francis made many statements during the interviews for which there is no other evidence, including with respect to (1) benefits he received from the government, (2) lying about his illness to remain on "medical furlough," (3) his willful violations of his plea agreement, and (4) his withholding key evidence. The recordings also contain statements that will undoubtedly be inconsistent with Francis's trial testimony, as shown by statements Francis has already made to government agents.

### C. "Relevant To An Important Issue In The Case"

With respect to whether the recordings contain evidence that is "relevant to an important issue in the case," it bears noting that this Court already made at least a preliminary relevance finding when it found the *Nixon* factors were satisfied. And the examples from the podcasts discussed above, as well as a review of the podcast transcripts, show there is a great deal of evidence contained in the Francis recordings that is "relevant to an important issue in the case."

Perhaps realizing it cannot win with *Shoen II's* test, Audiation misstates that test. Specifically, it says that "[t]o demonstrate relevance" in this context "the

1  subpoenaing party must show that the testimony at issue 'go[es] to the 'heart of the

2  matter' and is 'crucial to the case.'" 11/30/21 Audiation Memo. at 9 (Doc. #635-1)

3  (quoting *Zerilli v. Smith*, 656 F.2d 705, 713 (D.C. Cir. 1981)). As discussed above,

4  in *Shoen II* the Ninth Circuit rejected the argument that to overcome the limited

5  journalist's privilege a party seeking disclosure must show the "requested information

6  goes to the heart of the seeker's case." *Shoen II*, 48 F.3d at 415 (quotation omitted).

7  Furthermore, the Ninth Circuit explicitly rejected the test set out in the D.C. Circuit's

8  *Zerelli* case in circumstances in which a party does not seek the identity of a

9  confidential source. Yet Audiation relies on *Zerilli's* test here, even though the

10 Defendants are not seeking the identity of a confidential source.[5]

11      Applying the wrong standard, Audiation then claims the Francis recordings are

12 "not crucial to the defense" because the Defendants are "not even mentioned in the

13 podcast" episodes. 11/30/21 Audiation Memo. at 9 (Doc. #635-1). As an initial

14 matter, Audiation's use of the language "podcast" suggests that the Defendants *are*

15 *mentioned* in the complete Francis interview recordings. That inference is supported

16 by Audiation's earlier statement (discussed above) that seems to amount to saying

17 that Francis's trial testimony will "repeat" what he said in the unreleased recordings.

18 If that is correct, then the unreleased recordings must contain Francis statements

19 _____

20      [5] Audiation makes the same mistake at the outset of its memorandum, when it
cites a California case, *Mitchell v. Superior Court*, 37 Cal. 3d 268, 282 (1984), to

21 support its "goes-to-the-heart-of-the-case" argument. 11/30/21 Audiation Memo. at

22 2 (Doc. #635-1). The opening sentence in *Mitchell* says it deals with "a discovery
order [in a civil case] requiring petitioners to produce documents revealing

23 *confidential sources of information*." *Id.* at 272 (emphasis added). And in *Delaney*

24 *v. Superior Court*, 50 Cal. 3d 785, 808 (1990), the California Supreme Court
addressed the scope of the reporter's privilege under California's "shield law" in a

25 criminal case and held that to overcome the privilege "a criminal defendant must

26 show *a reasonable possibility* the information will materially assist his defense. A

27 criminal defendant *is not required to show that the information goes to the heart of*
*his case*."

28

about the Defendants, which is an additional factor weighing in favor of disclosure. But whether Francis mentioned the Defendants in any portion of the recorded interviews is immaterial to the outcome here.   As discussed above, the pocast episodes, and the unreleased recordings, are replete with Francis statements that are relevant to the defense.

Audiation's next argument is also based on the wrong test.  Specifically, it argues that the recordings are not "crucial to the defense" because they "are likely not even admissible as evidence because they constitute hearsay."  11/30/21 Audiation Memo. at 9 (Doc. #635-1).  As an initial matter, the Court has already ruled on the admissibility issue, when it applied the *Nixon* factors and authorized issuance of the subpoena.  Furthermore, Audiation's argument is specious, most obviously because evidence of prior inconsistent statements and statements against penal interest are not barred by the hearsay rule, nor are statements evidencing (1) benefits Francis received from the government, (2) that Francis has lied to this Court about his health, (3) that Francis has willfully violated his plea agreement, and (4) that Francis is withholding key evidence from the government.

Finally, Audiation claims that "[a]t most, Defendant[s] seek[] this information to impeach a government witness, but the desire to fish for possible impeachment evidence repeatedly has been found inadequate to overcome the First Amendment qualified privilege."  11/30/21 Audiation Memo. at 9 (Doc. #635-1).  To support its diminution of "impeachment" evidence, Audiation says, "[f]or example, in *Shoen II*, the Ninth Circuit rejected the notion that potential impeachment of the defendant was an interest that could overcome the First Amendment qualified privilege because the impeachment of the defendant through interview notes was not 'an important issue in the case.'"  11/30/21 Audiation Memo. at 9-10 (Doc. #635-1) (quoting *Shoen II*, 48 F.3d at 418).  There are several responses.

//

//

1    First, the Defendants aren't "fishing for possible" evidence, the evidence is in
2    the recordings, as shown by the podcasts, the discussion above, and this Court's
3    finding that the *Nixon* factors were met.

4    Second, in the portion of *Shoen II* cited by Audiation the court rejected the
5    plaintiffs' argument that they needed disclosure of the interview materials to show
6    their father/the defendant lied when he stated "during [his] deposition that he loved
7    his sons [the plaintiffs]," because any such lie was entirely "collateral" to the issues
8    in the case. *Shoen II*, 48 F.3d at 418.  The Defendants are not seeking evidence of
9    such a collateral and trivial lie.

10   Third, *Shoen II* doesn't hold that "impeachment" evidence can never be
11   considered "relevant to an important issue in the case."   Indeed, the Sixth
12   Amendment's confrontation clause guarantees a criminal defendant the right "to delve
13   into [a] witness' story to test the witness' perceptions and memory" and "to impeach,
14   *i.e.*, discredit, the witness." *Davis v. Alaska*, 415 U.S. 308, 316 (1974).  Consistent
15   with that, several Supreme Court cases hold "that a prohibition on cross-examination
16   is highly suspect, even when there is a competing interest present that would be
17   infringed if cross-examination is allowed." *Shine v. Cambra*, 1999 WL 252475, *4
18   (N.D. Cal. 1999) (rejecting assertion of journalist's privilege and citing *Davis*, 415
19   U.S. at 308, *Chambers v. Mississippi*, 410 U.S. 284, 295 (1973), and *Douglas v.*
20   *Alabama*, 380 U.S. 415 (1965)).

21   Considering this case law, Audiation's denigration of a criminal defendant's
22   right to impeach a witness – particularly in the manner anticipated for Mr. Francis –
23   is meritless. *See also Doe v. Kohn Nast & Graf, P.C.*, 853 F. Supp. 147 (E.D. Pa.
24   1994) (rejecting assertion of reporter's privilege and stating, "the [reporter's
25   videotaped] interviews, which concern the allegations in the underlying lawsuit, are
26   clearly relevant evidentiary material in this case where plaintiff's credibility will play
27   an important role at the trial," because the recordings "could be used for impeachment
28   //

purposes and would be admissible as admissions under Rule 801(d)(2)(A) of the Federal Rules of Evidence").

## CONCLUSION

Based on the foregoing, the Defendants request the Court order:  (1) the audio/video recordings of the Francis interviews be produced within forty-eight hours; (2) if Audiation fails to comply, a contempt order will be entered and Audiation, Alexander "Sandy" Smallens (on whom the subpoena was served and Audiation's founder and general manager), and intervener Project Brazen will be jointly and severally liable to pay $10,000 per day for each day delinquent; and (3) additional sanctions may be ordered if the delinquency persists.

Respectfully submitted,

Date:  December 6, 2021

/s/ Todd W. Burns
Counsel for James Dolan

/s/ Joseph Dominic Mancano
Counsel for David Newland

/s/ Robert E. Boyce
Counsel for David Lausman

/s/ David S. Wilson
Counsel for Stephen Shedd

/s/ Michael Crowley
Counsel for Mario Herrera

/s/ Thomas Peter O'Brien
/s/ Daniel Prince
Counsel for Bruce Loveless

**CERTIFICATE OF SERVICE**

Undersigned counsel certifies that the foregoing filing is true and accurate to the best of information and belief, and that a copy of the foregoing document has been caused to be delivered this day upon counsel for all parties, including the intervening parties, via CM/ECF.  In addition, the intervening parties' attorney was provided a copy of this filing at alonzowickers@dwt.com and dianapalacios@dwt.com.

Date:  December 6, 2021          */s/ Todd W. Burns*
Burns & Cohan, Attorneys at Law
1350 Columbia St., Suite 600
San Diego, California, 92101
Phone:  619-236-0344
Fax:  619-768-0333
Email: todd@burnsandcohan.com