ROBERT E. BOYCE
State Bar No. 79806
email: rb@boyce-schaefer.com
LAURA G. SCHAEFER
State Bar No. 138801
email: ls@boyce-schaefer.com
BOYCE & SCHAEFER
Attorneys at Law
934 23rd Street
San Diego, CA 92102
619/232-3320

Attorneys for Defendant
DAVID LAUSMAN (6)

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

**(Honorable Janis L. Sammartino)**

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 17CR0623-JLS-6 |
| Plaintiff, | **DEFENDANTS' JOINT MOTION TO DISMISS DUE TO PROSECUTOR MISCONDUCT** |
| v. | **[Related motion Dkt.# 873]** |
| DAVID NEWLAND, et.al. | |
| DAVID LAUSMAN, (6) | |
| Defendant. | |

**DEFENDANTS' JOINT MOTION TO DISMISS**[1]

**I.   INTRODUCTION.**

The prosecution team has repeatedly engaged in misconduct that has severely prejudiced the defendants' ability to receive a fair trial. This misconduct has substantially prejudiced trial defense strategy and trampled on constitutional rights, and, thus the indictment against them must be dismissed. Despite the Court's admonitions that the primary responsibility of the prosecutors here is to do

---

[1] This motion is being filed jointly by Defendants David Newland, James Dolan, Bruce Loveless, David Lausman, and Mario Herrera.

justice, that has not occurred. The prosecutors, instead, have doubled down on their misstatements to the Court, only to argue in their recent submission on *Brady* materials that such repeated misrepresentations are inadvertent. But lightning does not strike the same defendants, the same court, and the same prosecution team twice-or many times. Neither does the involvement of a taint team nor the presence of the front office in courtroom cure the prosecution team's repeated, affirmative misrepresentations to the Court. The government's misconduct is baked-into these proceedings, and in week 11 of trial, it is impossible to unwind the government's intentional-or, at a minimum, reckless-disregard for their obligations here. In short, the government's actions have deprived the defendants of a fundamentally fair trial.

The defense submitted a motion to dismiss based on the prosecution team's 1) violations of its *Brady* obligations by not disclosing exculpatory evidence; 2) presenting a false narrative 3) making false statements and 4) bribing witnesses. Dkt.#873. The defense requests that this motion be considered with the *Brady* motion.

The prosecution has engaged in other misconduct, including making repeated misleading statements and assertions of fact and eliciting improper testimony that, cumulatively, and with the other evidence of misconduct, have irremediably harmed the defendants. In addition to the misconduct described in the defense *Brady* motion, the prosecution has 1) recklessly submitted the false declaration of Mr. Francis certifying records that were not GDMA business records; 2) made misleading statements regarding the authentication and foundation for the admission of these documents; 3) made inaccurate and misleading representations about child pornography on Mr. Sanchez and Mr. Francis' computers and benefits they received; 4) made inaccurate representations regarding immunity it provided to Gillett; 5) made misleading representations regarding the use of agents as summary witnesses and presented Agent DeLaPena

as a summary witness; and 6) elicited improper opinions that the defendants accepted bribes and were in a conspiracy. The defendants recognize that the Court has in some instances already ruled on these issues and is not asking the Court to revisit them. The defense requests these issues be considered in conjunction with the Brady motion as to their prejudicial effect on the defendants' ability to receive a fair trial in this case.

## II. RELEVANT LEGAL STANDARD.

Under *U.S. Bundy*, 968 F.3d 1019, 1030 (9th. Cir. 2020), the Court may dismiss an indictment with prejudice (1) to implement a remedy for the violation of a recognized statutory or constitutional right; (2) to preserve judicial integrity by ensuring that conviction rests on appropriate considerations; and (3) to deter future illegal conduct. To dismiss an action for prosecutorial misconduct for a *Brady* violation, the district court must find (1) "flagrant misconduct" and (2) "substantial prejudice" to the accused. *Id*. at 1031. Both are present here.

## III. THE GOVERNMENT HAS MADE MISLEADING ASSERTIONS OF FACT, MISLED THE COURT, AND ELICITED IMPROPER OPINION AND SUMMARY WITNESS TESTIMONY.

### A. The government has made inaccurate representations about child pornography found on Mr. Sanchez and Mr. Francis' computers and benefits they received.

**Sanchez Computers**: The Court recently tentatively ruled that the prosecution misrepresented facts relating to the existence of child pornography on Mr. Sanchez's computer and that the government failed to produce in discovery evidence of the same. The Court announced its proposed sanction for this misconduct. May 11, 2022 hearing.  Those issues related to Mr. Sanchez's possession of child pornography have been briefed (see, Dolan Supplemental Memorandum related to Lausman's Brady motion, Dkt ## 851, 884) and are incorporated by reference.

When taken in the light of the prosecution's overall misconduct, the prosecution's behavior regarding Mr. Sanchez weighs in favor of dismissal -

indeed, even a limiting instruction cannot cure the defects in this case and the violation of defendants' constitutional rights.

In brief, the prosecution misrepresented that law enforcement had concluded that Mr. Sanchez did not have child pornography on his computer and used that to obtain a favorable ruling from the Court. *See* Dkt. # 851 at 3-4. It was only after the defense again policed the government on its misrepresentations after noting that Mr. Sanchez had an additional provision in his plea agreement protecting him from possession of unauthorized electronic data that the truth came to light: that the government's representations regarding the content on Mr. Sanchez's computer were not true. *See* Dkt. # 884. But even as of May 11, 2022, the lead prosecutor here continued to "double down" on misrepresentations to the Court, claiming that the additional language in the Sanchez plea agreement had to do with classified information, not child pornography (which disregards the fact that virtually every other plea agreement in this case concerns the dissemination of classified information, but *no* other plea agreement includes a veiled carve-out for "unauthorized" material like child pornography).

**Francis' computer**: The government, through Agent Mark Luque, submitted files from a Francis computer and from media seized in GDMA offices in Thailand to NCMEC for review in November 2021, after the defense notified the government of potential child pornography. On December 8, 2021, Mr. Pletcher wrote in a letter to defense counsel: "Upon receipt, NCMEC compared the submitted files with NCMEC's Child Recognition and Identification System, which returned no positive results. As a result, NCMEC concluded that it 'has no information pertaining to any of the individuals seen within the submitted files.' While this is not necessarily a conclusive determination, it does provide further support that neither the United States nor Cornerstone Discovery, nor any Defendant is in knowing possession of contraband."

This is a misleading interpretation of what NCMEC's analysis shows. NCMEC's analysis concluded only that it did not possess information regarding the specific individuals depicted in the files – NCMEC could not associate the files with known victims. Just because the child victims are not "known" does not make them any less victims. In fact, it is arguably worse, because it suggests there are unknown children out there being molested. This issue has been briefed, but it is part of the pattern of misleading and inaccurate statements by the prosecution team. See Dkt. #851, incorporated by reference.[2]

### B. The government submitted the false declaration of Mr. Francis certifying GDMA business records and made misleading representations regarding the records.

**The filing of the false certification from Mr. Francis**. The government produced a list of more than 2500 documents that it represented were individually reviewed by Leonard Francis and certified as GDMA business records. Dkt. #601. After conducting a detailed and time-consuming analysis, the defense determined that there were documents on the list that were not GDMA business records – in fact there were records seized from Facebook or the Blue Ridge that were never in GDMA's files. Dkt. #603.

Once the government's inaccurate representation about the list was discovered, the government then represented to the Court that the original list that Francis certified inadvertently included more than "just those reviewed GDMA business records." Describing this as an innocent mix-up, the government submitted a new list of documents allegedly certified as GDMA business records. Dkt. #622 at 9. The new and different list did not just remove non-GDMA documents, it also included additional new documents. Despite representing that all the documents had been made available or provided in discovery, a number of

---

[2] It is disturbing that the government has turned a blind eye to Mr. Francis' possession of these images, especially in light of the fact that he currently has custody of minor children in his private condominium while he awaits sentencing.

-5-

documents were not even previously produced. This was the first of many "inadvertent" oversights, "dropping the ball" and "mistakes."

**Misleading statements that no emails were doctored**. The defense sought to impeach Mr. Francis statements by playing a tape of a portion of the Podcast where Mr. Francis stated that Agent Beliveau had informed him he had been indicted in the United States, and advised him "on how to evade and clean up" all the servers and do "counter intelligence" on them. Dolan Exhibit 451-1. The government moved to exclude this evidence, stating that Mr. Francis did not state that he "altered or deleted" emails. Dkt.# 786, p. 10. The defense opposed the motion to exclude. Dkt.#787.

During argument on the motion, Mr. Pletcher stated that "Your Honor, the premise of the motion is that Leonard Francis doctored emails or other documents that he changed, altered or forged them in some way. . . They were not deleted. By hook or crook, we have them. It's not that they're doctored or changed." Reporter's Transcript of March 21, 2022 AM hearing, p. 9-10.

That statement was not accurate. Agent DeLaPena later volunteered on cross-examination that he was aware that Mr. Francis "cut and paste" at least one email from GDMA servers. This doctored email from Mr. Francis to Howard Patty suggested that Mr. Francis talked to Mr. Lausman himself, and not Mr. Shedd, about the Vladivostok husbanding contract, falsely stating that "I" (Mr. Francis) talked to Mr. Lausman who had some "heated, heated conversations" with FISC representatives about the Vladivostok protest.[3] Lausman Exhibits 34, 39.1 and 39.2. Agent DeLaPena even asked Mr. Francis about this conversation with Mr. Lausman. At that time, Mr. Francis did not tell Agent DeLaPena that this email to Howard Patty was a "cut and paste" of Mr. Shedd's email to Mr. Francis. Thus, it

---

[3] Mr. Shedd claims in his email he talked to Mr. Lausman, but of course, that does not mean that actually happened either, particularly since we now know he has perjured himself.

appears the government knew or should have known that this, and perhaps, other emails had been doctored or "cut and paste."

The government's case consists largely of emails between Mr. Francis and his "three 0-4s," Mr. Aruffo, Mr. Shedd and Mr. Sanchez. Some emails reference the defendants, and they are being spun by these individuals as being incriminating to the defendants. The authenticity and veracity of these emails describing events that occurred over a decade ago are critical to the case. It is troubling that there is evidence that *any* of these emails may have been doctored, that this was a practice employed by Mr. Francis with respect to his "business records" and that the government was aware of this, but omitted it when seeking authentication of these records from the Court. The government also neglected to advise the Court when it sought a ruling on the admission of these thousands of documents that it was not certain it would call Mr. Francis as a witness.

**Misleading assurances that a proper foundation would be made for the source of the GDMA records**: The government represented that Agent DeLaPena would testify that "he seized the materials from Leonard Francis' computers." Reporter's Transcript, March, 30 2022 at 85. Agent DeLaPena testified that he was not present when agents seized the computers and digital devices from Mr. Francis in the United States. Agent DeLaPena was not present when computers or drives were seized or collected from Singapore. And Agent DeLaPena was not present when Mr. Francis' investigator purportedly collected "binders" or "boxes" of documents from GDMA's offices in Singapore after his arrest. Agent DeLaPena testified that the "GDMA Finance Department" collected these documents from their Singapore office. Agent DeLaPena does not have any first-hand knowledge of what the GDMA Finance Department did, who was involved or how they did it. Mr. DeLaPena's testimony about the source of most of the documents he offered was based on hearsay – what another agent or Francis' lawyers and investigator told him.

**Authentication of the Singapore digital media**: The government submitted various certifications from law enforcement agents certifying copies of digital media and represented that those materials were from the "GDMA servers." Dkt. #601, Dkt. #622, Dkt. #686. The defense conducted a detailed and time-consuming analysis to once again determine that the items allegedly copied did not appear to be from the GDMA servers. The government then was forced to acknowledge that its certification regarding the "Singapore Server" was insufficient as it was awaiting a certification from Singapore. Dkt. #622 at 9.

When the certification from Singapore was provided, it failed to provide any link between where the items were seized and anything in the United States' possession/evidence inventory. Dkt. #705. Significantly, the items in the certification from Singapore were not linked - by any person with knowledge - to the GDMA servers nor were they linked to any of the government's evidence. The court held that the government's certifications were not sufficient. Reporter's Transcript Feb. 17, 2022 at 12.

During the hearing, the government, acknowledging again that its certifications were inaccurate, represented that the government would call "Mr. Francis' private investigator" to establish what the items were, where they came from, and that they were related to the GDMA servers as the government had represented. *Id.* at 22: "Absolutely, we agree that that investigator would have to testify as to his efforts to secure that information from GDMA and bring it to us to copy."

That has not and will not be done. The government did not present the testimony of "Mr. Francis' private investigator" but introduced dozens of documents from that data set. The investigator is not on the government's remaining witnesses list.

The government represented, through Agent DeLaPena, that some unidentified data set allegedly from Singapore was the same as the data set

produced to the government by Leonard Francis' lawyers.

Agent DeLaPena did not have personal knowledge of the original source (purportedly the GDMA servers) of the items alleged to be the data set from Singapore. Agent DeLaPena testified that he compared – document by document - millions of documents from these two data sources and determined them to be identical. The defense has not found a single report of investigation to corroborate that Agent DeLaPena conducted this document by document comparison of millions of records and it is humanly impossible for Mr. DeLaPena to have made this comparison of millions of documents.

### C. The government made inaccurate representations about immunity for Alex Gillett and instructed him not to create Brady information.

In response to the defense request for jury instruction 4.9 (testimony of witnesses involving special circumstances) the government stated (Oct. 1, 2021): "The United States does not anticipate presenting testimony from any witness who received immunity. The United States does not object to using the other clauses of the instruction to the extent justified by the evidence at trial." Dkt. #594, p. 8.

Discovery provided by the government in February demonstrates that the government agreed not to prosecute Gillett in the U.S. in exchange for his cooperation and agreement to testify. See marked collectively as Exhibit A, Mr. Pletcher's email to Mr. Gillett's lawyer dated Aug. 27, 2021: "Unfortunately, this [trial testimony by Gillett] is not a voluntary obligation of Mr. Gillett's. He was served with compulsory process in the United States to testify at this trial, he was rewarded by the Court in Australia for his commitment to ongoing cooperation with the matter, not to mention that as part of our agreement not to prosecute him in the United States, he promised to meet this obligation." and Mr. Huie's letter to Australian Federal Prosecutor Tom Ellison dated Dec. 7, 2018, "given Mr. Gillett's prosecution in Australia and his pledge to be interviewed and cooperate fully with our investigation, we do not regard Mr. Gillett as a potential defendant

in the United States."

Beyond this issue, and despite a week-long evidentiary hearing on *Brady* violations, the government now appears to be instructing witnesses *not* to create *Brady* materials so that the government can avoid its obligation to produce such information to the defendants. *See, e.g.* Ex. B (Ms. Chu instructing Gillett to "please refrain from writing substantive emails about your testimony, so that we can have a chance to talk through any questions you may have."). As already noted, the prosecution has an obligation to learn of evidence favorable to the defense and disclose it. *Bundy*, 968 F.3d at 1038. It should not be instructing witnesses not to create discoverable information in an effort to avoid this obligation.

Indeed, the prosecution's instruction is more of a continued effort to force both the Court and the defense to rely on the governments Reports of Investigation ("ROI"). This causes multiple issues, including that (a) the government does not produce ROIs with exculpatory information, as evidenced with Ynah and Mr. Sanchez, (b) several of the government's ROIs provide no information other than "prepared for trial testimony," (*See* Ex. C) and (c) at least one witness has testified that the government did not record their statements in the ROIs. See, e.g. Shedd testimony, May 10, 2022 am, pages 36-40.

**D.     The government made misleading representations regarding the use of agents as summary witnesses.**

The government moved in limine to call multiple case agents each repeatedly to testify as "introductory or summary witnesses." Dkt # 528 at 3-4. The court limited the government to one case agent but did not expressly address the substance of the testimony. See, Reporters Transcript September 2, 2021, at 32.

The government renewed its motion to call two case agents and have them testify in installments, summarizing the government's anticipated testimony. "Between each case agent installment, other expert, lay, cooperator, agent, or

percipient witnesses. . . ." Dkt. #601. The court again denied the request to call two agents multiple times, permitting the government to call only one case agent to testify once. Reporter's Transcript Nov. 18, 2021 at 34.

During trial, and no longer referring to "summary witnesses," the government filed a "notice" that it would call Agent DeLaPena to admit hundreds of documents and emails in evidence and to testify regarding the "import of those documents to the investigation and the indictment of the defendants." Dkt. #797. The defense again objected to the proposed testimony as improper summary/overview testimony. Dkt. # 807. The Court expressed serious reservations about the testimony the government was proposing. Reporter's Transcript, March 30, 2022 at 88: "That makes me nervous, Mr. Pletcher. It makes me uncomfortable." In response, the government represented that Agent DeLaPena would testify to what he did, not what other people told him, and that he would not be interpreting anything. Id. at 91.

In fact, Agent DeLaPena was a summary witness; he was a conduit for the presentation of Mr. Francis' emails, likely because the government knew it would not call Mr. Francis to testify. Agent DeLaPena described the contents of the emails and, when he was able, their meaning within the context of the case. The defense was forced to be vigilant and lodge serial objections to the agents' testimony, causing the jury to infer the defense had something to hide. Most of what Agent DeLaPena knew about the evidence offered through his testimony was derived from the hundreds of hours the agent spent with Mr. Francis or from what other agents told him, despite the government's representation that he would not testify about what other people told him and that he would not be a summary witness.

////

////

### E. Eliciting improper and inadmissible opinions that the defendants were "conspirators" who accepted bribes and referring to the defendants collectively as "others" and "the O-6's."

The prosecutor elicited improper opinions that the defendants accepted bribes from Mr. Francis:

> Q. Based on your observations, personal knowledge, Mr. Aruffo, was Defendant David Newland one of those people who received bribes from Leonard Francis?
>
> A. Yes, sir.

Reporter's transcript March 9 am, p. 12.

> Q. In return for these bribes, Mr. Aruffo, did you agree with others to assist Leonard Francis in his ship husbanding business
>
> A. Yes, sir, we did.

*Id*. at 13.

> Q: Mr. Aruffo, in answer to the question, in return for these bribes, did you and the others agree to assist Leonard Francis in his ship husbanding business, you answered yes. Did those individuals with whom you agreed include defendant David Newland?
> A. Yes sir.

*Id.* at 21.

The prosecutor also elicited Mr. Aruffo's testimony that there was a conspiracy:

> Q: Did you and the other members of the conspiracy that we just discussed receive lavish dining experiences?
>
> MR. MANCANO: Objection to the use of conspiracy. It's a legal conclusion, one that the jury is required to give.
>
> THE COURT: Overruled. Overruled.

*Id*. at 28.

> Q: I'm going to, Mr. Aruffo, from here on forward refer to all of those individuals as co-conspirators. Okay?
>
> A. I understand.

*Id*. at 23.

These are only representative examples of the improper opinions elicited. Testimony that the witness and unspecified others committed bribery and were in a conspiracy is inadmissible because whether certain conduct constitutes bribery or conspiracy is a legal conclusion. *United States v. Knigge*, 832 F.2d 1100, 1109 (9th Cir. 1987), amended on other grounds, 846 F.2d 591 (9th Cir. 1988); *United States v. Hanna*, 293 F.3d 1080, 1085 (9th Cir. 2002) [conviction reversed on the charge of making threats against the President for permitting Secret Service agents to testify that they understood the defendant's communications to be serious threats to kill him.] The defense briefed this for the Court, and the Court agreed this was improper. Dkt#780. The defense requests that the Court consider this with the other instances of improper conduct.

The prosecution also repeatedly phrased questions vaguely in terms of the collective "others" or "the O-6s." See e.g; Reporter's Transcript March 9 am, at 13, 20-23; Reporter's Transcript May 4 am, at 16: "Q: And in advance of this port visit, did you coordinate with the O-6s as you described doing before? A: Yes."; Id. at 29, 42, 65, 71. Guilt is individual to the accused, even in a conspiracy case. The prosecutor's repeated references to the others and "the O-6's" is non-specific and improper.

////
////
////
////

## IV. CONCLUSION.

The government prosecutors have made repeated false and misleading statements to the court, and elicited improper testimony. Considered cumulatively, these and the other very serious issues raised in the *Brady* motion warrant the grant of a mistrial and dismissal.

Respectfully submitted,

Dated: May 13, 2022

/s/ Laura Schaefer
/s/ Robert E. Boyce
Counsel for David Lausman

/s/ Michael L. Crowley
Counsel for Mario Herrera

/s/ Joseph Dominic Mancano
Counsel for David Newland

/s/ Todd W. Burns
Counsel for James Dolan

/s/ Thomas Peter O'Brien
/s/ Ivy Wang
/s/ Daniel Prince
Counsel for Bruce Loveless