UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                          Plaintiff,<br><br>v.<br><br>DAVID NEWLAND, et al.,<br><br>                          Defendants. | Case No.: 17-CR-623 JLS<br><br>**ORDER REGARDING DEFENDANTS' JOINT MOTIONS TO DISMISS (1) FOR FALSE STATEMENTS TO THE COURT; *BRADY* VIOLATIONS; FAILURE TO CORRECT FALSE NARRATIVE; AND BRIBERY OF WITNESSES; AND (2) DUE TO PROSECUTOR MISCONDUCT**<br><br>(ECF Nos. 873, 902) |

On April 20, 2022, Defendant Lausman filed a Motion to Preclude Presentation of False and Irrelevant Evidence and Request for an Evidentiary Hearing re *Brady* Violation (the "*Brady* Motion") (ECF No. 844). The Court granted Defendant Lausman's request for an evidentiary hearing and ordered the Government to install a taint team to handle the *Brady* Motion. *See* ECF No. 848. The Court held a three-day evidentiary hearing on April 26–28, 2022. *See* ECF Nos. 857–60. Defendants' Joint Motion to Dismiss for (1) False Statements to the Court; (2) *Brady* Violations; (3) Failure to Correct False Narrative; and

(4) Bribery of Witnesses (the "Omnibus Motion") (ECF No. 873), and Defendants' Joint Motion to Dismiss Due to Prosecutor Misconduct (the "Misconduct Motion") (ECF No. 902), followed.  Also before the Court are Defendant Loveless's Supplemental Brief Regarding the Omnibus Motion (ECF No. 921), Defendant Loveless's Supplemental Brief Regarding the Misconduct Motion (ECF No. 920), and Defendant Dolan's Supplemental Brief Regarding the *Brady* Motion (ECF No. 851).  The Court granted all Defendants' requests for joinder in these matters.  The Government taint team filed an Opposition to the Omnibus Motion (ECF No. 896), and the Government prosecutorial team filed an Opposition to the Misconduct Motion (ECF No. 931).  After considering the Parties' arguments, the evidence, and the testimony from the evidentiary hearing, the Court rules as follows.

## BACKGROUND

The Court and the Parties are familiar with the factual and procedural background of this case.  Therefore, the Court only recounts the facts and procedural history relevant to the three main issues raised in the present Motions and explored at the evidentiary hearing: (1) federal agents' communication with Christy Tabancura ("Ynah"); (2) federal agents' offer to pay foreign witnesses to come to the United States to testify at trial; and (3) Jose Sanchez's possession of child pornography.

### I.     Ynah

The Government alleged in Overt Act 118 of the Indictment that in May 2008 in Manila, Philippines, Defendants Dolan, Loveless, and Lausman attended "a raging multi-day party, with a rotating carousel of prostitutes," hosted by Leonard Francis ("Francis").  ECF No 1 ¶ A118.  The Government alleged that Ynah was the prostitute who provided services to Defendant Lausman.  This is the only allegation in the Indictment that Defendant Lausman accepted the services of a prostitute as a bribe.  On March 2, 2022, the Government asserted in its opening statement that "Defendant[] Lausman's wife Carol didn't come to Manila, and so Defendant Lausman partied along with the rest of the

///

members of the conspiracy . . . and in Manila he accepted a prostitute from Leonard Francis as well." Transcript of Gov't Opening Statement at 31 (Mar. 2, 2022).

On March 4 and 8, 2022, just days after the Government's opening statement, federal agents Jill Kelley and Oscar Cunha made contact with Ynah for the first time. Agents Kelley and Cunha testified at the evidentiary hearing that the purpose of contacting Ynah was to invite her to testify at trial, and that they had no intention of conducting a substantive interview over the phone or by text. Ynah declined to travel to the United States to testify; however, Ynah spontaneously texted the following message to federal agents:

> That particular person, he doesn't even look like that he wants me to go with him but Leonard really pushed for it, so I still went with him in his room but nothing happened, I even slept on the couch lol
>
> Reason I did went with him is because I want to get paid ofcourse. So Yeah, told Leonard something happened so I get paid

ECF No. 846-1 at 7–8 (text reproduced verbatim). This statement was a spontaneous disclosure and was not made in response to any question or statement by federal agents.

The agents verbally reported to AUSA Mark Pletcher ("Mr. Pletcher") immediately after these contacts with Ynah and inquired how they should write up the information in a report. Mr. Pletcher advised the agents to "circle back." The agents approached Mr. Pletcher a total of four times regarding writing a report on the Ynah contacts, and each time he told them to follow up with him at a later time. It was only after Defendant Lausman filed the *Brady* Motion on April 20, 2022, that agents prepared an NCIS report regarding the contacts with Ynah, six weeks after the contacts took place. *See* ECF No. 846-1. No evidence was admitted at trial to support the Government's assertion in opening statement that Defendant Lausman accepted the services of a prostitute.

II. **Compensation of Witnesses**

When the Court ordered the Government to turn over agent and prosecutor communications relevant to the *Brady* Motion, Defendants discovered that Agent Cordell

De La Pena instructed other federal agents to offer potential foreign witnesses up to $5,000 to come to the United States to testify. Email evidence shows that Agent De La Pena asked his supervisors whether witnesses could be paid under his agency's policies, and his supervisors indicated they could. Agent De La Pena then instructed other agents to raise the prospect a cash payment with overseas witnesses, but ultimately no witnesses agreed to testify and no payments were made. At the evidentiary hearing, Agent De La Pena testified that he wanted to offer compensation to foreign witnesses for lost wages and childcare costs.

### III. Child Pornography

Jose Sanchez ("Sanchez") was a Francis coconspirator who cooperated with the Government. The Government admitted dozens of emails between Sanchez and Francis at trial and used these records as evidence that the Defendants participated in the charged conspiracy. Additionally, Sanchez allegedly planned to testify at trial that he saw Defendant Lausman leave the party in Manila with Ynah. Defendant Lausman allegedly told Sanchez the next morning that he did not have sex with Ynah, and that she slept on the couch in his hotel room.

In its motions in limine, the Government represented to the Court that during the electronic processing of Sanchez's computer, "an algorithm flagged certain images on the computer as potential child pornography." ECF No. 528 at 23. However, the Government asserted that law enforcement reviewed the images in consultation with the National Center for Missing and Exploited Children ("NCMEC") and "concluded that the images were not, in fact, child pornography." *Id.*

The Government produced additional discovery around the time of the *Brady* Motion related to Sanchez's alleged possession of child pornography. NCMEC had concluded that the flagged image files on Sanchez's computer did not match any previously identified child pornography, and the usernames and emails associated with Sanchez did not lead to matches in the NCMEC database; however, NCMEC did not find definitively

///

that the files were not child pornography.  The Government did not call Sanchez to testify at trial.

At the evidentiary hearing, Defendants explored both the Government's failure to issue a report regarding Ynah and Agent De La Pena's offer of compensation to foreign witnesses.  Defendants' Omnibus and Misconduct Motions followed.

## SUPPRESSION OF EXCULPATORY MATERIAL

Defendants argue that the Government violated its *Brady* obligation by failing to disclose exculpatory or impeachment material that (1) federal agents communicated with Ynah; (2) federal agents offered to pay foreign witnesses to come to the United States to testify at trial; and (3) Jose Sanchez possessed child pornography and received related nonprosecution benefits.  ECF No. 873 at 15–16; ECF No. 851 at 2.

In *Brady v. Maryland*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  373 U.S. 83, 87 (1963).  There is no violation of *Brady* if disclosure is "made at a time when disclosure would be of value to the accused."  *United States v. Gordon*, 844 F.2d 1397, 1403 (9th Cir. 1988) (quoting *United States v. Davenport*, 753 F.2d 1460, 1462 (9th Cir. 1985)); *see also United States v. Shelton*, 588 F.2d 1242, 1247 (9th Cir. 1978) (holding delay in disclosure only requires reversal if it so prejudiced appellant's preparation or presentation of his defense that he was prevented from receiving a fair trial), *cert. denied*, 442 U.S. 909, 99 (1979).  Additionally, there is no violation of *Brady* if the defendant "has enough information to be able to ascertain the supposed *Brady* material on his own."  *Milke v. Ryan*, 711 F.3d 998, 1017 (9th Cir. 2013) (quoting *United States v. Aichele*, 941 F.2d 761, 764 (9th Cir. 1991)).

"To establish a *Brady* violation, the evidence must be (1) favorable to the accused because it is either exculpatory or impeachment material; (2) suppressed by the government, either willfully or inadvertently; and (3) material or prejudicial." *United States v. Blanco*, 392 F.3d 382, 387 (9th Cir. 2004).  "Failure to disclose information only

constitutes a *Brady* violation if the requested information is 'material' to the defense." *Sanchez v. United States*, 50 F.3d 1448, 1454 (9th Cir. 1995); *United States v. Bundy*, 968 F.3d 1019, 1039 n.7 (9th Cir. 2020) ("[T]he materiality of evidence under *Brady* is an objective inquiry."). The Ninth Circuit has made clear that a court may not apply *Brady*'s appellate materiality standard when evidence emerges mid-trial, as it did here. *See Bundy*, 968 F.3d at 1033 (9th Cir. 2020) (citing *United States v. Olsen*, 704 F.3d 1172, 1183 n.3 (9th Cir. 2013)). Instead, the court must "assess the relative value of the [evidence] on the basis of the indictment, the pretrial proceedings, the opening statements, and the evidence introduced up to that point." *Bundy*, 968 F.3d at 1033.

## I. Ynah

The Court concludes, and the Government concedes, *see* ECF No. 896 at 2–3, that Ynah's statements to federal agents on March 4 and 8, 2022, were exculpatory evidence that the Government had a duty to disclose pursuant to *Brady* and its progeny. Furthermore, such evidence was suppressed by the Government.[1] The Court additionally concludes that the evidence was material, but that the prejudice to Defendants was minimized for several reasons.

First, as to Defendant Lausman, the Government contends that Defendant Lausman had "the same information and more from Ynah before trial and before the prosecution," and therefore there was no *Brady* violation. ECF No. 896 at 3. The Court agrees. Defendant Lausman's investigator contacted Ynah before trial and received more detailed information than the federal agents. Therefore, Defendant Lausman was not prejudiced because he had enough information to ascertain the exculpatory information without the disclosure. *See Rhoades v. Henry*, 598 F.3d 495, 502 (9th Cir. 2010) ("[N]o *Brady* violation occurs when a defendant possessed the information that he claims was withheld.") (citation omitted).

---

[1] Whether the information was suppressed willfully or inadvertently is irrelevant to the *Brady* analysis. *See Blanco*, 392 F.3d at 387. However, the Court finds *infra* that the Government willfully suppressed the evidence regarding Ynah.

Although the Court finds there was no *Brady* violation as to Defendant Lausman, the Government was still obligated to promptly disclose this exculpatory information and correct the statement it made in opening that Defendant Lausman accepted the services of a prostitute. The Court sanctioned the Government for withholding the evidence by striking Defendant Lausman from Overt Act A118 of the Indictment. The Court determined that a curative instruction to the jury remedied the Government's statement during opening. Accordingly, the Court delivered the following instruction to the jury:

> The Court has determined that there is no evidence to sustain the allegation that Defendant Lausman accepted the services of a prostitute at the Makati Shangri-La Hotel in Manila, Philippines. Accordingly, the Court has stricken Defendant Lausman from overt act A118 of the indictment. You must disregard the Government's argument during opening statement that Defendant Lausman accepted the services of a prostitute.
>
> This instruction stems from the Government's failure to timely disclose favorable evidence applicable to Mr. Lausman. You may not consider this instruction as an indication of the Court's view of the allegation set forth in overt act A118 as to any other defendant.

Second, the Court finds there was no violation of *Brady* as to all Defendants because the disclosure came midtrial when the evidence was still of value to the Defendants. The Defendants argue that "the government's contact with Ynah provided exculpatory information to rebut a central premise of the government's case—the exchange of paid sexual encounters for secrets." ECF No. 921 at 2. The Government counters that "[d]isclosure during trial generally satisfies *Brady*." ECF No. 896 at 4.

Examining the evidence objectively, *see Bundy*, 968 F.3d at 1039 n.7, Ynah's statement supports the Government's assertion that Francis provided coconspirators with the services of prostitutes. In Ynah's statement to federal agents, she said Francis "pushed" for her to go with Defendant Lausman to his hotel room, and that she lied to Francis that "something happened," presumably sex, so Francis would pay her more money. *See* ECF No. 846-1 at 7–8. This does not create a "glaring hole in the government's case," as the

Defendants allege, ECF No. 921 at 2, but instead effectively confirms that Ynah attended the party as a prostitute and received payment from Francis to provide prostitution services to the attendees. However, if Defendants wanted to use this evidence to undermine the Government's "sex for secrets" theory, they had ample opportunity to do so. The Defendants had weeks of trial remaining when this evidence came to light.[2] As an additional sanction for failing to timely disclose this evidence, the Court instructed the Parties to meet and confer regarding a stipulation about Ynah's statements to investigators; however, no stipulation or other request regarding Ynah's statements were forthcoming. Therefore, the Court already fashioned an appropriate sanction for the Government's failure to timely disclose this information to Defendants, which Defendants had the ability to utilize during trial.

The midtrial disclosure of evidence regarding federal investigators' contact with Ynah did not constitute a violation of *Brady* resulting in substantial prejudice to Defendants. Defendant Lausman had the same, and likely better, information before the Government, and the other Defendants had time and opportunity to utilize the evidence in their defense. The Court addressed this issue when it arose with a curative instruction, and no further remedy is required at this stage.

**II.     Compensation of Witnesses**

Next, Defendants argue that the Government failed to disclose impeachment evidence that Agent De La Pena instructed other federal agents to offer potential foreign witnesses up to $5,000 to come to the United States to testify. ECF No. 873 at 16. Defendants characterize this as an attempted bribery of witnesses.

Even assuming this evidence was impeachment material suppressed by the Government that was material to the Defendants, there was no due process violation under *Brady*. The Court need not reach the question of whether the offer of payments to potential witnesses was proper because the disclosure of this information came midtrial. There was

---

[2] The disclosure came on April 20, 2022, and closing arguments concluded June 7, 2022.

no violation under *Brady* because "the documents were disclosed to the defendants while they were still of substantial value at trial." *Gordon*, 844 F.2d at 1403. Defendants had ample opportunity to utilize this evidence because Agent De La Pena was subject to recall, and Defendants could examine him about this evidence. Therefore, the Court finds there was no violation of *Brady* or its progeny for the failure to disclose Agent De La Pena's offer of compensation to foreign witnesses.

### III. Child Pornography

Finally, Defendants argue that the Government failed to disclose suspected child pornography images located on devices possessed by Jose Sanchez and the related nonprosecution benefits Sanchez received. ECF No. 851 at 3–5. During trial, the Court found that the Government misrepresented the content of the images located on Sanchez's computer in its motions in limine and that the Government failed to provide timely discovery with respect to the analysis of the images, such as Agent Cunha's emails and Agent Curry's search warrant application.

As a sanction for the untimely disclosure and Defendants' inability to retain an expert to examine the files, the Court informed counsel that the following jury instruction would be given:

> You are about to hear the testimony of Jose Sanchez. The Court has determined that the Government failed to timely disclose information to the Defendants regarding suspected child pornography files located on Mr. Sanchez' computer during a search at his residence in 2013. Because the Defendants have not had sufficient to time to investigate this information, you may assume that the files in question were in fact child pornography.

After this proposed instruction was announced, the Government did not call Sanchez as a witness, and he did not testify at trial. Therefore, Defendants were ultimately not prejudiced by the untimely disclosure because Sanchez did not testify on behalf of the Government. Additionally, at the time of disclosure midtrial, Defendants were fully aware of the nonprosecution benefit contained in Sanchez's plea agreement and still had the

///

ability to use the late-disclosed information in trial.³ *See Gordon*, 844 F.2d at 1403. Thus, the Court concludes no further relief is required under *Brady*.

## PROSECUTORIAL MISCONDUCT

Defendants argue that the Court should exercise its supervisory power to dismiss the Indictment with prejudice because of the Government's flagrant and severely prejudicial misconduct. ECF No. 873 at 27–28. Defendants argue that the prosecution team's misconduct in this matter "has severely prejudiced the defendants' ability to receive a fair trial." ECF No. 902 at 1. Defendants move to dismiss the Indictment on the basis that the Government has (1) created a false narrative, and (2) made false and misleading assertions of fact.

"Under its supervisory powers, a district court may dismiss an indictment with prejudice for prosecutorial misconduct only if there is '(1) flagrant misbehavior and (2) substantial prejudice.'" *Bundy*, 968 F.3d at 1031 (quoting *United States v. Kearns*, 5 F.3d 1251, 1253 (9th Cir. 1993)). The court may invoke its supervisory power in response to outrageous government conduct that "does not rise to the level of a due process violation." *Id.* at 1030 (quoting *United States v. Barrera-Moreno*, 951 F.2d 1089, 1091 (9th Cir. 1991)). However, dismissal with prejudice is the most drastic remedy a Court can impose. *See, e.g.*, *United States v. Isgro*, 974 F.2d 1091, 1097 (9th Cir. 1992) ("Such dismissal [of an indictment with prejudice] exercised under the guise of 'supervisory power' is impermissible absent 'a clear basis in fact and law for doing so.'" (quoting *United States v. Chanen*, 549 F.2d 1306, 1313 (9th Cir. 1977))). To warrant dismissal pursuant to the court's supervisory powers, "government conduct must be so grossly shocking and outrageous as to violate the universal sense of justice." *United States v. Kearns*, 5 F.3d 1251, 1253 (9th Cir. 1993) (citing *United States v. Green*, 962 F.2d 938, 941 (9th Cir. 1992)).

---

³ Furthermore, Defendants did not request the Court fashion an instruction to introduce this information to impeach Sanchez as a hearsay declarant.

### I. False Narrative

Defendants argue that the Government created a "false narrative about prostitution" that "cannot be remedied by an instruction or recalling of government witnesses." ECF No. 873 at 3. The Court already determined that a curative instruction remedied any potential harm to Defendant Lausman based on the Government's statement in opening that he accepted the services of a prostitute. As to the other Defendants, evidence introduced throughout trial supports the Government's assertion that Francis did provide the services of prostitutes to coconspirators. Additionally, the Court found *supra* that the statement by Ynah does not foreclose the possibility that prostitution occurred at the Manila party. She admitted in her statement to investigators that Francis paid her to "go with" Defendant Lausman to his hotel room and do "something." ECF No. 846-1 at 7–8.

Defendants rely on *United States v. Obagi*, 965F. 3d 993, 998 (9th Cir. 2020), to argue that an instruction to disregard evidence and argument is insufficient to cure the harm caused by a prosecutor's presentation of a false narrative. ECF No. 873 at 39. However, the present case is distinguishable from *Obagi*. In *Obagi*, the Ninth Circuit reversed the defendants' convictions because the government failed to disclose until after closing argument that a key cooperating witness had previously cooperated with the government in a similar but separate case. However, the Ninth Circuit said that had the false evidence been discovered "prior to the close of evidence," the presumption that the jury would follow a curative instruction by the court "likely would govern." *Obagi*, 965F. 3d at 997. Here, the disclosure regarding Ynah came in the middle of the Government's case and before any evidence was offered regarding Defendant Lausman accepting the services of a prostitute. The Court issued a curative instruction, and Defendants had sufficient time to use the late disclosed information and argue appropriately.

The Court finds the curative instruction adequately remedied any harm to Defendants created by the Government's argument during opening statement regarding Ynah. The overall narrative that prostitution services were available to coconspirators was

///

sufficiently supported by evidence at trial, and therefore does not warrant the extreme remedy of dismissal.

## II. False Statements

Defendants argue that the Government made false statements to the Court that (1) the alleged prostitutes would not testify because the Court declined to grant them anonymity; and (2) federal agents had contacted Ynah. Defendants also argue that the Government tendered known false evidence in violation of *Napue v. Illinois*, 360 U.S. 264 (1959).

"A claim under *Napue* will succeed when (1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) the false testimony was material." *Henry v. Ryan*, 720 F.3d 1073, 1084 (9th Cir. 2013) (quotations omitted). "Mistaken, inaccurate or rebuttable" testimony does not give rise to a *Napue* claim. *Id.*

As to Defendants' first claim, Defendants point to a statement by the Government that the alleged prostitutes would not testify because the Court denied the Government's motion that they be guaranteed anonymity. Although the Court takes candor to the tribunal seriously, this statement does not rise to the level of "flagrant misbehavior" that would support dismissal of the Indictment as it had no bearing on the evidence or testimony presented at trial. *See Kearns*, 5 F.3d at 1253.

As to the false statements regarding the contact with Ynah, the Court finds that Mr. Pletcher's failure to disclose the Ynah contact amounted to flagrant misconduct. Federal agents approached Mr. Pletcher about the matter on four separate occasions, and he repeatedly rebuffed them. It is clear to the Court that the information was willfully withheld from Defendants and misrepresented to the Court. The Court sanctioned this behavior when it instructed the jury that the curative instruction "stems from the Government's failure to timely disclose favorable evidence applicable to Mr. Lausman." However, the Court finds Defendants have not demonstrated they suffered substantial prejudice. The prejudice to Defendants was minimal and already remedied by a curative

instruction. Accordingly, the Court declines to exercise its supervisory powers and dismiss the Indictment on this basis.

In sum, Defendants have not demonstrated the alleged prosecutorial misconduct substantially prejudiced them. Therefore, the extreme remedy of dismissal is not appropriate.

## CONCLUSION

The Court has implemented lesser sanctions than dismissal to remedy any prejudice Defendants may have suffered. Furthermore, the Court also has sanctioned the Government for its flagrant misconduct. The drastic remedy of dismissal is not warranted under these facts. Accordingly, the Court **DENIES** Defendants' Motions (ECF Nos. 873, 902).

**IT IS SO ORDERED.**

Dated: July 13, 2022

*Janis L. Sammartino*
Hon. Janis L. Sammartino
United States District Judge