TODD W. BURNS
California State Bar No. 194937
todd@burnsandcohan.com
Burns & Cohan, Attorneys at Law
501 West Broadway, Suite 1510
San Diego, California 92101
Telephone: (619) 236-0244
Facsimile: (619) 768-0333

Counsel for James Dolan

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

(HONORABLE JANIS L. SAMMARTINO)

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 17-cr-0623-JLS |
| Plaintiff, | |
| vs. | Date: June 5, 2023 |
| DAVID NEWLAND, *et al.*, | Time: 9:00 a.m. |
| Defendant. | |

DEFENDANTS' JOINT NOTICE OF MOTIONS AND MOTIONS FOR NEW

TRIAL BASED ON GOVERNMENT'S: (1) *BRADY* VIOLATIONS; (2)

PRESENTATION OF SUMMARY TESTIMONY; (3) USE OF

LEONARD FRANCIS TO CERTIFY GDMA "BUSINESS"

RECORDS; (4) PRESENTATION OF FALSE

TESTIMONY; AND (5) CUMULATIVE

ERROR AND MISCONDUCT[1]

---

[1] These motions are being filed on behalf of David Newland, James Dolan, David Lausman, and Mario Herrera.

# TABLE OF CONTENTS

*Page*

NOTICE OF MOTIONS AND MOTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

THE GOVERNMENT COMMITTED FIVE KNOWN, FLAGRANT
*BRADY* VIOLATIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    I.     Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    II.    The Prosecutors Suppressed Evidence Of Ynah's Statements To
          Agents And Lied To The Court About That. . . . . . . . . . . . . . . . . . . . . 3

    III.   The Prosecutors Suppressed Evidence Of Sanchez's Possession
          Of Child Pornography And Lied To The Court About That . . . . . . . . 6

    IV.   The Prosecutors Failed To Produce Discovery Related To
          Francis's Possession Of Child Pornography. . . . . . . . . . . . . . . . . . . . 12

    V.    The Prosecutors Suppressed And Produced Misleading
          Evidence Related To Francis's Living Arrangements . . . . . . . . . . . . 12

    VI.   The Prosecutors Suppressed Evidence Of De La Pena's
          False Statements Under Oath In The Rafaraci Case And Lied
          To The Court About That . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    VII.  Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

DESPITE THE COURT'S ADMONITIONS AND RULINGS, THE
GOVERNMENT REPEATEDLY PRESENTED SUMMARY/
OVERVIEW TESTIMONY FROM AGENT DE LA PENA, WHICH
ROSE TO THE LEVEL OF MISCONDUCT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    I.     Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    II.    Relevant Background Leading Up To De La Pena's Testimony . . . 21

    III.   De La Pena's Direct Testimony Was Rife With Error Willfully
          Caused By The Prosecutor, In Partnership With The Agent . . . . . . 28

         A.   The Prosecutor Presented De La Pena As An All-Knowing
              Uber-Witness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

         B.   De La Pena's Testimony About James Dolan
              Allegedly "Divulging" "Investigations" To "Jose Sanchez
              And Leonard Francis" Is The Type Of Improper Testimony
              The Prosecutor Elicited Repeatedly, And Exemplifies
              The Government's Willful Misconduct. . . . . . . . . . . . . . . . . . . 33

|  |  | 1. | Direct Testimony . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 33 |
|---|---|---|---|---|
|  |  | 2. | Cross Examination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 37 |
|  | C. | | Despite The Court's Prohibition, The Prosecutor Repeatedly Sought To Elicit, And Elicited, "Connect The Dots" Testimony . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 43 |
|  | D. | | Despite The Court's Prohibition, The Prosecutor Repeatedly Had De Le Pena Construe, Or Put His Spin On, Emails . . . . | 48 |
|  | E. | | The Prosecutor Repeatedly Sought To Elicit Improper Testimony About The Alleged "Dissemination" Of "Proprietary" And Classified Information. . . . . . . . . . . . . . . . . | 51 |
|  | F. | | The Prosecutor Elicited Improper And Dishonest Summary Testimony With Respect To Alleged Prostitutes . . | 54 |
|  | G. | | The Prosecutor Repeatedly Sought To Elicit Improper Testimony That The Defendants Went By A "Collective" Or "Group" "Identifier" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 56 |
|  | H. | | Through De La Pena, The Prosecutor Introduced A Lot Of Inflammatory Evidence With Respect To People Who Were Not On Trial, Which Was Irrelevant To Determining The Defendants' Guilt . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 59 |
|  | I. | | Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 61 |
| IV. | | | During Cross, De La Pena Repeatedly Gave Non-Responsive, And Highly Improper, Answers, Even After Being Admonished By The Court . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 62 |
|  | A. | | De La Pena Made Non-Responsive And Improper Statements With Respect To Every Aspect Of The Government's Case That The Defendants Raised On Cross . . . . . . . . . . . . . . . . . . . . . . . . . . | 62 |
|  |  | 1. | Hong Kong Port Visit Cancellation Settlement . . . . . . . . . . . | 62 |
|  |  | 2. | Late Payment Of Bills By Submarine Group 7 . . . . . . . . . . . | 64 |
|  |  | 3. | Steven Shedd And Alex Gillet Recruited Sanchez . . . . . . . . . | 65 |
|  |  | 4. | Examples Of Other Major Subjects About Which De La Pena Made Improper Statements On Cross . . . . . . . . . . . . . . . . | 67 |
|  | B. | | De La Pena Was Relentlessly Non-Responsive With His Answers . | 69 |
|  | C. | | De La Pena Violated His Oath To Tell The Truth, The Whole Truth, And Nothing But The Truth . . . . . . . . . . . . . . . . . . . . . . . . . | 71 |
| V. | | | Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 75 |

ii

THE ADMISSION OF RECORDS CERTIFIED BY FRANCIS VIOLATED
THE DEFENDANTS' CONFRONTATION AND DUE PROCESS RIGHTS . . 75

I.      Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  75

II.     Francis Is Not A Trustworthy Certifier And His "Records" Are
        Not Reliable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  76

        A.      Francis Is Not A Trustworthy Certifier Of Records . . . . . . . . .  76

        B.      The Manner In Which The Documents Were Maintained
                Was Not Trustworthy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  78

III.    The Source Of Many Of The Exhibits Introduced At Trial Is
        Unknown, And The Exhibits Were Not Properly Authenticated . . .  80

IV.     The Admission Of The Records Violated The Defendants'
        Confrontation and Due Process Rights . . . . . . . . . . . . . . . . . . . . . . . . .  81

V.      Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  84

THE PROSECUTORS INDUCED AND PREPARED THEIR
COOPERATING WITNESSES TO TESTIFY FALSELY . . . . . . . . . . . . . . . . . . . .  84

I.      Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  84

II.     Relevant Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  84

III.    The Government Prepared Its Cooperating Witnesses To Testify
        Falsely . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  86

        A.      Steven Shedd . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  88

        B.      Jesus Cantu . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  89

        C.      Edmond Aruffo . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  91

        D.      Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  95

IV.     Vacating The Defendants' Convictions Is Warranted Based Solely
        On The Government's Preparing Its Cooperators To Lie . . . . . . . . .  98

CUMULATIVE ERROR AND PREJUDICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  100

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  102

## NOTICE OF MOTIONS AND MOTIONS

At the date and time set out above, and for the reasons given below and otherwise supported by the record in this case, Defendants David Newland, James Dolan, David Lausman, and Mario Herrera ("Defendants") will move the Court to grant a new trial based on the government's: (1) *Brady* violations; (2) presentation of summary testimony; (3) use of Leonard Francis to certify GDMA "business" records; (4) presentation of false testimony; and (5) cumulative error and misconduct.

## INTRODUCTION

Federal Rule of Criminal Procedure 33(a) states that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." "A district court's power to grant a motion for a new trial is much broader than its power to grant a motion for judgment of acquittal." *United States v. Inzunza*, 638 F.3d 1006, 1026 (9th Cir. 2009). Among other things, Rule 33(a) allows a court to grant a defendant's motion for new trial for any reason that warrants reversal on appeal, to avoid the expense and delay of awaiting that outcome in the appellate court. *See United States v. Alvarez-Moreno*, 657 F.3d 896, 901-02 (9th Cir. 2011). Accordingly, this Court may grant a new trial based on any of the evidentiary, or other, errors and issues addressed herein, including prosecutorial misconduct.

"When prosecutorial misconduct is alleged, the issue is whether, considered in the context of the entire trial, that conduct appears likely to have affected the jury's discharge of its duty to judge the evidence fairly." *United States v. Henderson*, 241 F.3d 638, 652 (9th Cir. 2000). "[T]he touchstone of the due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Id.* (citing *Smith v. Phillips*, 455 U.S. 209, 219 (1982)). Nonetheless, the Ninth Circuit has held that when considering the appropriate remedy for prosecutorial misconduct, a court may consider whether (1) the misconduct was willful or egregious, (2) the prosecutors failed to take responsibility for it, and (3) the

prosecutors supervisors failed to adequately address the misconduct. *See United States v. Kojayan*, 8 F.3d 1315, 1318, 1320, 1325 (9th Cir. 1993).

With that case law in mind, the Defendants request that the Court vacate their convictions and grant a new trial, or dismiss, for the following reasons.

First, the government committed five known *Brady* violations, including two that were already found by the Court, and a third relating to Agent De La Pena's false affidavit statements in the Rafaraci case (about which separate briefing is being submitted under seal).

Second, the government blatantly and repeatedly violated the Court's rulings with respect to presenting summary/overview testimony from Agent De La Pena, which violated the Fifth and Sixth Amendments and multiple rules of evidence, and rose to the level of prosecutorial misconduct.

Third, based on what the Court knows now, including with respect to Leonard Francis's post-trial flight, it is evident that Francis was not fit, legally or practically, to certify and authenticate GDMA's "business records." Those documents made up the bulk of the government's trial exhibits, and were the bulwark for its theories and corresponding witness scripts.

Fourth, the government committed misconduct by inducing and preparing its cooperating witnesses to testify falsely.

Fifth, the nature of, and prejudice from, the government's errors and misconduct discussed in this brief compels granting a new trial, particularly in light of the serious and willful nature of the misconduct, the prosecutors' lying to the Court, and the Department of Justice's recent statement that it did not even intend to investigate what the Court correctly found was AUSA Mark Pletcher's flagrant *Brady* violation with respect to Ynah. *See* 3/15/23 OPR Letter (Exhibit A).

The Defendants address each of these issues separately below, and in doing so cover some of the dizzying array of government misconduct in this case.

**THE GOVERNMENT COMMITTED FIVE KNOWN, FLAGRANT *BRADY* VIOLATIONS**

## I.   Introduction

When addressing government misconduct during De La Pena's testimony, the Court said it had a "three-strike rule." 4/6/22 Trial Transcript ("TT") at 2967. With the known *Brady* violations alone, the government has reached five strikes. Those violations relate to the prosecutors willfully suppressing materials and information about: (1) Ynah's statements; (2) Jose Sanchez's possession of child pornography; (3) Leonard Francis's possession of child pornography; (4) Francis's living conditions; and (5) Agent De Le Pena's false statements in an affidavit in the Rafaraci case. Although the De La Pena *Brady* violation is addressed separately, in an under seal filing, here the Defendants ask the Court to consider the violations cumulatively. Accordingly, below they summarize the history of the government's known *Brady* violations in this case. That background shows that the prosecutors have no regard for Constitutional imperatives and instead have proceeded with a win-at-all-costs mentality.

Before discussing the *Brady* violations, it bears noting that some of the issues discussed below have previously been raised with the Court. Those issues are raised again here because: (1) in most instances, there is new information; and (2) they support the conclusion that the government engaged in widespread misconduct, which deepens concerns about what we still don't know, and informs consideration of the appropriate remedy, including based on cumulativeness.

The Defendants now turn to discussing the five known *Brady* violations.

## II.   The Prosecutors Suppressed Evidence Of Ynah's Statements To Agents And Lied To The Court About That

The prosecutors' first *Brady* strike involved their failure to disclose the content of agents' contacts with "Ynah." On April 21, 2022, when that issue was first raised, AUSA Michelle Wasserman told the Court that producing discovery about those

contacts "fell through the cracks." The Court responded, and mentioned its concern about what we don't know:

> What about everybody else? What's happened is there's a concern what else they don't have, and that's been a theme of the defense throughout this. What are we missing? What don't we have. And that's their concern. How can you allay that concern? Because they have, to a very large extent, with the Court behind the government on most of these issues, had to trust the government on most of these issues, had to trust on discovery and a variety of things, and now they're saying, "See, we told you, Judge, the trust was a little misplaced and they're flying a little fast and loose on the government's side."

4/21/22 TT at 4397-98. A short time later, the Court said:

> Do you understand when you say that, Ms. Wasserman, the angst that it causes on the defense side? One thing fell through the cracks. You've heard enough about this case, even though you're relatively new to it, to know that they've got a lot of concerns about things falling through the cracks.

*Id.* at 4397-98, 4403. What has happened since has vindicated and heightened those concerns.

To begin with, over the next several days the Court held an evidentiary hearing that showed, decisively, that the Ynah *Brady* production didn't "fall through the cracks." Instead, as this Court found, "Mr. Pletcher's failure to disclose the Ynah contact amounted to flagrant misconduct. Federal agents approached Mr. Pletcher about the matter on four separate occasions, and he repeatedly rebuffed them. It is clear to the Court that the information was willfully withheld from Defendants and misrepresented to the Court." 7/13/22 Order at 12 (Docket #1009). Had the Court not held an evidentiary hearing the flagrant nature of the misconduct would have remained obscured by Ms. Wasserman's vague claim that the Ynah discovery "fell through the cracks." That amplifies the Defendants' justifiable concerns about what else the government is hiding, and counsels for holding an evidentiary hearing with respect to the other *Brady* violations discussed below.

It also bears noting that Mr. Pletcher deliberately undermined the remedy the Court imposed for this *Brady* violation, and sought to perpetuate Ms. Wasserman's false claim during opening that Mr. Lausman received a prostitute. As the Court will

recall, to remedy this *Brady* violation, and the false statement in Ms. Wasserman's opening, the Court originally proposed telling the jury that, contrary to Ms. Wasserman's statement in opening, there was "insufficient evidence" that Mr. Lausman received a prostitute. *See* 5/26/22 TT at 6510. After discussing that proposed instruction with counsel, however, the Court agreed that it would suggest to the jury that there was some truth to Ms. Wasserman's misrepresentation that Mr. Lausman received a prostitute. *See id.* at 6514-15. To avoid that unfair prejudice to Mr. Lausman, the Court instructed the jury that "there was *no evidence* to sustain the allegation that Defendant Lausman accepted the services of a prostitute at the Makati Shangri-La Hotel in Manila, Philippines. . . . You must *disregard* the Government's argument during opening statement that Defendant Lausman accepted the services of a prostitute." Court's Instruction #37 (Docket #994) (emphasis added).

In his closing, Mr. Pletcher undercut this instruction and conjured the unfair prejudice this Court sought to avoid by not giving the first proposed version of its instruction. He set that up by telling the jury that Steven Shedd had testified that Francis "paired" Mr. Hornbeck, Mr. Dolan, and Mr. Loveless with prostitutes. 6/2/22 TT at 6897. Mr. Pletcher then turned to Mr. Lausman and said, "Ms. Wasserman said in opening that Mr. Lausman also received the services of a prostitute in Manila, but there was no evidence presented *at trial that that also occurred*." *Id.* (emphasis added). This strongly implied that there was such evidence, it just was not presented at trial, which, in light of the overall instruction, the jury likely assumed was excluded because of the government's misconduct. That is, rather than the jury believing there was no such evidence (the truth), Mr. Pletcher sought to make them believe there was such evidence (a lie), but the government was not allowed to present it to them.

Mr. Pletcher is nothing if not calculating, and in light of his gross and relentless misconduct that preceded this, and the discussion regarding the appropriate jury instruction remedy, it is evident that this was willful misconduct. *See United States v. Kojayan*, 8 F.3d 1315, 1321 (9th Cir. 1993) (stating, "[w]hen a lawyer asserts that

something not in the record is true, he is, in effect, testifying. He is telling the jury: 'Look, I know a lot more about this case than you, so believe me when I tell you X is a fact.' This is definitely improper"); *see also id.* at 1323 ("[e]vidence matters; closing argument matters; statements from the prosecutor matter a great deal"). Rather than accept the richly-deserved, and relatively limited, remedy for his flagrant misconduct, Mr. Pletcher sought to undermine that remedy and mislead the jury.

## III. The Prosecutors Suppressed Evidence Of Sanchez's Possession Of Child Pornography And Lied To The Court About That

The prosecutors second *Brady* strike involved child pornography found on Jose Sanchez's computer, and the government's concealing its agreement not to prosecute Sanchez for that. Although an evidentiary hearing would be useful for determining those who are responsible for the government's misconduct in that context, it is nonetheless evident that the violation was willful, and was compounded by the prosecutors repeatedly lying to the Court and defense counsel.

The issue first emerged when the government falsely told the Court, in an August 12, 2021 *in limine* motion, that "an algorithm" inaccurately "flagged certain images on [Sanchez's] computer as potential child pornography. As described in law enforcement reporting dated August 15, 2014, which was produced to the Defendants in this case, after review of the images and consultation with the National Center for Missing and Exploited Children, law enforcement concluded that the images were not, in fact, child pornography." 8/12/21 Gov't Memo. at 23 (Docket #528). Based on this, the government asserted that "the Court should exclude any cross-examination of Sanchez regarding these flagged images." *Id.*

The claim that those images are not child pornography was/is a lie. *See, e.g.*, 5/7/22 Dolan Memo. (Docket #884). The prosecutors suppressed discovery that would reveal their lie, and disguised their agreement not to prosecute Sanchez for possessing those images in vague language in his plea agreement. *See id.*; *see also* 1/6/15 Sanchez Plea Agreement (Trial Exh. DO-366). When defense counsel figured

this out and exposed it to the Court, the prosecutors were forced to admit their *Brady* violation. But they offered no explanation, accepted no responsibility, and continued to falsely claim that the images at issue are not child pornography. *See* 5/7/22 Dolan Memo. at 2-4 (Docket #884).

This last part was astonishing because the late-produced government discovery shows the images are child pornography. *See* 5/11/22 TT at 5793 (Court recognizing that government's claim that images seized from Sanchez were not child pornography is not supported by documents the prosecutors belatedly produced in discovery). And on May 3, 2022, when the issue arose in the midst of trial, supervising AUSA Aaron Arnzen sent an email to Mr. Dolan's counsel stating:

> As you'd expect, certain images found on [Jose] Sanchez' computer are relevant and at issue. If you'd like to view those images today, let us know and we'll make sure to have them loaded and ready for viewing after court (or, for that matter, any day/time that is convenient for you).

This offer was consistent with the Adam Walsh Act's requirement that child pornography evidence may only be reviewed at a law enforcement office, and may not be turned over in discovery. Nonetheless, the prosecution team persisted in telling the Court the subject images were not child pornography.

Furthermore, it is obvious that at least Mr. Pletcher understood that the special term in Sanchez's plea agreement was added to protect him from being prosecuted for possessing child pornography. That is evident from Mr. Pletcher's reaction when, on cross, defense counsel asked Agent De La Pena, "What does that [term] apply to? What other potential crimes did [Sanchez] commit related to unauthorized electronic data?" 4/13/22 TT at 3758. Without missing a beat, Mr. Pletcher said, "Objection, your Honor, this is subject to the pretrial *in limine* rulings." *Id.* To the extent there was any doubt, the subsequent discussion made clear that he meant the *in limine* ruling based on the government's lies to the Court about the images found on

//

//

Sanchez's computer. *See id.* at 3759, 3782-86. After that discussion, the Court allowed defense counsel's inquiry.[2]

When cross-examination resumed, defense counsel said to De La Pena that the subject plea agreement term "relates to images found on Mr. Sanchez's computer, doesn't it," and the agent – with his usual lack of candor – replied, "That could be." *Id.* at 3787. Defense counsel then asked, "Because there were images found on his computer that were suspected to be child pornography, right," and De Le Pena responded, "I recall the investigation of that, yes, sir." *Id.* at 3787-88. Defense counsel then asked, "And this provision protects Mr. Sanchez from being prosecuted for possessing child pornography, right," and the agent replied, "It seems like that's possible." *Id.* at 3788. The cagy answers notwithstanding, it is evident that De La Pena, and the prosecutor, knew there was child pornography on Sanchez's computer, //

---

[2] In light of these circumstances, there is good reason to doubt the veracity of the unsigned declaration from Sanchez's counsel, Vincent Ward, submitted by the government on May 9, 2022. *See* Docket #893. That unsigned declaration states that the special term in Sanchez's plea agreement was meant to protect Sanchez from later being prosecuted for disclosing classified information. *See* Docket #893. It is evident, however, that when Mr. Pletcher objected to defense counsel's questioning about that term, Mr. Pletcher understood the term was meant to protect Sanchez from prosecution for possessing child pornography. Furthermore, the content of Mr. Ward's unsigned declaration is dubious considering that other language in Sanchez's plea agreement already protected him from prosecution for passing classified information – that is evident from the fact that none of the other Defendants who had passed classified information had Sanchez's special term in their plea agreements. Finally, Mr. Ward's declaration was drafted by the prosecutors, who had/have substantial ongoing leverage over Mr. Ward/Sanchez because they have not yet made a sentencing recommendation for Sanchez. Under these circumstances, if the Court is inclined to give any weight to Mr. Ward's unsigned declaration, the Defendants should first be allowed to cross-examine him and anyone on the prosecution team who has relevant information.

and that the special term in his plea agreement was added to protect him from being prosecuted for that.

The Court should also be aware of recent events relating to this issue. Because the government had dissembled in its filings about whether the subject images were child pornography, defense counsel recently took up the government on AUSA Arnzen's offer from last May, and asked to review those images at the United States Attorney's Office (USAO). On March 21, 2023, in an email exchange about scheduling that visit, AUSA Michelle Wasserman chided counsel for Mr. Lausman, Laura Schaefer, that she had "already come to a conclusion regarding the contents of those files, before your defense investigator has reviewed them." Ms. Schaefer responded that if the images were not child pornography, the goverment should just turn them over in discovery and save everyone the time and expense of the meeting at the USAO. Rather than responding forthrightly, Ms. Wasserman wrote, "[t]he United States has already stated its position regarding the images in question in ECF No. 871," and confirmed the appointment at the USAO for March 27, 2023.

To remind the Court, in Docket #871, AUSA David Chu wrote, "Upon review of the images [found on Sanchez's computer], SA Cunha found that there was nothing in any of the images that allowed him to conclude that the images were child pornography." 5/3/22 Gov't Memo. at 5 (Docket #871). Following this statement was footnote 4, which states:

> Prior to May 2, 2022, SA Cunha had not seen SA Curry's probable cause statement for the follow-on warrant or his description regarding the three images of potential child pornography. On May 2, 2022, SA Cunha reviewed three images consistent with SA Curry's description and again concluded that there was nothing in the three images that would cause him to conclude that the images were child pornography. In fact, one of the images - the one with the child no older than two years old - appears to be of the actor Ike Barinholtz taking a 'selfie' with his own child and appears to be related to the comedian Conan O'Brien.

*Id.* at 5 n.4.

As Mr. Dolan noted in his reply to this filing, submitted on May 7, 2022, the claims about what Agent Cunha "concluded" were conspicuously lacking a

declaration from Agent Cunha, and the circumstances strongly undermined the government's claim that none of the images were child pornography. *See* 5/7/22 Dolan Memo. at 1-7 (Docket #884). Ms. Schaefer's visit to the USAO on March 27, 2023, has finally put this issue to rest – Sanchez's computer contained more than a dozen sickening images that are unquestionably child pornography.[3] *See* 3/28/23 Lapuz Report (Exhibit B). Despite this, with her recent email Ms. Wasserman tripled-down on the lie the prosecutors told the Court in their *in limine* motion.

Notably, the Court has already found that the prosecutors "misrepresented the content of the images found on Mr. Sanchez's computer in [their] motions *in limine*," and "failed to provide timely discovery with respect to the analysis of the images, such as Agent Cunha's emails and Agent Curry's search warrant application." 5/11/22 TT at 5797. The Court, however, made "no finding as to whether the government intentionally hid this discovery to conceal a benefit conveyed to Jose Sanchez or if the government was aware that the images were in fact child pornography." *Id.* at 5797-98. The Court also said that it "decline[d] to hold an evidentiary hearing at this late stage of trial because it does not believe that these determinations are necessary to provide an adequate remedy" with respect to Sanchez's testimony. *Id.* at 5798. But the government's intent, and the overall wrongfulness of its conduct, are relevant to this motion. And given what is now known, the Court should hold an evidentiary hearing to hear from Agent Cunha and learn from Mr. Chu, Ms. Wasserman, and the supervisors involved in the government's May 3, 2022 filing (docket #871) why they think it's okay to repeatedly lie to the Court and defense counsel.

//

---

[3] It seems evident that there were more than 100 such images on Sanchez's computer, but Ms. Schaefer and the defense investigator didn't think it necessary to look at all of them.

As it stands, the evidence is abundant that, as with the Ynah *Brady* violation, the prosecutors willfully withheld materials and information they were constitutionally obligated to produce, and baldly lied to the Court as part of that violation, and later to avoid accountability.

A final point bears noting here. The Court allowed a *great deal* of email evidence that included hearsay from Sanchez, mostly through De Le Pena's testimony. As the Court will recall, the emails were introduced as GDMA business records under Federal Rule of Evidence 902(11), and on that basis were also excepted from the hearsay rule under Federal Rule of Evidence 803(6). But when the Court allowed the Sanchez email evidence to be admitted, it presumably expected Sanchez to testify, based on the government's representations. And that presumption likely lessened a concern expressed by the Seventh Circuit, which the Court seemed to agree with, that "[t]he government was treading on dangerous ground by using Rule 902(11) here to introduce not just these but hundreds of other records to prove the truth of the matters asserted without regard to the many layers of hearsay and the Confrontation Clause rights that those records may have implicated." *United States v. Green*, 648 F.3d 569, 580 (7th Cir. 2011); 3/30/22 TT at 2525; *see also id.* at 2535, 2537.

With that concern in mind, had the Court known about the *Brady* violation related to Sanchez, and that the government would not call him as a witness, it might have taken a more restrictive approach to what the government, and De La Pena, were permitted to do with the Sanchez email evidence. More concerning, in the end the government actually benefitted from its *Brady* violation in this context, because it got all of the subject emails into the record, and had De La Pena put his improper spin on them (as addressed in detail in the next major argument section), while never subjecting Sanchez to cross examination.

//

//

**IV.   The Government Failed To Produce Discovery Related To Francis's Possession Of Child Pornography**

As the Court will recall, shortly before trial was scheduled to begin a defense contractor discovered that the government had produced to the defense images of child pornography found on Leonard Francis's hard drives, which were buried in ten tera-bytes of data turned over by the government. *See, e.g.,* 4/23/22 Dolan Memo. (Docket #851). The government never alerted defense counsel to those images even though they should never have been produced to the Defendants in discovery.

It strains credulity to believe that the government was unaware of at least the child pornography found on Francis's hard drive when he was arrested, given that the hard drive was thoroughly searched over a period of several years. Presumably the government failed to advise defense counsel about the child pornography because it did not want the jury to learn that, as a benefit for his "cooperation," Francis was not being prosecuted for possessing child pornography.

When called on this issue, Mr. Pletcher claimed the images were not child pornography, and De La Pena parroted that claim during his cross-examination. *See* 4/23/22 Dolan Memo. at 7 (Docket #851); 4/12/22 TT at 3626. That claim is belied by reports from the government's own forensic analyst, as well as the names attached to the images. *See* 4/13/22 TT at 3785 (Court stating, "just the name of the file is enough to tell you what's on Leonard Francis's computer"). But any lingering doubt has now been removed, because defense counsel Laura Schaefer, and defense investigator Efren Lapuz, went to the USAO on March 27, 2023, and confirmed that the images are child pornography. *See* 3/28/23 Lapuz Report (Exhibit B).

**V.   The Prosecutors Suppressed And Produced Misleading Evidence Related To Francis's Living Arrangements**

The Defendants repeatedly sought disclosure of benefits the government provided to Francis, and those requests were repeatedly directed at learning details about Francis's living arrangements while on "medical furlough." What the

government produced in response amounted to misdirection and withholding of key *Brady* information and material.

On August 14, 2018, NCIS Agents Nash and De La Pena photographed Francis's living quarters, and the photos depict Spartan arrangements in a "one-bedroom garage apartment" that measured 12 by 13 feet. *See* 8/14/18 Report and Photos (Exhibit O).

On May 13, 2019, the prosecutors provided defense counsel the Nash/De La Pena report and photos, in response to the Defendants' requests for discovery about Francis's living arrangements. *See* 5/13/19 Discovery Prod. 18 Letter, Prod. 8/14/18 Report and Photos (Exhibit P).

By mid-December 2020, however, Francis upgraded extravagantly. Though he was years late in paying millions of dollars in restitution to the government, he was able to swing renting a property in Carmel Valley for $7,000 a month. *See* Civil Complaint for Breach of Lease, ¶1 (Exhibit Q). Under the circumstances, this was clearly a financial benefit for his cooperation – after all, the government was entitled to that money in restitution, and could easily have taken it rather than allowing Francis to splurge on a mansion. At any rate, the government had already tacitly, and correctly, conceded that information about Francis's living arrangements was *Brady* material/information, yet the prosecutors did not provide any information to defense counsel about Francis extravagant upgrade to a five-bedroom, seven-bathroom home with beautiful grounds and a pool, valued somewhere between $2.47 and $3.04 million. *See* 12/16/22 Lapuz Report (Exhibit R). It makes being under "house arrest," look pretty good.

Of course, the prosecutors could not have been ignorant of this change. Lest there be any doubt, they were alerted to a concerning lack of monitoring of Francis at the property, and because of that, on January 15, 2021, DCIS agents visited Francis and the property "to assess his security situation." The government provided a report //

about that to defense counsel in discovery, which made no mention of the dramatic change in Francis's living arrangements. *See* 1/20/21 Report (Exhibit S).

The government did not subsequently provide defense counsel any information about that. And during trial, when Mr. Newland's counsel asked about Francis's living arrangements, De La Pena gave misleading and inaccurate answers in this exchange:

| | |
|---|---|
| COUNSEL: | He's still here, isn't he, in San Diego? |
| DE LA PENA: | I believe he's still here, yes. |
| COUNSEL: | You know he's still here. |
| DE LA PENA: | I don't keep up with him. His arrangement is between him and the court. I believe he's here. |
| COUNSEL: | Well, he's living in *an apartment* in San Diego. You know that, don't you? |
| DE LA PENA: | I don't know where he lives right now, sir, I don't. |
| COUNSEL : | You're one of the lead case agents, aren't you? |
| DE LA PENA: | Yes. |
| COUNSEL: | Aren't you aware of the fact there have been meetings with Francis recently? |
| DE LA PENA: | Yes. |
| COUNSEL: | By your fellow case agents? |
| DE LA PENA: | Yes. |
| COUNSEL: | And you don't know in which city those meetings occurred? |
| DE LA PENA: | To be absolutely correct here, you asked me if I knew specifically where he lives. I'm aware of his arrangement with the court. I'm not privy to the specific details of those arrangements or the *specific apartment* that he lives in. I believe it's here in San Diego, based on my understanding of that arrangement, but I don't know specifically his address. I do know that there have been meetings here in San Diego with him, I do. |

4/12/22 TT 3640-3641 (emphasis added). It is hard to believe that De La Pena didn't know where Francis was living, and that it wasn't in "an apartment." Thus it appears

he deliberately misled defense counsel, something that can and should be explored at an evidentiary hearing.

At any rate, the prosecutors could see that defense counsel was laboring under the mistaken belief that Francis was still living in a small, lightly furnished apartment, a mistake caused by what the prosecutors had, and had not, produced in discovery. The prosecutors were obligated to correct the false testimony from De La Pena about Francis living in an "apartment," and no later than that point to produce the corresponding *Brady* material relating to Francis's living arrangements. *See Hayes v. Brown*, 399 F.3d 972, 988 (9th Cir. 2005) (*en banc*).

The government never produced that information/material, and to this date has continued to stonewall. That is, the *Brady* violation continues.[4]

## VI. The Prosecutors Suppressed Evidence Of De La Pena's False Statements Under Oath In The Rafaraci Case And Lied To The Court About That

The most recent (known) *Brady* strike relates to De La Pena's affidavit in the Rafaraci case. Although that violation will be addressed in detail in a sealed filing, a few points bear making here to support a motion for new trial, or dismissal, based on cumulativeness.

First, the prosecutors have admitted that, at the outset of the trial, they made a calculated decision to withhold the De La Pena *Brady* material and information from the Defendants. That is, they are not claiming the discovery "fell through the cracks."

Second, when caught, the government again showed its penchant for making misleading statements and failing to accept responsibility. To begin with, in an effort to prevent having to produce any discovery, and to keep a lid on the misconduct,

---

[4] After Francis fled to Venezuela, defense investigator Efren Lapuz attempted to learn the details of Francis's living arrangements, but he has been largely unsuccessful. *See* 3/29/23 Lapuz Dec. (Exhibit T).

AUSA David Chu claimed that (1) De La Pena didn't intentionally lie, he just made some isolated, "honest mistakes," therefore (2) the prosecutors were not obligated to produce any related discovery. 7/19/22 Gov't Memo. (Docket #1014); *see also* 6/29/22 Gov't Memo. (Docket #985) (sealed).[5] The Court rejected that claim, stating, "Given the similarity between offenses in both cases, Agent De La Pena's critical role in the instant case, and the several instances of failure to disclose in this case, the Court finds that Defendants are entitled to discovery of the underlying facts related to Agent De La Pena's misrepresentations." 7/28/22 Order at 2 (Docket #1020).

The prosecutors made a second run at suppressing the discovery evidence by submitting it to the Court and asking the Court to bless the prosecutors' effort to hide their wrongdoing. In an October 14, 2022 sealed order (docket #1094), the Court rejected that request. In doing so, it pointed out that there was no objective test for determining what is a good faith mistake versus something worse, and, at any rate, even if De La Pena's misrepresentations were "mistakes," that was a legitimate avenue of impeachment, particularly in light of De La Pena's role as an overview witness with respect to just about every aspect of this case, a role he executed with great confidence.

As discussed in the Defendants' March 31, 2023 sealed filing, the discovery that the government subsequently produced vindicates the Defendants' concerns and what the Court said in its orders rejecting the government's efforts to suppress that discovery. To begin with, De La Pena's misstatements were not isolated or "honest" – they reflect deliberate, persistent lying or near-total incompetence. Furthermore, those misrepresentations aren't limited to just the false "examples" that De La Pena provided in his affidavit. Instead, it is evident that De La Pena's broader claims, which the examples were meant to support, were false, because the government

---

[5] The Defendants have included limited citations to sealed filings in this brief a manner that does not in any way implicate the reasons for sealing.

abandoned those claims entirely. Finally, whether the agent's statements were isolated or "honest" was for the jury in this case, not the prosecutors, to decide. And even if the jurors concluded that De Le Pena's misstatements in the Rafaraci case were not intentionally made, they surely would have concluded that the agent's inability to accurately digest and recount the content of the limited documents involved in the Rafaraci case completely undermined the government's presentation of him as an all-knowing overview witness in this case. As mentioned, the Court has already found that this alone was a legitimate avenue for impeachment.

A final point bears making here. When the government sought to squelch this issue without issue without having to produce discovery, it argued, essentially, that the suppressed *Brady* material was not material because, AUSA David Chu wrote, "De La Pena's testimony was limited in scope. He explained the contours of the investigation, and he introduced documents of the conspirators. From a substantive standpoint, Agent De La Pena's role was primarily limited to reading aloud the underlying evidence," a "role," the government claimed, that "was largely ministerial in that he gave voice to the documents." 6/29/22 Gov't Memo. at 7 (Docket #985) (sealed). As the detailed discussion in the summary testimony section of this brief shows, that is a flagrantly false characterization of De Le Pena's testimony. The prosecutors' penchant for making such false statements heightens the concern over what else they are hiding, "honestly" or not.

## VII. Conclusion

While the government's *Brady* violations are perhaps the most serious discovery-related abuses in this case, they are not the only ones. Broadly speaking, the prosecutors' most serious, non-*Brady* discovery violation seems to be their massive discovery dumps shortly before, and throughout, trial. Those began in early January 2022 and added up to about 20 gigabytes of data. That is a lot of discovery to review in the best of circumstances, and is impossible to review in the midst of a grueling trial.

17

One such dump happened on February 16, 2022, twelve days before trial began, and was made up of 5.44 gigabytes of data amounting to thousands of pages and including over 70 reports of witness interviews, 164 government contracts, Naval regulations, expert witness materials, results of forensic tests, *et cetera*.[6] This caused Mr. Lausman's counsel to (reluctantly) request a continuance, or, alternatively, sanctions against the government. *See* Docket #741. Mr. Lausman's motion also referenced a government production nine days earlier, on February 7, 2022, which included thousands of documents that were confusingly numbered and mislabeled, making it impossible to make sense of the material. *See id.* As the Court is aware from what transpired throughout the trial, that was a recurring problem.

The government's pattern of producing late discovery continued on the eve of trial, when it produced what it called production forty-four, which contained 449 megabytes of data, including a raft of new and important information. For example, this production contained dozens of reports of key witness interviews, many of which occurred months earlier. Furthermore, buried in this new discovery were a DOD Instruction and a National Security Presidential Directive that dealt with prohibitions against sex trafficking, which signaled to the Defendants for the first time that the government planned to introduce evidence to imply that they had engaged in sex trafficking.

As the Court is aware – because it heard about it from defense counsel regularly – these dumps continued throughout trial. The vast majority of the materials produced had existed for months prior, if not years. It is evident that the government played a waiting game to hobble defense counsel during a time when their attention

---

[6] This production, which the government called production forty-three, included revised expert witness information for Mark Lawton and Jodi Crawford. At a hearing on September 2, 2021, the Court had chastised the prosecutors for not producing expert witness information earlier and ordered them to do so by September 10, 2021. *See* 9/2/21 Rep. Tr. at 15.

should have been devoted to myriad trial matters. Furthermore, because the prosecutors did not provide a witness list until right before trial, and then deviated substantially from that list, defense counsel had no choice but to review materials related to, and to prepare for, dozens of witnesses who never appeared.

In sum, the government routinely withheld key information and materials – the known *Brady* material – and when it did produce materials it did so in a manner calculated to make it impossible for defense counsel to adequately review, and thus use, those materials during trial. "Such hard-bitten litigation tactics are unbecoming a prosecutor." *United States v. Kojayan*, 8 F.3d 1315, 1323 (9th Cir. 1993).

The Defendants now turn to the prosecutors' presentation of summary testimony through Agent De La Pena. That review shows, resoundingly, that the materials the prosecutors deliberately withheld with respect to De La Pena's misstatements in the Rafaraci case would have been critical to undermining the truthfulness and competence of the agent who served as the government's "every witness." That is, the materials and information withheld were material under *Brady*. Indeed, it seems highly likely that if the prosecutors had forthrightly faced their constitutional obligation to produce the materials related to De Le Pena's false statements in the Rafaraci case, versus not calling him as a witness in this case, they would have chosen the latter. Under such circumstances, they should not be heard to dispute materiality.

**DESPITE THE COURT'S ADMONITIONS AND RULINGS, THE GOVERNMENT REPEATEDLY PRESENTED SUMMARY/ OVERVIEW TESTIMONY FROM AGENT DE LA PENA, WHICH ROSE TO THE LEVEL OF MISCONDUCT**

## I. Introduction

Mr. Pletcher relentlessly and willfully sought to present, and presented, inadmissible summary/overview testimony from Agent De La Pena, ignoring the Court's rulings along the way. That course of conduct implicated all of the constitutional and rules-of-evidence concerns that underlie the prohibition on

summary/overview testimony, and also amounted to prosecutorial misconduct. The discussion of these issues below proceeds as follows.

First, the Defendants summarize the relevant litigation before De La Pena testified. The main purpose of that discussion is to show that before De La Pena testified, Mr. Pletcher was well aware of the governing law and the Court's views on what was (im)permissible.

Second, the Defendants review De La Pena's direct testimony, including the impact of the prosecutor's questions. During that testimony, the prosecutor and the agent repeatedly ignored controlling law and this Court's rulings.

Finally, the Defendants review De La Pena's cross-examination, in which he built on the impermissible aspects of his direct and ventured further afield, saying things that he knew were improper, ignoring the Court's admonishments, and violating the Court's *in limine* rulings.

Before launching into this discussion, however, there is a key point that bears emphasizing at the outset. Prior to De La Pena's testimony, the prosecutor led the Court to believe that the agent's testimony would be based on first-hand knowledge, what he actually did and observed. *See, e.g.*, 3/6/22 Gov't Memo. at 2 (Docket #797) ("DeLaPena will testify as a lay witness based on his extensive personal involvement in this investigation"); *see also* 4/4/22 TT at 2687(Court expressing its understanding, and expectation, that De La Pena would only testify as to "what you did, sir, not what other people told you or what you know from any other source"); *see also id.* at 2684-86, 2699-2700 (same). As the later cross-examination showed, De La Pena did not have such first-hand knowledge. What he "knew" was instead based on what others told him, specifically: (1) what the few witnesses he actually spoke with told him; (2) what he read in other agents' reports about what people said; (3) what he read in other agents' reports about the seizure and collection of evidence done by others; and (4) what he read in emails. He also lacked any first-hand knowledge with respect to the evidence seized, because he: (1) was not present when Francis was arrested and

his devices were seized, or when evidence was seized or collected in Singapore; (2) had no first-hand knowledge of how that evidence was processed by those who seized it; and (3) did not collect or collate the items produced by Francis's lawyers, *et cetera*. He was, in short, a classic hearsay witness. And the fact that Mr. Pletcher represented to the Court at the outset that he was something other than that is one more incident of misconduct.

## II. Relevant Background Leading Up To De La Pena's Testimony

The Defendants begin by summarizing the relevant background leading up to De La Pena's testimony. That is useful to frame the legal issues and to show that the prosecutor was well aware that his later direct examination of De La Pena, and De La Pena's obviously scripted answers, were improper.

In an August 21, 2021, pretrial motion *in limine*, the government asked the Court for permission to call, and re-call, several "case agents" to testify about different "topics." With unwitting candor, the government said each of these "case agents" would testify "as an introductory or *summary witness*, followed by fact witnesses specific to the events comprising that topic." 8/12/21 Gov't Memo. at 3 (Docket #528) (emphasis added). The Defendants opposed that approach for multiple reasons, including because using a case agent as a summary witnesses is contrary to the rules of evidence and constitutional imperatives, and thus is forbidden by case law. *See* 8/19/21 Def. Memo. at 6 (Docket #558). The Court denied the government's request. *See* 9/2/21 Rep. Tr. at 31-33.

Consistent with a Court order, at the outset of trial the government provided a list of its first fifteen witnesses. De La Pena wasn't on the list. However, the government's early fact witnesses, Jesus Cantu and Edmond Aruffo, "performed" terribly. At that point, the government pivoted to De La Pena, and let the Court know about that in a "notice of intent" that stated that it would call De La Pena to testify "regarding the investigation into Defendants and Leonard Francis." 3/6/22 Gov't Memo. at 1 (Docket #797). That notice was unusual, and thus raised suspicion that

the government's intentions were impure.  But the government had learned from the *in limine* litigation, and thus in its "notice" it assured the Court that it did "not intend to use Agent De La Pena as an 'overview' witness or as a witness to summarize the testimonial evidence that the jurors have heard at trial."[7]  *Id.* at 3 n.2.

The Defendants filed an opposition to the government's "notice," in which they discussed in detail the case law addressing the legal problems with summary case agent testimony (*e.g.* hearsay, foundation, vouching, Federal Rules of Evidence 701-04, the Fifth Amendment right to due process, and the Sixth Amendment right to confrontation).  *See* 3/29/22 Def. Memo. (Docket #807).  Because the Court is well-aware of that case law, that discussion isn't repeated here, but a few practical points bear making.

As promised in the government's "notice of intent," De La Pena began his testimony by telling the jury about the massive investigation related to Leonard Francis.  That testimony was bolstered throughout De La Pena's testimony, and included him telling the jury about the wide range of evidence collected and the 1700 witness interviews.  Of course, De La Pena was not involved with much of the investigation; for example, he was only present for a small fraction of the interviews. Thus, he could not testify about what occurred in those interviews, or other aspects of the investigation in which he was not involved, without violating the rules of evidence and constitutional provisions.  Considering this, his testimony about the investigation was largely irrelevant, lacked foundation, and was based on hearsay.

But De La Pena's testimony about the entire investigation nonetheless set him up as the uber-witness who was knowledgeable about all things related to the case. That gave special credence to his subsequent, and improper, summary testimony and,

---

[7] Prefatory summary testimony is also objectionable.  Indeed, prefatory testimony is usually what is discussed in case law barring summary testimony, because one concern with such testimony is that the prospective testimony may never materialize.

coupled with the fact that he was the case agent and member of the prosecution team, bolstered his ability to improperly vouch for the prosecution.[8] *See United States v. Casas*, 356 F.3d 104, 119-20 (1ˢᵗ Cir. 2004) (stating that "[o]verview testimony by government agents is especially problematic because juries may place greater weight on evidence perceived to have the imprimatur of the government"); 4/19/22 TT at 4053 (De La Pena testifying that he was "part of prosecution team"); 4/13/22 TT at 3723 (De La Pena testifying that he was the "lead case agent for trial").

Thus, when, for example, the prosecutor asked questions about what the "investigation" showed – as he did hundreds of times – De La Pena could answer with evident authority, in the jury's eyes, even though his answers were based on hearsay and lacked foundation. *See Casas*, 356 F.3d at 119-20 (stating that "such testimony raises the very real specter that the jury verdict could be influenced by statements of fact or credibility assessments in the overview but not in evidence"). Given the length of time that De La Pena testified, the Defendants were forced to wait for days before challenging the testimony on cross. And when the cross did arrive, challenging De La Pena's broad statements was difficult because it required, or at least invited, eliciting from the agent what he relied on for the broad statements he made during his direct. That, in turn, risked De La Pena's airing inadmissible "evidence," and opened the door to all sorts of otherwise inadmissible opinion testimony. Put differently, challenging De La Pena's improper direct testimony on cross risked doing, and arguably often did, more harm than good, and implicated the concerns precluding summary testimony. In short, the government set itself up to get a double-punch from the improper summary testimony.

//

---

[8] The prosecutor deliberately capitalized on the vouching dynamic by adding the words "Agent De La Pena" in the middle of *countless* questions. He didn't do that with other witnesses.

Coming back to the litigation history, the Court addressed the government's "notice of intent," and the Defendants' opposition, on March 30, 2022, a few days before De La Pena testified. Several things said at that time bear noting because they are relevant to what occurred later.

First, defense counsel pointed out that De La Pena was not on the government's list of its first fifteen trial witnesses, and it was obvious the government was seeking to call him, and eliminate witnesses, because its "percipient" witness cooperators were "going down in flames." 3/30/22 TT at 2440. The prosecutor didn't deny this, and, indeed, admitted that he was calling De La Pena so he could avoid calling other witnesses. To that, the Court said, "that makes me nervous, Mr. Pletcher. It makes me uncomfortable." *Id.* at 2527.

Second, defense counsel said that De La Pena's anticipated testimony about what the "investigation" showed would necessarily draw on hearsay, because the investigation consisted largely of questioning hundreds of witnesses, including cooperators, about emails. *See id.* at 2437-38; *see also* 3/29/22 Def. Memo. at 1, 6 (Docket #807) (noting that De La Pena's testimony would necessarily draw on what he'd been told by cooperators); *United States v. Gadson*, 763 F.3d 1189, 1208 (9th Cir. 2014) ("[a]llowing the government to admit hundreds of emails with multiple layers of hearsay through a government agent who will interpret the records based on knowledge he gained from statements made by cooperators in proffer sessions is the "functional equivalent" of "ex parte in-court testimony" that violates the defendants' Sixth Amendment right of confrontation and due process). The prosecutor attempted to deny this concern, but actually confirmed it, stating:

> He is not going to testify from hearsay. He is not going to testify from information that anyone else told him. He's going to testify simply from his own investigation about pieces of the evidence that fit together. He has been part of this case for 10 years. *He has interviewed well into the upper hundreds of individuals, maybe over a thousand.* He himself has reviewed millions of documents. So Agent De La Pena has the absolute firsthand knowledge of every aspect of this case from its inception.

3/30/22 TT at 2529-30 (emphasis added). In short, the prosecutor claimed that

hearsay was not hearsay because it was part of the agent's "investigation." This evidences the prosecutor's startling misunderstanding of the prohibition on hearsay, and Sixth Amendment confrontation rights, and shows why summary testimony is so pernicious – it allows impermissible hearsay, and testimony that lacks foundation, to come in below the surface of the "summary" testimony.

Third, and relatedly, the prosecutor's claim that De La Pena conducted a significant portion of the interviews involved in this case is belied by the discovery – he actually interviewed a small portion of the hundreds of people interviewed. Similarly, any suggestion that De La Pena conducted the bulk of the investigation in this case is belied by common sense and the discovery, which shows the investigation involved perhaps a hundred agents. Thus, for the agent to recount "the investigation" necessarily called for hearsay and testimony that lacked foundation. The Court emphasized this point during the March 30, 2022, hearing, stating that De La Pena cannot testify about "other people's things. It can't be, Mr. Pletcher, it just cannot be that this one man knows everything of his own accord and his own knowledge and his own contact. It just can't be, sir." *Id.* at 2538.

Fourth, during the March 30, 2022, hearing, the government argued that there were no hearsay or confrontation clause problems with introducing hundreds of emails that: (1) were authenticated by Leonard Francis as business records, and thus also cleared the hearsay hurdle under Federal Rule of Evidence 803(6); and (2) contained the statements of alleged co-conspirators who would not be called at trial. *See id.* at 2525. The Court replied, "I haven't seen a case that exactly says that. I've looked at your cases, and I've looked at their cases, and I think one of my concerns here is that we're going to make some new law in this area, and it's not going to be good law, Mr. Pletcher." *Id.* at 2525; *see also id.* at 2535, 2537; *United States v. Green*, 648 F.3d 569, 580 (7th Cir. 2011).

Fifth, during the hearing the prosecutor told the Court that De La Pena was "not going to tell the jury what the emails mean." *Id.* at 2530. Defense counsel

responded that it was obvious that De La Pena was going to "talk about the meaning of those emails," and that he would "effectively interpret those for the jury." *Id.* at 2532-33. The Court replied, "He can't do that." *Id.* at 2533.

Sixth, and relatedly, the Court cautioned against the prosecutor using De La Pena to "connect the dots," stating, "See, that's a problem, when you put the Agent in a position of kind of capsulizing everything, summarizing everything, connecting, as you said to me earlier, and connecting all the dots, I don't know that that's his role." *Id.* at 2529.

Finally, the Court made clear to government counsel that he was skating on thin ice. At the outset of the hearing, the Court said, "I don't want to build into this case reversible error and I think we could be approaching a line that would be very, very difficult with De La Pena." *Id.* at 2435. The Court closed the hearing on a similar note, stating, "If the outcome of that is what the government thinks it could be, the conviction of some or all of them, then on appeal there's going to be some law made, and it may not be law that the government likes or that anybody likes because of the nature of it. It just doesn't feel right . . . ." *Id.* at 2540.

The Court came back to the De La Pena testimony issue on the next trial day, April 4, 2022. The Court declined to enter a broad ruling because it concluded it would have to deal with the issues on a question-by-question basis. *See* 4/4/22 TT at 2549. But adding to what it said on March 30, the Court cautioned the government that De La Pena's testimony "should be relying on things that have been established and not on things that are coming prospectively, because that could be problematic as to whether or not those things actually come into evidence." *Id.* Furthermore, early in De La Pena's testimony the Court stated, outside the presence of the jury, "We're all very aware that Agent De La Pena's testimony is fraught with some issues that could be concerning, and he's probably well aware of it, too. Which is why I'm just asking him to say 'I' and what he personally saw and heard and did. . . . We're not going to hear a variety of things that we know, based on the authority in the

federal courts, would not be acceptable from this witness, and we're all going to be very vigilant on that." *Id.* at 2718-19.

Despite the briefing and discussion, and the Court's warnings, over the next five days the prosecutor relentlessly sought to introduce impermissible summary testimony. He was met with many objections that were sustained, but he often ignored the Court's rulings by (1) restating the same question, (2) phrasing the same question in a manner that made it no less objectionable, or (3) coming back to the same question later. Furthermore, at times the prosecutor was obviously indifferent to whether an objection was sustained, because he'd already conveyed what he wanted to convey to the jury. At other times, De La Pena thwarted the Court's rulings by answering before the Court could sustain an objection, or including the testimony precluded by the Court's ruling in his next answer. The prosecutor's and agent's relentlessness eventually wore down defense counsel, who began withholding objections that often served no practical purpose but seemed likely to aggravate the jurors. *See* 4/11/22 TT at 3469 (defense counsel stating that he was abstaining from repeatedly objecting because it looks bad to the jury); *see also* 4/5/22 TT at 2907-08 (defense counsel stating, near the beginning of De La Pena's direct, that the prosecutor's repeated improper questions were putting him in the position of objecting repeatedly and thereby prejudicing the jury). In the end, despite defense counsel's efforts, the prosecutor presented a wide range of summary/overview testimony through De La Pena, regarding just about every aspect of the case. The Court concluded as much in its October 14, 2022, order. *See* 10/14/22 Order at 4 (Docket #1094) (sealed); 4/21/22 TT at 4411 (Court stating, shortly after De Le Pena's testimony, "we have had opinions, and we have had summary witnesses").

The Defendants now turn to addressing some of the many specific objectionable aspects of De La Pena's direct testimony.

//

//

### III. De La Pena's Direct Testimony Was Rife With Error Willfully Caused By The Prosecutor, In Partnership With The Agent

Below, the Defendants address several portions of De Le Pena's direct testimony during which he and the prosecutor ran roughshod over the case law proscriptions and the Court's admonitions and rulings.[9] For organizational and readability purposes, the Defendants have broken out this discussion into several examples and categories, though there is a great deal of overlap amongst those.

The first example/category discussed below is De La Pena's improper testimony that Mr. Dolan "divulged investigations" to Leonard Francis and Jose Sanchez.[10] The Defendants start with that example because it encompasses many of the problems with De La Pena's testimony, and shows blatant government misconduct.

The second and third categories/examples discussed below are broader in nature, dealing with the government's eliciting testimony "connecting the dots" and construing emails, though the Court clearly and repeatedly prohibited such testimony.

The fourth through sixth categories/examples addressed below are more subject-matter focused, covering De La Pena's testimony about (1) the alleged "dissemination" of "proprietary" and classified information, (2) "prostitutes," and (3) the use of "collective" and "group" "identifiers."

Finally, the Defendants address a related issue that the Court expressed concern about repeatedly – the use of De La Pena to dump a great deal of inflammatory

//

---

[9] De La Pena's direct testimony began on April 4, 2022 (though he only testified briefly that day), ran through April 5-7, and concluded in the middle of the day on April 11.

[10] The Defendants refer to De La Pena's "testimony" as shorthand for the questioning and testimony, and often it was the content of the questioning that was objectionable.

28

evidence about the conduct of others into the record, even though that evidence was irrelevant to jurors determining the Defendants' guilt.

It bears noting that the Court sustained objections to the vast majority of the examples of improper questions and testimony addressed below. But the damage was often done by the questioning, or the agent blurting out an answer or otherwise undermining the Court's rulings. And even when the Court sustained objections, the prosecutor and/or agent often proceeded as if it had not. Given those dynamics, and because repeatedly objecting threatened drawing the jurors' ire, defense counsel noted during De La Pena's testimony that they began to abstain from objecting to some of the questioning and testimony, but they maintained a continuing objection. *See* 4/11/22 TT at 3469.

Before turning to a discussion of the categories and examples of improper questioning and testimony, the Defendants first address the ways in which the government set up De La Pena as an all-knowing uber-witness. That is relevant to, among other things, assessing prejudice.

## A. The Prosecutor Presented De La Pena As An All-Knowing Uber-Witness

The prosecutor presented De La Pena as an uber-witness who knew everything there was to know related to the case. He did that in several ways.

First, De La Pena testified that he had a degree in commerce with a specialization in accounting from the University of Virginia, and a master in public administration from USC. *See* 4/4/22 TT at 2678-79. De La Pena also claimed many years of experience investigating procurement fraud and public corruption, and said he is a "certified adjunct instructor . . . for public corruption investigations." *Id.* at 2680-83.

Second, De La Pena testified that he had been a lead case agent on this case for twelve years, nearly since its inception, and that he put in a massive amount of work on the investigation. *See* 4/4/22 TT at 2683. He claimed he'd spent "months of my

life locked in an NCIS office reviewing millions and millions of emails," and repeatedly emphasized that he'd reviewed millions of documents related to the case, including "99 percent" of the "millions" of documents allegedly seized from Francis's computers. 4/4/22 TT at 2723, 2727; 4/5/22 TT at 2797, 2799. (Incidentally, this was obviously a gross exaggeration, but when confronted on cross with the fact that it was practically impossible that he read even one millions emails, De La Pena claimed he was a fast reader, then doubled-down and said he'd read millions of emails "line by line." *See* 4/12/22 TT at 3607, 3659. This absurd testimony did nothing so much as re-enforce the conclusion that De Le Pena's work was limited to reading what others had written, and thus didn't have the foundation to give the testimony he gave, which was also necessarily based on hearsay.)

Third, De La Pena repeatedly testified that he was able to discern and confirm relevant facts, and verify the authenticity of countless documents and emails, by reviewing evidence obtained from a variety of sources. *See* 4/4/22 TT at 2714; 4/5/22 TT at 2831, 2832, 2846-47, 2858; 4/6/22 TT at 3010, 3110; 4/7/22 TT at 3300-01, 3302, 3306; 4/11/22 TT at 3423-24. Although repetition ensured the jury could not miss the intended thrust of that testimony, the prosecutor drove it home by stating – early in De La Pena's testimony, and in the jury's presence – that "the documents themselves were all reviewed by Agent De La Pena" and were authenticated and corroborated by "distinctive characteristics," "distinctive senders," and "distinctive metadata," and "were appropriate in time and content." 4/5/22 TT at 2894; *see also* 4/11/22 TT at 3485 (prosecutor stating, "I think it's pretty far-fetched to say none of these documents have any indicia of reliability because they all correspond with one another").

Fourth, and relatedly, De La Pena testified that he had been trained in "how to seize and review electronic evidence," 4/4/22 TT at 2681, and he claimed that the government's email evidence could be trusted because he had compared metadata from millions of emails retrieved from different sources. From the start, De La Pena

was explicit in telling the jury the purpose of this testimony, stating, "We examine the metadata to ensure the integrity of what we're looking at." 4/5/22 TT at 2825. De La Pena then went on to tell the jury – repeatedly – that all the email evidence could be trusted (*e.g.*, their had been no "alteration of the data," 4/5/22 TT at 2873-74), and he could verify the sender and recipient, because he had reviewed the metadata for the millions of emails in the government's possession. *See* 4/5/22 at 2857-58, 2860, 2869, 2871, 2873-74, 2876, 2888, 2890; 4/7/22 TT at 3210, 3269; 4/11/22 TT at 3352. Again, the jury could not have missed the intended meaning of this testimony, but the prosecutor left nothing to chance, stating during his questioning, for example, "I think you testified previously you have, in fact, reviewed all the relevant metadata in all of these documents in the 81 series." 4/6/22 TT at 3114; *see also* 4/6/22 TT at 2963 (prosecutor stating that "De La Pena has testified that he reviewed the metadata as to every single electronic record. This is a digital fingerprint of how these documents are produced").[11]

Fifth, the prosecutor presented De La Pena as having an astounding breadth of knowledge with respect to GDMA, the ship husbanding business in Asia, and the Navy, though he didn't work for GDMA or in the ship husbanding business, and had never served in the Navy. *See* 4/12/22 TT at 3620.

---

[11] Agent De La Pena kept up his corroboration claims on cross, in his frequently non-responsive answers. *See, e.g.*, 4/12/22 TT at 3638 (when asked about fact that he wasn't present when GDMA hard-drives were collected in Singapore by unknown people, agent claims he did a thorough search of hard-drives and "I do believe that I got everything"); 4/13/22 TT at 3764 (claiming that materials seized from Francis on arrest were "corroborated . . . across many other sources"); *id.* at 3767 (claiming that "the emails that came from Singapore [law enforcement] matched the emails that came from the nine hard drives"); 4/19/22 TT at 4061 ("I reviewed all of that information [provided by Singapore law enforcement] and used it as corroboration" for trial exhibits); *id.* at 4124 (claiming the email evidence was reliable because "I reviewed the metadata on these emails. I reviewed all of the information surrounding these emails").

As examples with respect to GDMA and the ship husbanding business, the prosecutors presented De La Pena as having an adequate basis to testify about the following: (1) the nature and operation of GDMA's finance department, and his opinion that it was "robust," 4/5/22 TT at 2813-14; (2) the identity of GDMA's "finance manager" and "other GDMA employees," 4/7/22 TT at 3298, and that GDMA had "a series of several accountants that handled the day-to-day interactions with vendors," 4/5/22 TT at 2815; (3) considerations that are "important when crafting a port, or ship husbanding bid," 4/6/22 TT at 3115; (4) the type of information that GDMA would want to "price and win contracts," 4/5/22 TT at 2493; (5) who bid on, and could bid on, various port-husbanding contracts, *see* 4/6/22 TT at 3065-66; (6) why certain ports were "importan[t] with respect to ship husbanding," 4/7/22 TT at 3206; and (7) the identity of GDMA's corporate competitors and their executives, *see* 4/7/22 TT at 3230.

As examples of De La Pena's claimed knowledge of all things Navy, the prosecutors presented De La Pena as having an adequate basis to testify about the following: (1) when FISC would solicit bids for port-husbanding contracts, *see* 4/6/22 TT at 3113; (2) what a FISC regional contract is, and when the Navy shifted to using those, *see* 4/7/22 TT at 3279; (3) how documents are classified, and how classified documents may be transmitted, *see* 4/7/22 TT at 3292; (4) what a Navy "transit plan" is, *see* 4/6/22 at 3129; (5) that submarine ship schedules are "more sensitive" than other types of ship schedules, 4/7/22 TT at 3193; (6) how classified information was transmitted on the USS Blue Ridge, 4/7/22 TT at 3195; (7) that some email providers were blocked from use on the Blue Ridge and others were not, *see* 4/6/22 RT at 3124-25; (8) what is the "Peleliu Pacific Partnership" 4/7/22 TT at 3213; (9) from what company the Navy bought fuel in a given port during a given time period, *see* 4/11/22 TT at 3452; and (10) what the liberty policy was in Jakarta for a given port visit, *see* 4/11/22 TT at 3436.

//

The point here is not that De La Pena didn't have adequate foundation to testify about much, maybe all, of this subject matter – though he assuredly did not, and what knowledge he had about these things undoubtedly was based on hearsay.[12] The point here is that the government presented De La Pena as knowing everything about anything that was relevant to its case. They then leveraged that premise to advance a raft of improper questioning and testimony. The Defendants now turn to discussing examples of that, in the categories summarized above.

**B.     De La Pena's Testimony About James Dolan Allegedly "Divulging" "Investigations" To "Jose Sanchez And Leonard Francis" Is The Type Of Improper Testimony The Prosecutor Elicited Repeatedly, And Exemplifies The Government's Willful Misconduct**

As mentioned, this section of the memorandum focuses on De Le Pena's direct testimony. However, for this first example the Defendants discuss the direct and related cross, because that combination is illustrative of what happened repeatedly during De La Pena's testimony.

**1.     Direct Testimony**

A leading example of the improper testimony the government elicited occurred early on the second day of De La Pena's direct testimony, though after many objections related to summary testimony had already been sustained:

> PLETCHER: As part of your investigation, Agent De La Pena, did you also investigate whether individuals divulged to Leonard Francis information about the existence of ongoing investigations?

---

[12] That De La Pena was not the appropriate witness to testify about much of the the subject matter covered in the email evidence was also evident from all the things claimed he didn't know on cross, with respect to people named and terms used in the emails. *See, e.g.*, 4/14/22 TT at 3898, 3905, 3919, 3944, 3945, 3960, 3965, 3978, 3982, 3992; 4/19/22 TT at 4024. The government should, therefore, have called as witnesses the people who were involved in the email exchanges. It could have easily done so without any net gain in trial time if it had eliminated the massive amount of irrelevant and unfairly prejudicial evidence it admitted with respect to people who were not on trial.

DE LA PENA: I did, yes.

PLETCHER: As part of your investigation, what did you find?

DE LA PENA: I found that on at least one occasion Jim Dolan told Jose Sanchez and Leonard Francis that there were no investigations.

BURNS: Objection. This is based on hearsay. Move to strike.

THE COURT: Sustained. The motion to strike is granted.

PLETCHER: Is information about ongoing investigations internal proprietary information?

DE LA PENA: It is.

PLETCHER: And so, if we could, please, let's look at government's exhibit 70-132 as it's been marked for identification, and it's three pages.

4/5/22 TT at 2938-39. There are several things to note about this exchange.

First, as already mentioned, the prosecutor pretended, here and throughout his questioning, that if he preceded a question with, "as part of your investigation," that magically opened the door to impermissible summary testimony and hearsay.

Second, the impropriety of this exchange is largely loaded into the question, "did you also investigate whether individuals divulged to Leonard Francis information about the existence of ongoing investigations?" By questioning the agent like this, the prosecutor essentially asked the agent to give his opinion that "individuals divulged the existence of ongoing investigations" to Francis. Under the circumstances in this case, that opinion was necessarily based on hearsay.

Third, the prosecutor and agent scripted this exchange, and both knew the target was Mr. Dolan. That is obvious because: (1) the prosecutor asked whether the agent was aware of anyone "divulging the existence of investigations," and, according to the government, there were several people who revealed investigations to Francis over the years; (2) De La Pena nonetheless immediately zeroed in on Mr. Dolan; and (3) De La Pena's answer was not actually directed at anyone divulging information about an ongoing investigation, it was that Mr. Dolan supposedly "told Jose Sanchez and Leonard Francis that there were *no investigations*." Furthermore,

34

as defense counsel mentioned during a break in the proceedings shortly thereafter, De La Pena blurted out his answer quickly, as defense counsel was objecting, knowing well that his answer was objectionable.[13] *See* 4/5/22 TT at 2938. In sum, it is evident that the prosecutor and De La Pena choreographed this exchange to put their spin on the email the prosecutor mentioned at the end of the quoted exchange, which the Defendants will come back to in a moment.

Fourth, the prosecutor essentially ignored that the Court sustained the objection and struck the testimony by next asking, "Is information about ongoing investigations internal proprietary information," and then proceeding to an email exhibit. Having spun the upcoming email evidence in the way he wanted, the prosecutor was indifferent to the Court's ruling, and effectively kept the jury's attention on that spin by again referring to ongoing investigations, plural.

Fifth, that spin was misleading to the point of a lie, because the point conveyed by the first question and answer ("yes") is that Mr. Dolan "divulged to Leonard Francis information about the existence of ongoing investigations" – plural – and the subsequent statement by De La Pena was that "on at least one occasion Jim Dolan told Jose Sanchez and Leonard Francis that there were no investigations." When the objection was sustained, the prosecutor turned to government trial exhibit 70-132, an

---

[13] Although not reflected in the transcript (because it is impossible to reflect there), Mr. Dolan's counsel checked with the court reporter and confirmed that defense counsel objected at the same time De La Pena was answering. When asked on cross about his blurting out the answer quickly, while defense counsel was objecting, De La Pena said, "I could very barely hear your objection." 4/13/22 TT at 3725. "Very barely" should have been enough, but, at any rate, the agent knew well what he was doing, as shown by his conduct throughout the cross. *See* 4/21/22 TT at 4426 (Court stating, shortly after De La Pena was done testifying, "the way some of the testimony has gone. We don't want it to be summary. We don't want it to be opinionated. And we don't want it to be furthering a particular goal. And agents are smart, and so you understand the Court's concern, but, more importantly, the concern of the five Defendants in this case").

email chain between Francis and Sanchez that indicates that on February 3, 2009, Sanchez wrote to Francis, "By the way JD does not know about any ongoing investigation, will give you a call when we depart this morning." There is nothing in the email to indicate how, or even if, Sanchez got that information from Mr. Dolan (*i.e.*, JD), nor that Mr. Dolan knew Sanchez conveyed the quoted message to Francis. Thus, contrary to what the prosecutor and De La Pena indicated in their preview/summary testimony, the actually admissible evidence – the email chain – did not indicate that Mr. Dolan (1) "divulged to Leonard Francis information about the existence of ongoing investigations," or (2) "told Jose Sanchez *and* Leonard Francis that there were no investigations" (singular or plural). With respect to the latter point, the email does not even show Mr. Dolan *told* Sanchez *or* Francis *anything* about investigations.

In sum, not only was the quoted exchange impermissible summary testimony, the prosecutor and the agent teamed-up to present a false narrative. A prosecutor is obliged to correct false testimony when it appears, *see Jackson v. Brown*, 513 F.3d 1057, 1074-75 (9th Cir. 2008), thus he also may not conspire with the case agent to present false testimony. Furthermore, the fact that some of the falsity was embedded in the prosecutor's question is of no help to the government here. "[A] line of questioning that repeatedly incorporates inadmissible evidence can be just as improper as the direct admission of such evidence," and "can violate the Federal Rules of Evidence" as well as the constitutional guarantees to confrontation and due process. *United States v. Sine*, 493 F.3d 1021, 1031 (9th Cir. 2007). Indeed, the Ninth Circuit has "held that incorporating inadmissible evidence into questioning can constitute prosecutorial misconduct." *Id.* at 1032 n.8. The exchange set out above, and many others like it during trial, amounted to such misconduct.

Shortly after the exchange quoted above, defense counsel raised all of the issues discussed here with the Court, noting, among other things, that De La Pena was "spring loaded" to offer the false testimony that "Mr. Dolan has divulged information

about an investigation." 4/5/22 TT at 2947-48. Defense counsel also lamented whether the jury will "catch on to the fact that what the agent said is untrue, it doesn't match up with the email?" *Id.* at 2948.

## 2. Cross Examination

That concern was especially justified because Mr. Dolan's counsel didn't have the opportunity to make that connection for the jury for another eight days, until his cross began on April 13. And at that time, De La Pena proved quite willing to take the government's misconduct to another level.

Mr. Dolan's counsel began this line of questioning by asking the agent if he recalled being asked on direct about Mr. Dolan "divulging the existence of investigations." 4/13/22 TT at 3724-25. The agent took advantage of this question by saying, "there is an email that refers to Mr. Dolan disclosing." 4/13/22 TT at 3725. In addition to being non-responsive, that wasn't true, as discussed above.

Defense counsel therefore turned to the email, government trial exhibit 71-132, and questioned the agent about the fact that (1) the email was from Sanchez (on cooltoad) to Francis, (2) Mr. Dolan was not copied on it, and (3) there was no email indicating the subject email was forwarded to Mr. Dolan. *See id.* at 3725-26. To the last question, the agent said, "not specifically, no." *Id.* at 3726. This non-responsive answer was meant to lead the jury to believe that the email was forwarded to Mr. Dolan in some "non-specific" way, which is not true.

To rebut that nonsense, defense counsel next questioned the agent about the fact that he did not have "any email that shows Mr. Dolan received an email from a cooltoad account," to which the agent replied, "Sorry, I've reviewed a lot of emails. I'm not sure." *Id.* at 3727. This was obvious dissembling because if Mr. Dolan had received (or sent) an email from a cooltoad email account, that would have been featured in the government's case. But when defense counsel asked the agent whether he recalled seeing a cooltoad email that listed Mr. Dolan as a sender or recipient, the agent said, "There was a lot of blind copying going on that we don't

always have specific access to." *Id.* at 3727-28. Again, this was non-responsive, and was also dishonest, because the government had access to such information with respect to the cooltoad accounts. Nevertheless, the response was calculated by the agent to make the jury believe that Mr. Dolan received such emails as blind-copies.

When defense counsel followed up with the same question, trying to get the agent to answer it, De La Pena said, "What stands out in my memory is that Mr. Dolan –" *Id.* at 3728. Defense counsel cut-off what was obviously going to be a non-responsive and improper answer and asked the same question a third time (that is, wouldn't the agent recall if he'd seen an email from a cooltoad account for which Mr. Dolan was the sender or recipient), and the agent responded, "I can't specifically recall if that happened or not. There was definitely information from Mr. Dolan – " At that point, defense counsel again tried to cut off this non-responsive and improper answer, but the agent finished by saying, "sent to an account from cooltoad." *Id.*

Defense counsel next asked if Sanchez was questioned about this exact email, and the agent said, "I am not sure." *Id.* at 3729. Of course, Sanchez was questioned about the email, and the agent knew it. When defense counsel pressed forward on that topic, the prosecutor objected on hearsay grounds, and defense counsel replied that the government had opened the door to such questioning by mis-characterizing the email. *See id.* at 3730. The prosecutor responded, "The Court allowed agent De La Pena to read the email, that's all." *Id.* That was nonsense, as defense counsel pointing out, stating, "First, it was mis-characterized in the question, and the agent spoke over my objection. I think it's opened the door." *Id.* The Court agreed.

Defense counsel then asked whether Sanchez was shown the subject email in a January 28, 2015 interview, at which time Sanchez told agents that "he did not know what investigation he was referring to" in the email. *Id.*; *see also* 1/28/15 Report at 5 (Exhibit C). De La Pena said he could not recall that, which is hard to believe given his claimed knowledge of everything about the case, and that this email //

exchange was one of the first things the government featured in De La Pena's direct testimony. *See* 4/13/22 TT at 3730.

Defense counsel then turned to a raft of examples of Sanchez divulging investigations to Francis, based on what Sanchez learned from his superiors and those he worked with. Those examples were totally unrelated to Dolan, and Sanchez admitted many of them in his plea agreement. *See id.* at 3731-37. After establishing Sanchez's penchant for getting information about investigations from unwitting people (like Mr. Dolan), and passing it on to Francis, defense counsel asked, "And in all the emails that you've looked at that indicate on the sender line that they were sent by Mr. Dolan, you can't point to a single one where he even uses the word 'investigation,' can you?" *Id.* at 3738. The agent replied, "No, sir. He sent other emails." *Id.* The agent was never content to answer, he always had to get in an improper dig that furthered his summary testimony.

To confront the implication raised by that improper answer – that Mr. Dolan sent "other emails" divulging information – defense counsel next asked, "And, of course, you and other investigators have met with Mr. Sanchez many times and discussed those various emails?" *Id.* at 3738. The obvious answer to that question was yes, but the agent again dodged with a non-responsive reply, stating, "I've met with Mr. Sanchez a few times, yes." *Id.* at 3738. Defense counsel then pointed out that a report of one of those interviews indicated that Sanchez "said that he never told Mr. Dolan that he, Mr. Sanchez, was using a cooltoad account," and the agent replied, "I don't specifically remember that." *Id.* at 3742; *see also* 1/28/15 Report at 6 (Exhibit C). Defense counsel next asked, "Another thing that Mr. Sanchez said is that he did not tell Mr. Dolan that he, Mr. Sanchez, was sending ship schedules to Mr. Francis, right," and the agent replied, "Again, I'd have to review the reports, and there are other statements from Mr. Sanchez that are much different than those statements." 4/13/22 TT at 3742.

//

Defense counsel then referred to a January 28, 2015 report, and asked whether it was true that Sanchez said during the subject interview that he did not tell Mr. Dolan that he/Sanchez was using a cooltoad account. *See* 4/13/22 TT at 3742. The government objected as hearsay and defense counsel replied that the government had opened the door by mis-characterizing the email evidence, *see id.* at 3742, and the agent had further opened the door with his improper answers on cross. The Court overruled the prosecutor's objection and defense counsel again asked whether it was true that Sanchez told investigators that Mr. Dolan did not know that he/Sanchez was using cooltoad. *See id.* at 3743. The agent replied, "Again, I would have to review the document to specifically say what he said. And I know that statement is much different from what Mr. Sanchez has told me." *Id.*

Before proceeding further with reviewing the cross, it is useful to pause and note three key things about the exchanges discussed in the preceding two paragraphs.

First, the agent's non-responsive answers continued to further the improper summary testimony he gave on direct, and the agent was obviously not ignorant of the impropriety.

Second, the agent's repeated answers about Sanchez's "much different statements" trampled on the government's statement to the Court that it would not violate the hearsay rule in this way. As the Court will recall, in an *in limine* motion, Mr. Dolan wrote that he intended to use prior inconsistent statements by cooperators for impeachment, and asked that the Court order the government not to respond with prior consistent statements made by the witness at a time when he had a motive to fabricate. *See* 8/12/21 Dolan Memo. at 14-16 (Docket #540). At the hearing on that motion, the Court stated that it was moot because the government agreed not to violate the hearsay rule in this manner. *See* 9/2/21 Rep. Tr. at 20-21. The government opened the door to the questioning set out above by De La Pena's effectively, and improperly, telling the jury that Sanchez had stated that Mr. Dolan was involved in his/Sanchez's improperly divulging information to Francis. Under

Federal Rule of Evidence 806, Mr. Dolan was therefore entitled to impeach those implied Sanchez statements with Sanchez's prior inconsistent statements – that was all entirely proper. What was improper, as recognized by the government in its concession with respect to the *in limine* motion, was for De La Pena to testify that Sanchez had made some other statements indicating that Mr. Dolan was involved in improperly divulging such information. Sanchez wouldn't even have been allowed to testify to such hearsay statements. In short, the agent capped off his improper testimony by violating the Rules of Evidence in a manner that the government promised to avoid. The agent was likely aware of that impropriety, but, in any event, it was an obvious risk – to the defense – of presenting his improper summary testimony.

Third, the agent repeatedly claimed, here and throughout his testimony, that he'd need to see the reports counsel was referring to before answering, so he could assess the "context." But the agent obviously knew that the statements were made, and the reports have been attached here to remove any doubt. What he seemed to be trying to do was to bait counsel into showing him the reports, at which point the agent would undoubtedly have used them to go off on some other impermissible tangent. Defense counsel did not take that bait.

Coming back to the review of the cross, counsel next pointed out that Sanchez told investigators that he "did not discuss with Mr. Dolan that he was sending ship schedules to Mr. Francis, right?" 4/13/22 TT at 3744. De La Pena replied, "I have read the report. It's been a little while. Specifically, I believe those statements are being taken out of context. I would be happy to talk more about what Mr. Sanchez told me." *Id.* Defense counsel ignored that response and asked, "So Mr. Sanchez, also in January 2015, said that Mr. Dolan did not get involved in who received a husbanding contract, right?" *Id.* The agent again tried to get into his summary testimony, stating, "My review of the evidence indicates –," at which point defense counsel again had to cut him off. The agent was not so easily stopped, however, as

was evident when defense counsel next asked, "Mr. Sanchez also explained to investigators that Mr. Dolan's job was to make sure that there was a contract in place? That is, that there was coverage for a port visit." *Id.* at 3745. The agent replied, "It's also true that he had influence, sir." *Id.*

Defense counsel then asked, "Mr. Sanchez also explained that controlling port visit costs, that that was a ship function, not Mr. Dolan's job, right?" *Id.* at 3745; *see also* 3/16/16 Report at 7 (Exhibit D). The agent replied, non-responsively, "That's an inaccurate representation of the N4's job." 4/13/22 TT at 3746. Defense counsel responded, "What I'm asking you is what Mr. Sanchez, who actually worked in the N4 department, said," and repeated the question. The agent responded that Sanchez's statement was being "taken out of context." *Id.* As the report shows, it wasn't. *See* 3/16/16 Report at 7 (Exhibit D).

At this point, the prosecutor again objected on hearsay grounds. Defense counsel replied that the questioning "highlight[ed] why [De La Pena] shouldn't have been used as a summary witness," and the Court said, "I think the door has been opened. I think Mr. Burns may go ahead." 4/13/22 TT at 3746.

Defense counsel next pointed out that in his statements to investigators, "Mr. Sanchez also explained that Mr. Dolan was not able to give competitor information to GDMA. That is, information about GDMA's competitors, right" *Id.* The agent replied, "You're still not showing me the report, Mr. Burns, so I have no ability to tell you whether that statement is taken out of context." *Id.* at 3746-47. One can only imagine the field day the agent would have had if handed a report. At any rate, defense counsel replied that if the agent could not recall that Sanchez made the statement, he should just say that. *See id.* at 3747. But the agent was not so easily knocked off his goal of giving improper testimony, and he replied, "I've read the report. It's been a little while. My understanding and my investigation showed that the N4 absolutely –" *Id.* Defense counsel again cut off the improper testimony, though its impact – throughout the direct and cross – was obviously felt by the jury.

### C. Despite The Court's Prohibition, The Prosecutor Repeatedly Sought To Elicit, And Elicited, "Connect The Dots" Testimony

As discussed above, prior to De La Pena's testimony the Court cautioned the prosecutor not to use him to "connect the dots" with respect to evidence, because for that the agent would inevitably rely on hearsay and lack foundation, and such testimony would amount to a multi-day closing argument. *See* 3/30/22 TT at 2529. The Court also made that point several times during De La Pena's testimony. But early in the direct, the prosecutor told the Court that he did not intend to abide by the case law and this Court's admonitions, stating:

> The presentation of evidence in a case like this one, you know, can't be beginning to end, because people have a different understanding and different knowledge as to different events, and so our presentation of the evidence is to try to aggregate that and to put that information in right now.

4/5/22 TT at 2771. This amounted to the prosecutor saying that he refused to abide by the prohibition on summary testimony because it would be inconvenient, or adversely impact his case. "A party cannot, however, avoid the dictates of the rules of evidence simply because they create a burden." *United States v. Sine*, 493 F.3d 1021, 1035 (9th Cir. 2007). But the more disturbing aspect to the prosecutor's quoted statement is that he acknowledged that the agent would try to smooth over people's "different understanding" with respect to events, even though many, or most, of those witnesses would not testify during trial. The jury, of course, would have no way of knowing where those inconsistencies lay, much less have the opportunity to assess the credibility of the people who made the statements on which the agent relied. Finally, it is impossible for defense counsel to know how to defend against such "aggregated" testimony. But "aggregated" testimony is exactly what the prosecutor sought, and often received, when he repeatedly asked the agent what he learned from the "investigation," and asked him to, effectively, connect the dots.

A good example of the government using De La Pena to "smooth" over problems involved the issue of when Mr. Dolan allegedly joined the charged

conspiracy. The Court will recall that De La Pena testified that Mr. Dolan joined the conspiracy at a dinner in Hong Kong on January 29, 2008. *See* 4/13/22 TT at 3834; *see also id.* at 3807-08. Given the timeframes involved, and the date of subsequent Francis "events," that was the latest the government could claim Mr. Dolan entered into the conspiracy. But De La Pena knew he could not claim an earlier date, because Mr. Dolan wrote emails to Francis in December 2007 and January 2008, regarding the Navy's late payments to GDMA, which clearly showed Mr. Dolan was pushing back against Francis, and thus was not in Francis's pocket. *See, e.g.,* Gov't Trial Exh. 81-25. De La Pena smoothed over this issue by claiming Mr. Dolan entered into the conspiracy on January 29, 2008, and in doing so he blunted a defense attack based on the fact that the indictment's allegations were not consistent with the evidence.

Later, however, Steven Shedd testified on cross that Mr. Dolan entered into the conspiracy in the Fall of 2007. *See* 5/10/22 TT at 5434. Shedd claimed that Aruffo – who brought Shedd into the conspiracy – told him as much in the Fall of 2007, but Shedd was caught flat-footed when defense counsel advised him that Aruffo had testified that he was not aware of Mr. Dolan being part of the conspiracy. *See id.* at 5434-35. Shedd also could not account for the fact that De La Pena had testified that Mr. Dolan entered the conspiracy on January 29, 2028, and Shedd's testimony did not otherwise make sense. *See id.* at 5435-39. In sum, this example illustrates what Pletcher admitted: the government would not have been able to hold its case together if the actual percipient witnesses testified, so it aggregated and smoothed things out with De La Pena.

The prosecutor regularly set up such "connect the dots," "aggregated" testimony with questions such as, "When you review information like this, the dissemination of unauthorized proprietary information, do you also identify events that took place in or around that time?" 4/5/22 TT at 2927-28. De La Pena answered yes to this question and moments later explained, "Whenever I saw an icon email like this and any number of similar emails, I undertook a systematic review of all of the

44

information that I had at my disposal surrounding an event like this. That includes other emails. It includes any financial information that I came across, any of the physical evidence that was seized including things like Leonard Francis's passport or other pieces of evidence or documents that I found, seized, or had been provided over the course of time." *Id.* at 2928-29. De La Pena then agreed that he was "in effect, kind of making a timeline." *Id.* at 2929.

After a defense objection to this "connect the dots" testimony, the Court said to the prosecutor, "ask him what he did." *Id.* Ignoring that direction, a few moments later the prosecutor asked the agent to identify people who attended a Francis "event" "in close proximity" to May 31, 2008. *Id.* at 2930. After several more objections, the Court asked the agent his basis for answering that question, and the agent replied, "Upon reviewing all the surrounding documents, upon reviewing the email communications back and forth seized off of Leonard Francis's laptop and other sources, upon reviewing travel records, financial documents, and other pieces of evidence, Jim Dolan attended as well." *Id.* at 2932. The "Jim Dolan" add-on was non-responsive and evidently meant to punish Mr. Dolan's counsel for his objections. At any rate, the answer again showed that the prosecutor was seeking to have the agent "connect the dots" for the jury based on reviewing a wide range of unspecified documents. Aside from obscuring the actual, admissible evidence, and likely relying on hearsay, the testimony sought amounted to giving a long closing argument, which is one of the reasons summary testimony is prohibited. The Court sustained the objection. *See id.* at 2932.

The prosecutor nevertheless pursued this sort of testimony throughout the direct examination. For example, the next day the prosecutor asked, "as part of your investigation, did you have cause to investigate an event at the Altitude Restaurant?" 4/6/22 TT at 3001. When the agent said yes, the prosecutor asked what the agent "did to investigate," and he replied, "I reviewed documents, financial information, emails, passport records, travel records, and attempted to *connect* what I knew about that

event to activities undertaken by U.S. Navy officers." *Id.* at 3002-03 (emphasis added). Despite the obvious red flag of the word "connect," the prosecutor proceeded down this path again and, when objections were sustained, made several prejudicial remarks about how the jury could not just be "thrown into the pool," they instead needed the prosecutor and agent to connect the dots for them. *See id.* 3003-05. That is, even though the objections were sustained, the prosecutor continued to inflict improper prejudice on the defense.

The prosecutor came back to this approach later that day, asking, "Did you investigate whether additional individuals became associated with Leonard Francis" after July 2007? 4/6/22 TT at 3079. Although the court sustained a summary testimony objection, the agent on his own circled back a short time later, stating that he "wanted to ascertain what happened next in these series of events that I had previously been looking at, so I reviewed emails, U.S. Navy databases, financial records, everything that I had at my disposal to come to an understanding of the events that happened thereafter." 4/6/22 TT at 3083. Defense counsel objected, noting that the government was again proceeding with improper summary testimony, and that the prosecutor was loading content into his questions, thereby defeating the impact of objections. *See id.* at 3084. The Court admonished the prosecutor "not too elicit or frame things too much," *id.*, but the prosecutor persisted, stating, "We're speaking as to how Agent De La Pena investigated the issues of recruiting so we can segue into the next time period." *Id.* at 3086.

Of course, how the agent investigated the case was irrelevant, and the prosecutor knew that such questioning cannot be permitted to subvert the prohibition on summary testimony. Nonetheless, he persisted with this type of questioning, and over the next few minutes the Court admonished him twice, stating, (1) "Let's move ahead in a non-leading way, non-conclusory way, and pose a question, Mr. Pletcher,"

//

//

*id.* at 3087, and (2) "pose a question with a focus on what this document says.  No conclusions."[14]  *Id.* at 3092.

The prosecutor was not to be deterred, however.  For example, the next day he asked the agent "whether any of the individuals named in this email participated in an event with Leonard Francis shortly thereafter?"  4/7/22 TT at 3223.  In the face of summary witness objections, the prosecutor said, "It's just based on all of the aspects of his investigation, the review of the evidence.  It's just simply juxtaposing this to the event, and then we're going to move on."  *Id.* at 3224.  The Court sustained the objections and said, "that's what the jury's going to be doing.  The jury's going to juxtapose."  *Id.* at 3224-25.  And the jury is supposed to do that based on the admissible and admitted evidence, not based on the agent's "aggregation" of who-knows-what.

A short time later that same day, the prosecutor tried to connect emails together on a timeline, and the Court sustained an objection.  *See id.* at 3261.  A few minutes later, the prosecutor asked, "from the previous message on November 21st to this message on November 29th, what has happened."  *Id.* at 3265.  The Court sustained

//

_____

[14]  Defense counsel repeatedly objected to the prosecutor's using improper questioning to effectively offer summary testimony.  For example, on April 7, 2022, Mr. Dolan's counsel said, "Your honor, I'm just going to ask that government counsel be admonished not to load his testimony into his questions.  I mean, we don't know unless we hear from these witnesses what event they're talking about, but he's making the connection in his question.  So let's hear from the witnesses, not from government counsel."  *See* 4/7/22 TT at 3283.  As the Ninth Circuit has explained, "When a lawyer asserts that something not in the record is true, he is, in effect, testifying.  He is telling the jury: 'Look, I know a lot more about this case than you, so believe me when I tell you X is a fact.'  This is definitely improper."  *United States v. Kojayan*, 8 F.3d 1315, 1321 (9th Cir. 1993); *see also id.* at 1323 ("[e]vidence matters; closing argument matters; statements from the prosecutor matter a great deal").

another objection, but not before De Le Pena answered, "the party at the Shangri-La Kowloon has." *Id.*

Shortly after that, the prosecutor asked about a previously admitted email, and in response to the Court's statement that it viewed the questioning as cumulative, the prosecutor said, "It puts the time and chronology together, your Honor." *Id*. at 3276. The Court responded, "Well, we're talking about the parameters of this witness's testimony, and connecting the dots in that fashion was not going to be permissible." *Id.* Of course, the prosecutor knew that – it was the fourth day of the direct, and the Court had told him that repeatedly.

Nevertheless, the prosecutor continued with the "connect the dots" testimony the next day, unfazed by sustained objections. *See, e.g.*, 4/11/22 TT at 3439; *see also id.* at 3397, 3401, 3412. Furthermore, the examples given above are far from exhaustive. In fact, much of the agent's direct testimony was comprised of his "connecting the dots" in one way or another.

### D. Despite The Court's Prohibition, The Prosecutor Repeatedly Had De Le Pena Construe, Or Put His Spin On, Emails

As discussed above, prior to De La Pena's testimony defense counsel said he was concerned that De La Pena would testify about "the meaning of those emails," and would "effectively interpret those for the jury." 3/30/22 TT at 2532-33. The Court replied, "He can't do that." *Id.* at 2533. Shortly after the agent began testifying, defense counsel again raised this concern, stating that it was evident that the prosecutor intended to have the agent "construe emails," which "isn't permitted by *Gadson*." 4/5/22 TT at 2754. The Court reiterated what it had said earlier, stating, "Well, we're not going to do that." *Id.* Nonetheless, that is exactly what the prosecutor did, repeatedly, often by loading substance into his questions.

Indeed, a short time after the Court said, "'we're not going to do that," the prosecutor had the agent read a text from Sanchez to Francis and asked "in what way" that text was "reflective of a false flag." *Id.* at 2792. The agent replied, "*My*

*understanding* of this message and the *review of John Beliveau's activities*, *it indicated to me* that Mr. Francis had received the false flag reporting." *Id.* (emphasis added). The Court sustained an objection because the texts should speak for themselves. *See id.* Moments later, however, the prosecutor came back to the same question, stating, "Is that [text] response consistent with the contents of the false flag information that you had inserted into the case file?" *Id.* at 2793. Another objection was sustained and the testimony stricken, but the prosecutor had made his point.

A short time later, the Court again sustained an objection that the agent was interpreting text messages. *See id.* at 2795. Nonetheless, moments later the prosecutor mentioned that "data and evidence was recovered from Singapore," and asked, "Did that confirm as well that John Beliveau was providing internal case information to Leonard Francis?" *Id.* In the face of objections, the prosecutor pressed forward until eventually halted by the Court. *See id.* at 2795-96.

In another example later that same day, the prosecutor presented an email to the agent and said, "Is Mr. Sanchez discussing two different events in conjunction with Leonard Francis?" *Id.* at 2937. The Court sustained an objection that the "email speaks for itself," but the prosecutor ignored that ruling, asking next, "Both events, is it fair to say, were in July?" *Id.* The Court sustained "the same objection." *Id.*

Things continued in this manner. For example, the next day the prosecutor presented an email to the agent and asked/said, "the general content of the email is a discussion about ships, port visits." 4/6/22 TT at 3052. The Court sustained a summary testimony objection to the question, which obviously sought the agent's interpretation/construction of the email.

Shortly after that, the prosecutor presented an email chain to the agent and said/asked, "and again in this email string, is this another example of Leonard Francis expressing preference for Phuket, Thailand?" *Id.* at 3063. The Court sustained another objection.

//

49

This sort of questioning continued the next day.  For example, the prosecutor asked the agent, "And as part of your investigation, did you examine Leonard Francis's interests or preferences with respect to those port visits in Subic Bay?" 4/7/22 TT at 3222.  When the agent said yes, the prosecutor showed him an email and said, "Does that correctly express Mr. Francis's preferences for ships in the Philippines?"  *Id.* at 3223.  The agent answered yes before the defendants could get out their objections, at which point the Court struck the testimony.  *See id.*

There was more of the same the next day.  For example, at one point the Court sustained an objection to the prosecutor's trying to have the agent interpret emails relating to Alex Gillett.  *See* 4/11/22 TT at 3356.

Shortly thereafter, the prosecutor asked the agent if he had investigated whether "any individual named in the indictment" – which included many people who were not on trial – "solicited employment from GDMA or solicited assistance in finding employment using GDMA's help?"  *Id.* at 3387.  When the agent said yes, the prosecutor handed him a batch of emails and said, "In an effort to try to expedite this module, the question was, can you categorize what these documents are?"  *Id.* at 3388.  The Court sustained multiple objections, but that had little effect on the prosecutor, who moments later referred to a specific email and said, "Is this one of the emails, Agent De La Pena, that you reviewed with respect to this soliciting employment?"  *Id.* at 3389.  When the Court sustained another objection, the prosecutor essentially ignored that, too, asking, "Why did you review this exhibit?" The Court sustained another objection.  *Id.*

The prosecutor kept at it, moments later, *see id.* at 3392, and throughout his direct of the agent.[15]  In fact, many of the examples in the substance-specific

//

---

[15]  The prosecutor came back to this technique during his re-direct of the agent, which drew several more sustained objections.  *See* 4/20/22 TT at 4234-36, 4242.

categories of improper testimony discussed below involved the prosecutor improperly having the agent construe emails.

**E.    The Prosecutor Repeatedly Sought To Elicit Improper Testimony About The Alleged "Dissemination" Of "Proprietary" And Classified Information**

The prosecutor was especially tenacious in his efforts to elicit improper testimony about the alleged "dissemination" of "proprietary" and classified information.

That began early in De La Pena's testimony, when the prosecutor asked, "what did your investigation *conclude*" with respect to "the dissemination and unauthorized distribution of U.S. Navy proprietary information?"  4/5/22 TT at 2883 (emphasis added).  This obviously called for summary testimony, because it really asked what the agent "concluded."  The Court sustained an objection to the question but the prosecutor kept at it, re-phrasing the question in a manner that obviously sought the same impermissible testimony that De La Pena was prepared to give.  The Court repeatedly sustained objections, but, having framed the coming evidence in the manner he sought, the prosecutor rolled on, ignoring the impact of the Court's rulings.  *See id.* at 2884-86, 2916.

A short time later, the prosecutor asked De La Pena about an email and then said, "based on your investigation, is this an instance of internal proprietary information being passed?"  4/5/22 TT at 2919.  Defense counsel objected, noting that the emails speak for themselves, and the agent should not construe them.  The Court sustained the objection but government counsel ignored the impact of the Court's ruling and had De La Pena say the email contained "competitor information" that was "internal proprietary information."  *Id.* at 2919.

The next day – and really, throughout the direct – the prosecutor again used this technique of construing the email evidence with his questions, and also summarized his spin on prior testimony, by stating/asking, "As part of your investigation, we've looked at unauthorized disclosure of proprietary information in

a number of various categories. Did you also investigate whether flag rosters had been disseminated to Leonard Francis?" When the agent said, "I did," the prosecutor said, "And so if we could pull up document 81-200. And Agent De Le Pena, is this an example of that type of dissemination?" 4/6/22 TT at 2970. The prosecutor went on to ask the agent if three emails were "examples" of such "unauthorized dissemination?" *Id.* at 2970-71. That questioning sought blatantly impermissible testimony, as it amounted to the agent construing the emails rather than allowing them to speak for themselves, and the agent did so before the email evidence was introduced. Accordingly, the Court sustained objections. *See id.* at 2972.

A short time later, the prosecutor and agent continued this dance when the prosecutor asked, "And so, Agent De La Pena, if we could then turn to what's been marked for identification as government's exhibit 81-8. In the course of your investigation, Agent De La Pena, did you investigate whether the biographies of U.S. service members were disseminated in an unauthorized fashion?" 4/6/22 TT at 2980. When the Court sustained summary witness and relevance objections, the prosecutor and witness ignored those rulings, with the prosecutor asking, "What specifically did you do as part of your investigation with respect to this document [exhibit 81-8]," and the agent responding, "So I assessed millions of documents for patterns of behavior. One of the patterns of behavior was the disclosure of internal –" *Id.* at 2980. The Court sustained another summary testimony objection, and, of course, the prosecutor and agent surely knew the testimony was improper. Furthermore, the prosecutor was unfazed by the sustained objections, because he was able to frame the email in the way he liked before it was introduced.

The next fifteen pages of trial transcript show the prosecutor repeatedly employing this approach with respect to the alleged improper disclosure of "proprietary information," during which the Court repeatedly sustained objections and the prosecutor persisted with obviously improper questioning, achieving his goals despite the sustained objections. *See id.* at 2984, 2986, 2991, 2992, 2993, 2999.

The same dynamics were evident in the prosecutor's questioning about the alleged disclosure of classified information. For example, when asking the agent about an email exchange between Francis and Sanchez, the prosecutor said, "In your review of this document, did you investigate whether it also included the unauthorized disclosure of classified information," to which the agent said "yes." 4/6/22 TT at 2999. The Court sustained a summary witness objection and struck the testimony, but the prosecutor proceeded to question the agent about the subject email as if the Court hadn't stricken the testimony, asking the agent to discuss "an example" from the email in which the agent concluded that classified information had been disclosed. *See id.* at 2999-3000.

A short time later, the prosecutor asked the agent, "who disclosed classified information to Leonard Francis?" *Id.* at 3119. The Court again sustained a summary witness objection.

About ten minutes later, the prosecutor said/asked, "And, Agent De La Pena, I know you testified that there were many, many, many examples of classified information. We'll just go over a few representative examples." *Id.* at 3127. Defense counsel objected, noting that in addition to seeking summary testimony the prosecutor was effectively testifying, and the Court sustained the objection. *See id.* Once again, the prosecutor ignored that ruling by saying to the agent, "Well, let's start with this one," and then offered up an email attachment as one of his "examples" of the "many, many, many" times *someone* allegedly passed classified information to Francis. *See id.* at 3127-28. The Court again sustained an objection, but it made no practical difference – once again the prosecutor achieved his goal with what he knew was improper questioning.

Another blatant example of the prosecutor willfully trying to elicit improper summary testimony with respect to the alleged passing of classified information to Francis was his attempt to have De La Pena testify about the total number of "classified information units" that were allegedly passed, and by whom. Setting aside

for the moment that the vast majority of that evidence did not relate to any of the Defendants on trial, it could hardly have been a more obvious example of summary testimony. In response to that objection, the prosecutor said the agent was "going to testify he just counted. Right? There's no – he counted up all the documents *that he believed* –" 4/7/22 TT at 3204. Of course, it isn't just a matter of counting, as is evident from the "that he believed" language. And it was obviously summary testimony, as the Court pointed out by stating, "But aren't we going through the documents? I thought that was the point of the Court's earlier ruling, that we weren't going to do this in a summary fashion for a variety of reasons, so we were just going to go through things." *Id.* Of course, the prosecutor knew that was the Court's ruling, and he defied it countless times.

## F. The Prosecutor Elicited Improper And Dishonest Summary Testimony With Respect To Alleged Prostitutes

The prosecutor and agent were determined to tell the jurors that women Francis invited to his parties during USS Blue Ridge port visits in May 2008, and later that year, were prostitutes. There were, however, four problems with that claim.

First, the only witness who might be able to support that claim was Francis, and the government didn't want to call him.

Second, shortly before trial, Francis told journalist Tom Wright that the women who attended his parties were "university students, secretaries," and "professionals" who hung out with very wealthy people and came to his parties because they "just want to have some fun." 4/14/22 TT at 3973-3974.

Third, and relatedly, in an email to one of the women, Febby Caroline, Francis wrote things such as, "I got it, my love. Miss you so much. Warm kiss and lovey smell. Hmmm mwaaa." 4/14/22 TT at 3972. That doesn't seem consistent with a prostitute-customer relationship.

Fourth, there was an email that stated that Francis was hanging out with two of the women, Joyca and Ina, on New Year's 2008, and that circumstance, and the

attached photograph, don't support the conclusion that those two women were prostitutes.

But the prosecutor and De La Pena were not going to let facts, and the rules of evidence, stand in the way of their narrative. Their efforts in this regard began on April 6, 2022, when the prosecutor asked about an email that referred to a "talent search," and then quickly shifted to a substance-loaded question, asking, "Are you talking about prostitutes?" 4/6/22 TT at 3056-57. The Court sustained the Defendants' objections. *See id.* at 3057. Undeterred, the prosecutor then said, "Did you investigate, Agent De La Pena, whether those women were prostitutes." *Id.* at 3057. Defense counsel objected again, pointing out that it was "the same question," and the Court sustained the objection. *Id.* at 3058. The prosecutor nonetheless kept pressing this line of questioning, claiming the agent was relying on emails, to which defense counsel said "let's see the emails" and the Court agreed. *Id.* at 3059. The prosecutor then said he was going to get to those unidentified emails "later in the testimony," and the Court responded, "Well, then it becomes summary." *Id.* at 3059-60. The prosecutor said he'd come back to the topic later.

He did the next day, and picked up with the same sort of improper questioning the Court had shut down the day before. The prosecutor began by asking the agent about one of the women named in an email, saying, "Over the course of your investigation, have you been able to identify the reference to BT?" 4/7/22 TT at 3273. De La Pena said he had, and the prosecutor then asked, "Who or what is that?" *Id.* Defense counsel objected quickly on summary witness grounds, but the agent responded before the Court could rule (as he often did), saying, "*It's* a prostitute that Leonard Francis paid." *Id.* (emphasis added). The Court sustained the objection, but once again the damage was done, willfully.

The prosecutor didn't stop. Moments later, he asked essentially the same question, "have you been able to determine who or what is BT?" *Id.* The agent said yes, and when asked how he determined that, he replied, "That is a reference that

comes up quite often in emails between –" *Id.* at 3274. The Court again sustained an objection and *again* told the prosecutor to stick to the email evidence. *Id.* The prosecutor essentially ignored the sustained objections and immediately asked the agent what the term "det" in an email meant, another attempt to elicit De La Pena's claim that the women were prostitutes. The Court again sustained an objection. *See id.*

During a subsequent discussion outside the presence of the jury on April 11, 2022, defense counsel mentioned that De La Pena had referred to the women named in the emails as prostitutes, "even though the emails don't say that," and the Court agreed. 4/11/22 TT at 3498. Of course, the prosecutor knew that the emails didn't say that, and he and the agent knew that Francis had recently made statements indicating that the women were not prostitutes. The prosecutor's sustained effort to nonetheless present contrary testimony from De La Pena was blatant misconduct.

**G.     The Prosecutor Repeatedly Sought To Elicit Improper Testimony That The Defendants Went By A "Collective" Or "Group" "Identifier"**

The prosecutor also repeatedly sought to elicit improper testimony that the Defendants went by some sort of group name. He first did that by trying to have De La Pena tie together various aspects of the government's "wheel demonstrative." The Court sustained an objection to that blatant attempt to elicit summary testimony. *See* 4/5/22 TT at 2800-01.

Blocked from using his "wheel demonstrative," the prosecutor still sought to connect a vast, unspecified group of people together with overarching labels. For example, shortly after the Court shut down the "wheel," the prosecutor asked De La Pena, "as part of your investigation, were you able to identify group names or collective identifiers that these individuals called themselves over time." *Id.* at 2801-02. The court sustained a summary witness objection. *Id.* at 2802.

Relentless, the prosecutor then asked, "As part of your investigation, did you become familiar with the term inner circle." *Id.* at 2802. In the face of objections and

this Court's inquiry, the prosecutor said De La Pena could testify about that term because he'd reviewed "documents." After additional objections, the prosecutor made prejudicial statements about how unidentified people used "nicknames." *Id.* at 2802-04. In response, the Court once again told the prosecutor to stick to any email evidence and sustained the objections. *See id.* at 2804.

The prosecutor continued to press the issue, however, prejudicing the Defendants in the process. The Court eventually stated what should have been clear already, telling the prosecutor, "he's not a summary witness. He's not an overview witness. He's not an interpretive witness. He can only tell us what he saw, heard, did, you know, his specific role in this." *Id.* at 2805.

Nonetheless, the prosecutor came right back to the same questions, asking, "So, Agent De La Pena, with respect to these group names and collective identifiers, were you able to, as part of your investigation, identify names?" *Id.* at 2805. In the face of additional objections, the Court told the prosecutor to refer to an email, and he responded, "Sure, I will reference each one at a time. But at this point, if we could, let's bring up what's been previously admitted as government's 10-11. As part of this email, Agent De La Pena, did you identify the term inner circle as a collective identifier for –" *Id.* at 2806-07. In this way, the prosecutor ignored the Court's rulings by loading the impermissible testimony into the question, rather than letting the email speak for itself. In doing so, the prosecutor indicated that the term "inner circle" was a "collective identifier" for some unidentified people. When defense counsel objected, there was a great deal of back-and-forth and the prosecutor said several things advancing his spin in this context.

During that exchange, in front of the jury, defense counsel pointed out that not only was the prosecutor using the agent as a summary witness, the email he eventually referred to was between Francis and Edmond Aruffo in 2006, and did not connect to any of the Defendants on trial. *See id.* at 2807-09. As defense counsel pointed out, the prosecutor was trying to have the agent make sweeping statements

(*i.e.*, offer summary testimony) about "group identifiers" and the like, rather than refer to specific emails, because the sweeping statements were not supported by the actual emails. *See id.* at 2808-09. The Court sustained the objections, but the damage was done at that point – the jury was left with the impression that the Defendants and others, like Aruffo, had a group name, befitting conspirators.

The prosecutor was not content to leave it alone, however. Perhaps twenty minutes later (*i.e.*, ten transcript pages), he asked, "As part of that investigation, Agent De La Pena, did you at times read terminology that is indicative of a collective identifier or group name?" *Id.* at 2819-20. The prosecutor then skirted objections by having the agent testify that such "collective identifiers" existed, though the prosecutor and agent did not refer to any actual evidence of that. *Id.* at 2820-22. The testimony was, therefore, substantively meaningless, though the prosecutor's intent was obvious: to get the jury to draw the conclusion that the Defendants had a collective name or names – names that the prosecutor spouted repeatedly during the trial – but the agent was being prevented from specifying those names for the jury. In context, the questioning and testimony implicated all of the problems with summary testimony, and were misconduct.[16]

The spin the prosecutor put on the Francis/Aruffo email from 2006 was not a unique example of this sort of attempt to mislead. The prosecutor also introduced an email that referred to people that appeared in attached photos as a "band of brothers," a term the prosecutor repeatedly pitched as one of his group identifiers. But the prosecutor deliberately excluded the photos from evidence, because they showed Francis, Sanchez, Mr. Dolan, and several other people who were not charged, and who De La Pena could not even identify, at a Royal Malaysian Navy event. *See*

---

[16] The prosecutor was not completely done with his efforts to get in specifics in this regard. Much later in the day he asked De La Pena what the term "the boyz" meant to him "as part of his investigation," and the Court sustained objections. *Id.* at 2936.

1    4/14/22 TT at 3933-3936. This hardly evidenced some sort of identifier for people
2    alleged to be members of a conspiracy. Once again, the prosecutor and agent were
3    not going to let facts get in the way of their narrative.

**H.    Through De La Pena, The Prosecutor Introduced A Lot Of Inflammatory Evidence With Respect To People Who Were Not On Trial, Which Was Irrelevant To Determining The Defendants' Guilt**

6         Much of De La Pena's testimony related to inflammatory evidence with respect
7    to people who were not on trial, and which was irrelevant to the jurors' determination
8    of whether the Defendants were guilty of the crimes charged. This violated Federal
9    Rules of Evidence 401 and 403, and was unfair for obvious reasons.

10        It was also unfair for a less obvious reason. Defense counsel focused – before
11   and during trial – on defending against evidence that related to their clients. That was
12   a gargantuan effort, made a lot harder by the government's last-minute discovery
13   dumps. Defense counsel did not, and could not, prepare to defend against everything
14   the government might allege or claim about others who were not on trial. For this
15   practical reason, the irrelevant and unfairly prejudicial evidence the government
16   introduced with respect to others who were not on trial went unchecked, though that
17   surely does not mean the government's theories with respect to that evidence were
18   true. Indeed, given the government's validated penchant for falsity, it seems likely
19   much of what they presented about others was less-than-accurate.

20        Before De La Pena began his first full day of testifying, the Court raised this
21   issue with government counsel, asking, with respect to a group of 389 emails the
22   government sought to introduce, "Who were those between? What are they about?
23   What's going – I mean, if it doesn't include these folks, what is the purpose of their
24   presentation?" 4/5/22 TT at 2743. The Court went on to express concern that the
25   emails were largely between Francis and others who were not on trial, and then said,
26   "It's clear to me you have no intention of calling Leonard Francis." *Id.* at 2745. The
27   prosecutor was, by this point, well aware of the Court's confrontation clause (and
28   other) concerns in this context and thus hedged, albeit disingenuously, stating that

"[e]verybody's a witness until they're not." *Id.* The Court responded that the "sands are shifting depending on what the witnesses do," and expressed amazement that "we're six weeks into this case and the government doesn't know who they're going to call." *Id.* at 2745-46. The prosecutor dodged, stating that De La Pena "and other witnesses are simply going to be testifying about the evidence in this case," as if that somehow addressed the Court's concerns about unfair prejudice and the confrontation clause. *Id.* at 4749. At the end of this discussion, the Court made clear that it's concerns were not allayed, stating, "I do have an issue with 403 and putting in all of this with regard to other co-conspirators that do not implicate the Defendants in this case or involve the Defendants in this case," and the Court noted "there's a spillover problem with all of this also." *Id.* at 2761.

So warned, a prosecutor should tread lightly, but not Mr. Pletcher. For example, the next day he entered a whole bunch of evidence into the record related to Robert Gorsuch, which had nothing to do with the Defendants on trial. The Court agreed with the Rule 403 concerns that defense counsel raised about this outside the presence of the jury. *See* 4/6/22 TT at 3027. Despite this, moments later, after the jury came back, the prosecutor attempted to introduce testimony about the number of "classified units" that Steven Shedd and Alex Gillet allegedly gave to Francis, testimony that the Court stopped, and would later preclude, because it was summary testimony and also irrelevant to the question of the guilt of any of the Defendants on trial.

Nevertheless, the prosecutor proceeded to introduce countless emails that showed alleged wrongdoing by many others who were not on trial and never testified, most glaringly Jose Sanchez. Well down that road, the Court expressed exasperation that not only was the prosecutor presenting a great deal of evidence that was irrelevant to the Defendants' guilt, he was revisiting that evidence over and over. *See* 4/11/22 TT at 3470. The Court also returned to its Rule 403 and confrontation clause concerns, stating:

> We've heard an awful lot of Mr. DeGuzman. I'm very concerned, Mr. Pletcher, and I know what the case law says about business records and statements of co-conspirators, but as I've said, this trial needs to meet certain standards of due process, fundamental fairness, and part and parcel of that is confrontation, and I am concerned about that.

*Id.* at 3476. The Court drove home its concerns, saying, "We're drowning in the details on other co-conspirators and not getting to the point," *id.* at 3504, but it lamented, "I don't think anything is going to change." *Id.* at 3471.

And, of course, it didn't, because the prosecutor was nothing if not relentless. The next day, defense counsel again raised this issue during a break in the testimony, noting that the prosecutor had continued to dump a mountain of irrelevant but prejudicial evidence into the record related to people who would never be called at trial:

> These are emails from Leonard Francis to Hornbeck and Shedd, not relevant to Mr. Dolan in any way. As far as the government it seems to think that it can put in an infinite amount of evidence with respect to all sorts of other people, Hornbeck, Shedd, Sanchez. Most of the evidence that we've heard to establish that there is some rounded-out conspiracy, I think we've got that. I don't think we need this additional email to establish that Hornbeck and Shedd were up to no good.

4/12/22 TT at 3572. Consistent with what it had been saying for weeks, the Court agreed, stating, "Because this doesn't relate to anybody who is in front of me." *Id.*

The prosecutor must have understood, at least intellectually, the Court's oft-expressed and well-founded concerns. He nonetheless chose to proceed in what the Court repeatedly told him was a "problematic" and fundamentally unfair manner. He did so with the intent of drowning the jury in irrelevant but highly inflammatory evidence, and he succeeded.

## I.    Conclusion

There is no doubt that the prosecutor presented a great deal of summary, and otherwise objectionable, testimony through De La Pena. *See, e.g.*, 10/14/22 Order at 4 (Docket #1094) (sealed); 4/21/22 TT at 4411 (Court stating, shortly after De Le Pena's testimony, "we have had opinions, and we have had summary witnesses"). In doing so, the prosecutor acted willfully and committed misconduct, and also set the

stage for De La Pena's misconduct on cross. Indeed, in the midst of the mess that was De La Pena's cross, the Court said, "I rarely get unhappy, but the cross is the direct result of what was done on direct, so go ahead, Mr. Burns." 4/13/22 TT at 3783. The cross is discussed next.

## IV. During Cross, De La Pena Repeatedly Gave Non-Responsive, And Highly Improper, Answers, Even After Being Admonished By The Court

De La Pena's cross consisted largely of the Defendants introducing emails. That was done to counter the misleading pictures painted by the government's introduction of only parts of email chains, and the prosecutor's and De La Pena's improper spin on that evidence. The process of reading dozens of emails on cross was tedious but necessary, because the Defendants had to try to clear up what the actual evidence showed. However, it afforded De La Pena countless opportunities to make inappropriate, non-responsive remarks. He rarely missed capitalizing on such an opportunity.

The discussion above with respect to the prosecutor's and agent's false claims about Mr. Dolan divulging investigations to Francis is one example that demonstrates that dynamic in spades. Several more examples are discussed in the first section below, followed by two sections that discuss further De La Pena's (1) penchant for giving non-responsive answers, even after the Court's admonishments, and (2) violation of his oath to be truthful. As with the discussion of the direct testimony, the categories/examples discussed below have a great deal of overlap.

### A. De La Pena Made Non-Responsive And Improper Statements With Respect To Every Aspect Of The Government's Case That The Defendants Raised On Cross

### 1. Hong Kong Port Visit Cancellation Settlement

As the Court will recall, a key part of the indictment's allegations, and the government's trial case against Mr. Dolan, was the prosecutors' claim that Mr. Dolan improperly interfered in Francis's efforts to collect a cancellation settlement based on expenses GDMA incurred to prepare for the USS Kitty Hawk's planned port visit

to Hong Kong. That visit was scheduled for November 2008 but cancelled at the last minute because the Chinese government denied diplomatic clearance.

It was curious that this was a central pillar of the government's case against Mr. Dolan, because all of Mr. Dolan's conduct with respect to this issue occurred prior to when De La Pena claimed he joined the charged conspiracy (*i.e.*, on January 29, 2008). *See* 4/13/22 TT at 3834; *see also id.* at 3807-08. Furthermore: (1) the email exchanges with respect to this matter started in November 2008, and were out in the open, with several of the interested parties and officials copied; and (2) Mr. Dolan more than once pushed back on Mr. Francis's efforts in this regard. *See* 4/13/22 TT at 3827-38. To obscure the nonsensical nature of its theory that the emails showed Mr. Dolan providing a *quo* to Francis, the government didn't introduce any emails prior to January 14, 2008. *See id.* at 3827. When defense counsel sought to clear that up on cross, De Le Pena messed with him every step of the way. *See id.* at 3827-38.

For example, at one point defense counsel asked (essentially rhetorically) if he'd correctly quoted an email, and De La Pena responded, "Mr. Dolan forwarded the internal Navy email, that's correct, yes sir." *Id.* at 3830. A short time later, defense counsel again asked if he'd quoted an email accurately, and De La Pena replied, "Mr. Dolan again forwards internal U.S. Navy correspondence to Leonard Francis, that's correct." *Id.* at 3835-36. These non-responsive comments were meant to advance the prosecutors' claim that, as a bribery *quo*, the Defendants improperly forwarded "internal proprietary Navy information" to Francis. That was an especially silly claim in this context because, in addition to the email being from before Mr. Dolan had allegedly joined the conspiracy, Mr. Dolan copied several other Navy officials on it, indicating that he did not believe he was doing anything improper. And he wasn't, he was merely trying to make sure the Navy paid its bills, if valid, on time so it wouldn't get hit with a late payment fee required by the Prompt Payment Act.

Moments later, when defense counsel asked if the emails related to the Hong Kong cancellation settlement were all dated prior to when the agent alleged that Mr.

63

Dolan joined the conspiracy (they were), De La Pena replied, "As I said, recruiting is a big part of Mr. Francis's operations in this conspiracy, yes, sir." *Id.* at 3836. As an initial matter, that also made no sense, because the subject emails could not plausibly be characterized as relating to "recruiting." *Id.* Furthermore, the answer was non-responsive, thus the Court sustained an objection from Mr. Newland's counsel and told the agent, "we don't want any more opinions. . . . Sir, you've got to just answer the question. Don't volunteer. Don't give your opinion, and don't editorialize, sir. . . . [S]ometime when you're a defense counsel or a prosecutor, you can do it your way, but not in this way or in this courtroom." *Id.* That admonition fell on deaf ears.

### 2.     Late Payment Of Bills By Submarine Group 7

That was evident moments later, when defense counsel addressed the government's claim that Mr. Dolan improperly interfered to help Francis/GDMA deal with late payments for port visits by the Navy's Submarine Group 7.

The email exchanges with respect to that issue occurred during two time periods. The first was in December 2007, prior to when Mr. Dolan allegedly joined the conspiracy. Francis then raised the issue again in April 2008, after Mr. Dolan allegedly joined the conspiracy. The government's theory with respect to that issue suffered fatal flaws similar to those with respect to the cancelled Hong Kong port visit settlement. Specifically: (1) Mr. Dolan's conduct/emails were entirely out in the open, and involved several Navy officials; and (2) his conduct before and after he allegedly entered into the conspiracy was essentially the same, indicating that it was in no way reflective of his entering into a *quid pro quo* agreement with Francis on January 29, 2008, and was instead consistent with his job duties.

Defense counsel sought to reveal those facts to the jury, which the government had hidden by omitting from its evidence the December 2007 emails (even though they were mentioned in the April 2008 emails), and instead introducing copies of just some of the April 2008 emails. *See* 4/13/22 TT at 3839-47. Not only was defense

counsel's questioning about this appropriate, the government should be embarrassed at having tried to mislead the jury by leaving out email exchanges that explained the situation. Nonetheless, De La Pena again messed with defense counsel throughout the questioning on this subject.

For example, when defense counsel pointed out that the relevant email exchanges were "out in the open, Mr. Francis is copied, all these other people are copied, Mr. Dolan is copied, they're having this discussion out in the open, right," the the agent replied, "This one, yes." *Id.* at 3850-51. This was non-responsive and implied – falsely – that there were other, surreptitious email exchanges.

As another example, when defense counsel read portions of the emails and pointed out that those showed various officials responding, in the open, to the concerns Francis raised in his email, the agent volunteered, "And [the officials were] saying that there are discrepancies between GDMA estimates and invoiced bills, yes, sir." *Id.* at 3849. This is not the most troubling example of the agent giving a non-responsive answer, but it is one of countless examples of the agent constantly advancing his narrative rather than just answering the question, as the Court had unequivocally ordered him to do shortly before that. *See id.* at 3837. And it bears reiterating that the agent did this while defense counsel was simply trying to clean up the mess, and dishonesty, created by the agent's improper summary testimony.

### 3. Steven Shedd And Alex Gillet Recruited Sanchez

Another example of De La Pena's penchant for improper testimony involved the prosecutor's claim during opening that Mr. Dolan recruited Mr. Sanchez into the conspiracy. When defense counsel asked the agent if he recalled the prosecutor saying that during opening, he didn't just answer yes or no – he almost never did that – he said, "I believe that's true sir." *Id.* at 3748. The Court sustained an objection and told the jury, "It's not something that he can say. His belief as to what is true, it doesn't matter. You're the judges of what occurred here." *Id.* at 3749. But the agent testified to his "beliefs" over and over, (1) in the guise of what his "investigation"

showed, (2) by speaking over objections, (3) in sideways answers after objections were sustained, and (4) in his non-response "answers" to questions on cross.

More important, his claimed "belief" in this context was not true. To show that, defense counsel turned to the charge in the indictment's overt act A124, which states:

> On or about September 23, 2008, *having been recruited into the conspiracy by SHEDD and AG, Sanchez* sent Francis an email from his newly-minted cooltoad.com account, using the name 'Troy Smith,' a name created as an amalgamation of Troy Aikman and Emmitt Smith, former football players for the Dallas Cowboys, in which he wrote: "Wanted to discuss the operations for next week when you ['re] in the area. The senior bubbas are chomping at the bit."

(Emphasis added.) As defense counsel pointed out in the cross, this clearly alleged that Sanchez was "recruited into the conspiracy" by Steven Shedd and Alex Gillett. 4/13/22 TT at 3749-50. When asked about that, De La Pena replied, "It's specifically talking about opening a cooltoad account." *Id.* at 3749-50. This dodge was meant to again further the false claim that Mr. Dolan recruited Sanchez into the charged conspiracy.

To again try to counter that lie, defense counsel pointed out that Sanchez had told investigators that Shedd recruited him into the conspiracy, and the agent replied, "I believe at one point, very early on, he made a statement to that effect, yes, sir." *Id.* at 3751. When defense counsel responded that Sanchez made that statement on March 6, 2015, De La Pena said, "He was protecting Captain Newland. Yes, sir." 4/13/22 TT at 3751-52; *see also* 3/16/15 Report at 3 (Exhibit U). Presumably he meant Captain Dolan, but the answer was improper either way. And when defense counsel followed up by saying that Sanchez "actually repeatedly told investigators, in both January 2015 and March 2015, that it was Shedd and Gillett that recruited him into the conspiracy, right," De La Pena replied, "Mr. Sanchez said he was protecting Mr. Dolan." 4/13/22 TT at 3752; *see also* 1/28/15 Report at 3 (Exhibit D). As defense counsel tried to get an answer to his question about what Sanchez said on the dates indicated, De La Pena kept at it, saying, "And he also said he was protecting

Captain Dolan," and "That's what he told me, sir."  4/13/22 TT at 3752-53.   In addition to being non-responsive, this was blatant hearsay and violated the Court's *in limine* ruling prohibiting evidence of prior consistent statements made by cooperators at a time when they had an incentive to fabricate – indeed, at a time when the prosecutors where meeting with Sanchez to prepare him to give false testimony.

### 4. Examples Of Other Major Subjects About Which De La Pena Made Improper Statements On Cross

There are several other examples of De La Pena improperly messing with defense counsel – and, more important, the truth – during cross.

One is when defense counsel raised the inconsistency between the agent's claim that Mr. Dolan joined the charged conspiracy in January 2008 and the following language in the indictment's overt act A76:

> On or about September 16-17, 2007, Francis traveled to Yokosuka, Japan, where he met and dined with HORNBECK, DOLAN, LAUSMAN, LOVELESS, and others with the intent of vetting and incorporating certain additional members of the Seventh Fleet staff, including the new COS and DEGUZMAN's replacement into the conspiracy.

After showing this indictment paragraph to the agent, defense counsel said, "that seems to allege that Mr. Dolan is at this dinner on September 16 or 17 and being involved in vetting people for joining into the conspiracy, right?"  4/13/22 TT at 3810.  The agent responded, "I believe Mr. Dolan was being vetted at that time, sir." *Id.*  Once again, the agent expressed his "belief" and did not respond to the question. And the indictment clearly did not allege that Mr. Dolan was being vetted at that time. It alleged that he and three other named Defendants "met and dined . . . with the intent of vetting and incorporating" others into the charged conspiracy, "including the new COS and DEGUZMAN's replacement."

The agent's non-responsive answer is even more troubling in light of what happened moments later, when defense counsel asked if the agent was "aware of evidence that tends to indicate that Mr. Dolan wasn't at that dinner?"  *Id.* at 3811.

The agent replied, "Would you like to show me. I would be happy to look at it. Off the top of my head, I can't quote an email to you that says that." *Id.* The agent wasn't asked to "quote an email" "off the top of his head," and he surely knew that there were emails that showed Mr. Dolan didn't go to that dinner at Hornbeck's house, emails defense counsel introduced over the next several minutes. *See id.* at 3812-15.

This sort of dynamic played out over and over during the cross, with defense counsel introducing email or other evidence to clear up misleading, or outright false, claims made during De La Pena's summary testimony, and the agent messing with defense counsel every step of the way. *See, e.g.*, 4/14/22 TT at 3895 (defense counsel brought up that the government introduced a truncated version of an email chain regarding the USS Vandergrift helicopter part situation, and the agent replied that the exclusion was just a matter of "the way that these things print out sometimes"); 4/19/22 TT at 4022 (defense counsel brought up the government's truncated treatment of email chain related to CARAT Thailand "deflash" email).

At other times, the agent sought to hijack the cross and press his own misleading narratives, rather than answering the questions. For example, when defense counsel asked (again, essentially rhetorically) whether the Seventh Fleet Chief of Staff was copied on an email related to the cancelled Vladivostok port visit, the agent responded, "He was copied, but I should note that this email misrepresents the situation as it stood." 4/14/22 TT at 3945. This was obviously improper, and the Court granted a non-responsive objection and struck the testimony.

A short time later, defense counsel was merely reading email evidence into the record with respect to the CARAT 2009 funding issue when De La Pena interjected, "I hate to say it, sir, but there's important pieces of this email you're skipping over." *Id.* at 3983. That was rich, considering that in De La Pena's direct testimony the government repeatedly elided key email evidence to grossly mislead the jury.

//

Moments later, while defense counsel was reading an email that mentioned Admiral Bird, he asked "what position" Admiral Bird held at the time, and De La Pena responded, "Just to be clear, that's one piece of several that I would suggest are important. Vice Admiral Bird was the Seventh Fleet Commander." *Id.* at 3984. This non-responsive answer left defense counsel in the unenviable position of either allowing the agent to take over the cross and explain the several "pieces that he would suggest are important," or appear that he was hiding something. Not only was this improper, it was, again, ridiculous considering that defense counsel was introducing evidence about the situation that the government had deliberately withheld during its improper summary testimony.

**B.     De La Pena Was Relentlessly Non-Responsive With His Answers**

As already shown, De La Pena was relentless in giving non-responsive, improper answers, even after being admonished by the Court. Some additional examples bear highlighting here.

First, very early in the cross, when the agent was asked about the number of government trial exhibits that came from GDMA's hard drives, he said, "There are many, many, many more documents that are relevant that may not be able to be introduced or – frankly, we tried not to completely bury the jury in paper and just pick out the ones that are really the most important." 4/12/22 TT at 3658. The Court sustained a non-responsive objection and struck the testimony.[17]

A few minutes later, when asked whether he investigated a BZ letter that George Bush wrote to Francis, the agent replied, "there was no evidence that George Bush took any items of value from Mr. Francis, so no." *Id.* at 3660-61. Defense counsel again objected, and the Court admonished De La Pena, saying, "you're

---

[17]     In addition to being non-responsive and improper, the answer was inaccurate. The government admitted countless emails with respect to the actions of others, which were entirely irrelevant to determining whether the Defendants were guilty of the charged offenses.

volunteering and giving a lot of opinions, sir, so please just answer the question." *Id.* at 3661. De La Pena was not chastened, and, as pointed out above and below, he continued in the same vein throughout the cross.[18]

One additional, and especially improper, example warrants discussing here. During the cross, defense counsel asked about a letter from Lanny Breuer, a former U.S. Assistant Attorney General and one of Francis's lawyers, to the then-United States Attorney for the Southern District of California. In that letter, Breuer discussed Francis's cooperation and indicated that the government's trial case was based in large part on what Francis told and gave the government. When asked to confirm (again, rhetorically) some of the text in Breuer's letter, De La Pena dodged the questions and at one point stated, "I believe Mr. Breuer is doing his best, just as you are, sir, to represent the interests of his client." 4/13/22 TT at 3781. Defense counsel pressed on, again asking specifically what was written in the letter, and the

---

[18] Though the cross is replete with examples, a few additional cites are included here. *See, e.g.*, 4/13/22 at 3685 (offering that none of the bills he reviewed showed Aruffo paid Francis for hotels); *id.* at 3761 (going off on tangent, at which point Court interrupted by stating, "[t]here's nothing pending sir"); *id.* at 3767 (offering that "the emails that came from Singapore [law enforcement] matched the emails that came from the nine hard drives"); *id.* at 3788 (to question about whether anyone other than Sanchez referred to Mr. Dolan as "JD," giving some other nickname someone else allegedly called Mr. Dolan at some unspecified time); *id.* at 3805 (Court sustains non-responsive objection with respect to agent's answer about Francis stating he had the Navy "by the balls"); *id.* at 3806 (to question about what Francis said in Wright interview about withholding key video evidence, agent says, "[h]e says what he says on the podcast. He – in multiple other interviews, which you have, he has denied that"); 4/14/22 TT at 3968 (to questions about telephone record evidence not showing calls from Francis to Dolan, agent repeatedly dodges question and says, "[w]e were not able to collect all of the records that we wished we could"); *id.* at 3978 (to question about fact that, unlike Sanchez, there is no record of Mr. Dolan making "nasty" remarks about Lt. Commander Wong from the Hong Kong Ship Support Office, agent replies, "[n]asty about Christina Wong, no, but false information, yes").

agent replied, "As I said, as with you, defense attorneys do their best to represent the best case they can for their client." *Id.* at 3781. At that point, the Court sustained an objection. Defense counsel continued, stating, "Let's just come back to the question. Are you saying that this statement by Mr. Breuer is inaccurate?" *Id.* at 3791. De La Pena replied, "What I'm saying is that he's advocating for his client." *Id.* The Court interjected, "You're not answering the questions, sir. This is going to take three times as long as it needs to be. You have a different viewpoint, and that's not what he's asking you about." *Id.*

Although this is just one of many examples of De La Pena giving what he knew were improper answers, even after the Court admonished him to cut it out, there is a special twist of impropriety here. Specifically, De La Pena was obviously implying that Mr. Dolan's counsel was merely trying to advocate for his guilty client. Consistent with the presumption of innocence this was not. De La Pena was not blind to that impropriety, indeed, he repeated it because he thought it was a clever dig.

## C. De La Pena Violated His Oath To Tell The Truth, The Whole Truth, And Nothing But The Truth

The conclusion that De La Pena willfully gave improper testimony during the cross-examination is supported by the substance of his testimony and its repetition despite the Court's admonishments. But that conclusion is further supported by portions of De La Pena's testimony on cross that were obviously less-than the whole truth. Some examples are highlighted here.

First, when asked whether the portion of Sanchez's plea agreement that protected him from being prosecuted for offenses "related to the possession of unlawful or unauthorized electronic data" appeared in any other Defendants' plea agreement, De La Pena claimed, "I can't specifically say off the top of my head whether that's true or not, sir." 4/13/22 TT at 3758. After a break, during which the Court authorized further questioning about the plea agreement term, it became clear that De La Pena knew that it was in Sanchez's plea agreement to protect him from

being prosecuted for child pornography. *See id.* at 3787-88. Thus, it strains credulity that the agent was unaware that there was no such term in any other Defendants' plea agreement.

Second, when De La Pena was asked by counsel for Mr. Newland if Francis was living with his kidnapped children, he said, "I don't know that to be true." 4/12/22 TT at 3656. When Mr. Dolan's counsel followed up on that issue later, De La Pena repeated his claim of ignorance, stating, "I don't know if he has his kids with him or not." 4/13/22 TT at 3801. Mr. Dolan's counsel replied by pointing out that Francis had told Tom Wright, repeatedly, that he had his kids with him, and the government had facilitated that. *See id.* at 3801-02. De La Pena non-responded, stating, "I trust the probation officers and parole officers to do their jobs. I do my job. I'm a finder of facts in this case." *Id.* at 3802. He then claimed, "There were no benefits provided by me or my team to Mr. Francis in this matter at all." Moments later, he said, "I did not provide him any benefits, neither did anybody on the prosecution team." *Id.* at 3803. Of course, the agent knew Francis had his kids with him, and that the government had provided many benefits to Francis. But perhaps most galling was his claim, "I'm the finder of facts in this case." No doubt he believes that.

Third, as defense counsel zeroed in on questioning De La Pena about the child pornography found on Francis's computer, the agent could sense what was coming and tried to fend it off by claiming, "there was a series of images and other things [on the computer Francis had with him when he was arrested] that were not relevant in any way to the case." 4/12/22 TT at 3623. When defense counsel showed the agent a screenshot from the computer that listed videofile names that were obviously child pornography, De Le Pena claimed, "I didn't personally conduct where you're going with this, so I've never seen this before." *Id.* at 3624. Pressed further on this, including that one of the files was named "14-year-old has orgasm," he claimed that "those images were sent to the National Child Molestation and Exploitation Center

72

and that there was no prosecutable child pornography that came back." *Id.* at 3625-26. That was not true, the NCMEC made no such determination. *See* 4/23/22 Dolan Memo. at 6-8 (Docket #851). Furthermore, De La Pena's claimed ignorance of the files moments earlier is belied by this false claim, and by the fact that he was undoubtedly well aware of this issue because (1) it had recently been raised in court, and (2) he thoroughly scrubbed Francis's computer. *See* 4/12/22 TT at 3626.

Fourth, when De La Pena was asked about Francis's then-present living conditions, he said, "I don't keep up with him" and "I'm not privy to the specific details of those arrangements or the *specific apartment* that he lives in. I believe it's here in San Diego, based on my understanding of that arrangement, but I don't know specifically his address." 4/12/22 TT at 3640-41 (emphasis added). In addition to being non-responsive, it strains credulity to believe that De La Pena was unaware that Francis was living in a luxury mansion – not an "apartment" – in Del Mar.[19]

Fifth, in response to the Defendants' introduction of a recording of Francis indicating to Tom Wright that he destroyed and/or doctored GDMA's and his digital materials before he was arrested, the government tried to mislead the jury into believing that Francis had not been successful in deleting the emails on his GDMA account because those had been "frozen" by a government subpoena. The government knew that was not true because those emails were on GDMA's servers and thus could not have been "frozen" by the government. *See, e.g.*, 3/20/22 Def. Memo. at 7-8 (Docket #787). During his cross, De La Pena nonetheless tried to advance the government's misleading narrative by stating, when asked about Francis's statements about deleting his emails and doing "counterintelligence" with respect to his and GDMA's digital materials, "He attempted to delete his Gmail account, yes, sir." 4/13/22 TT at 3765. That was non-responsive and misleading, but

---

[19] De La Pena made a similar dodge with respect to Francis's faking his medical condition. *See* 4/13/22 TT at 3801.

De La Pena steadfastly stuck to that false claim when questioned further, repeating that Francis "had attempted to delete his Gmail account, which we preserved." *Id.* at 3771.

Sixth, when asked whether he was "aware of email evidence that tends to suggest that Mr. Dolan actually did not attend the Tokyo boys night out," which was a key part of the government's case, the agent replied, "Off the top of my head, I can't think of email evidence. I'm happy to review some." 4/14/22 TT at 3870. Given the centrality of this event to the government's case, it strains credulity that the agent didn't know there is substantial email evidence that shows Mr. Dolan did not attend. Nonetheless, the agent claimed ignorance, and then messed with defense counsel when he introduced the evidence.[20] *See id.* at 3871-76.

Seventh, when asked about the fact that emails from the Defendants' Navy accounts were not available for the defense, the agent said, "It's a DOD policy to destroy emails when people leave. It's a security risk." 4/12/2 TT at 3648; *see also id.* at 3649, 3651-52. That badly mis-characterized what was adduced during a four-day evidentiary hearing about this issue. Even after that hearing, much remained unanswered because the government's witnesses gave varying, sometimes conflicting, and ultimately unconvincing explanations. *See* 1/13/20 Dolan Memo. (Docket #318). But the upshot was that no Navy policy explained why the emails were deleted – to the contrary, Navy policies indicated that, given the rank of the individuals involved and the nature of their communications, the emails should have been preserved. *See id.* at 7-8.

There are many other instances of De La Pena claiming ignorance that were, at best, hard to believe. *See, e.g.*, 4/13/22 TT at 3689 (claiming he did not know the

---

[20] The government likewise misled the jury into believing Mr. Dolan attended a dinner at the Mezza 9 restaurant in Singapore, and got a hotel room from Francis there, even though De La Pena knew there was compelling evidence that refuted both claims. *See* 4/14/22 TT at 3906-16, 3921.

manner in which Francis had addressed Mr. Newland, though he'd pointed to evidence of such as indicating guilt); *id.* at 3691-94 (claiming not to recall Seventh Fleet JAG Capt. Barney testifying about maintaining contact with Francis on social media until Francis was arrested). An honest witness he was not.

## V.      Conclusion

The mountain of improper testimony that the government willfully introduced during De La Pena's testimony, as well as the agent's misconduct during cross, alone counsels for granting the Defendants' motion for new trial. Furthermore, given the duration and content of that testimony, there is no gainsaying that the suppressed *Brady* materials related to De La Pena's misstatements in the Rafaraci case were material. Finally, when considered cumulatively with all of the other issues raised herein, and otherwise apparent in the record, it is evident that granting a new trial is the least severe remedy available.

**THE ADMISSION OF RECORDS CERTIFIED BY FRANCIS
VIOLATED THE DEFENDANTS' CONFRONTATION
AND DUE PROCESS RIGHTS**

## I.      Introduction

The government knew Francis was untrustworthy – he was the star witness they could not afford to call to the stand. The government possessed Skype chats between Francis and Agent Beliveau confirming that Francis deleted GDMA company emails to protect himself, and, in the context of deleting and tampering with GDMA emails, he was coached by the agent on how to prepare his "defense and offense." This and other evidence would have steered most prosecutors away from the course taken in this case.

Now, Francis has absconded and his contempt of court confirms what the government already knew: Francis has no regard for the oath or the law. Any doubt about his untrustworthiness is extinguished.

The government made a calculated decision to shield the certifier and his documents from constitutional scrutiny in violation of the Defendants' Sixth

Amendment right of confrontation and Fifth Amendment right of due process. Instead, the government sponsored the Francis documents through a surrogate, Agent De La Pena, who had no idea how Francis retrieved, much less prepared and "maintained," many of the documents used to prosecute the Defendants. The prosecution then concealed evidence (the suppressed Rafaraci false statements materials) that would have allowed for powerful impeachment of the Francis surrogate.

Because the Francis-certified documents made up over half of the government's trial exhibits, the government will be unable to prove the error is harmless beyond a reasonable doubt. A new trial is warranted.[21]

## II. Francis Is Not A Trustworthy Certifier And His "Records" Are Not Reliable

### A. Francis Is Not A Trustworthy Certifier Of Records

Federal Rule of Evidence 902(11) allows for self-authentication of business records, and on that basis Rule 806(6) excepts them from the hearsay rule, but not if the "source of information or the method or circumstances of preparation indicate a lack of trustworthiness." Francis was not trustworthy to certify anything, let alone hundreds of exhibits introduced at the Defendants' trial.

//

//

---

[21]    The Defendants have filed several motions objecting to Francis's certification of records and moved to strike those records based on the government's failure to properly authenticate them. *See* Docket ##603, 629, 705, 925, 956. Additionally, the Defendants filed a joint Reply to the Government's Opposition to the Defendants' Renewed Motion re: Government Certifications, *see* docket #1050, and although the Court did not consider that reply, it suggested the defense could present those arguments at a later time. *See* Docket #1061. That reply has a more comprehensive argument on this issue, but, for the sake of brevity, only the major and newer points are raised here.

First, we now know that Francis perpetrated a fraud on the Court by absconding. And that escape and related lies to this Court cement the conclusion that he cannot be trusted as a certifier of anything.

Second, Francis had every reason to sign any document the government requested, and would sign whatever the government put in front of him. The Court will recall that prior to trial, the government mistakenly gave Francis their entire trial exhibit list, which included many documents from non-GDMA sources, and he signed a business records certification for the whole batch. *See* Docket #622, p. 9 (government stating, "[i]n identifying the matching bates numbered records, the United States inadvertently provided Francis's counsel with a draft of its entire exhibit list as opposed to the list of just those reviewed GDMA business records"). He signed whatever, because he expected to receive a significantly reduced sentence in exchange for doing the government's bidding.

Furthermore, an admitted forger, he produced many of the documents he certified while he attempted to secure a deal from the government. *See* Trial Exh. DO-456. And his subsequent medical furlough, with its and lax security and lavish lifestyle, depended on his continuing "cooperation" with the prosecutors, who never objected to his release. These facts alone disqualify him as a record-keeper and certifier. "[W]hen the record keeper, rather than being a clerical or professional employee, is a principal with a strong motive to falsify the records, the district judge may deem them so unreliable as to be unworthy of consideration by the jury." *Kikalos v. United States*, 408 F.3d 900, 904 (7th Cir. 2005).

Finally, the government knew that if Francis was subjected to cross-examination, the jury would not find the certifier of all these exhibits credible. Instead, they called De La Pena, who they protected from cross-examination by concealing evidence that would impeach him.

//

//

## B. The Manner In Which The Documents Were Maintained Was Not Trustworthy

The circumstances under which Francis, the custodian, kept his documents were also untrustworthy. As the Court will recall, the defense introduced Francis's statements to Tom Wright admitting that, before his arrest, he tampered with emails on his servers by "follow[ing] through" with the coaching he received from a corrupt NCIS agent on how to "evade" and conduct "counter intelligence" on his servers. *See* Trial Exh. DO-451-1.

At that time, the government asserted, and continues to assert, that, although Francis may have deleted emails in the past, they had recovered some emails, and therefore, Francis did not delete important evidence or otherwise tamper with his servers. Mr. Pletcher told this Court, "The United States recovered his emails. They were not deleted. By hook or crook we have them. It's not that they're doctored or changed." 3/21/22 TT at 1298-99; *see also* Docket #786, at 3, 9; Docket #931, at 12-13; Docket #1033, at 7 (arguing Francis did not delete emails); 3/21/22 TT at 1298 (asserting that emails were not changed). The Court nonetheless understood the faulty logic of the government's argument, as this exchange showed:

> THE COURT:      But do we have all of [the emails]?
>
> MR. PLETCHER: Well, we have what we recovered.
>
> THE COURT:      Well, that's exactly right. Isn't that the point?
>
> MR. PLETCHER: I don't think that's the point. I think --
>
> THE COURT:      I think it's always been the point.

3/21/22 TT at 1298.

As the Court recognized, the government's argument that some of Francis's emails were recovered misses the point. GDMA's corporate "document retention" policy, if you can call it that, was designed to reduce Francis's criminal exposure, protect him, and blame others if he was arrested. Retaining documents that exculpated others would not help his litigation strategy; just the opposite. Therefore, the concern

is that Francis manipulated and cherry-picked GDMA records, and deleted exculpatory emails and other records to benefit himself, another reason his certification of GDMA records cannot be trusted.

Skype chats from February, March, and April 2013, between NCIS Agent Beliveau and Francis, show that Francis deleted GDMA emails to protect himself. The agent and Francis discussed (1) the importance of deleting emails, (2) dumping email accounts, (3) changing the "who and what" of emails, and (4) Francis's deletion of his emails and email accounts, including his company accounts. In those chats, Beliveau asked Francis whether "u delete of of my emails and others in your gmail account," and Francis responded "Yeah 6 months back now Nov." 4/17/23 Skype at 4 (Exhibit M).[22] The agent then wrote, "great and I would just dump that account to be safe," "unless you change who and what you discuss in it." *Id.* Francis replied, "Done." *Id.* Beliveau told Francis that he needed to delete his trash bin as well. *See id.* at 5.

Francis also told Beliveau that he "cleaned out" his company's email accounts six months earlier to avoid government scrutiny of the records. *Id.* at 6. Beliveau warned, "my guess is they are going after your gmail accounts as we speak and probably sent a preservation letter several months ago," and he told Francis, "so the company has to keep everything once we preserve it." *Id.* at 5-6. Francis, always one step ahead of the law, responded, "I cleaned it out 6 months back," and the agent replied, "nice." *Id.* at 6.

In the context of deleting and tampering with emails, the two discussed the potential that Aruffo, Haas, and Sanchez might cooperate with law enforcement, and problems with Misciewicz's emails. *See id.* at 4. Referring to Misciewicz, who was

---

[22] The government produced two Skype chat records for April 17, 2023, which are mostly the same, with slight differences. Those two records are attached as Exhibits M and N, and M is the one cited most.

under investigation at the time, Beliveau told Francis, "dumbo didn't delete anything for several years," and "he hurt you by doing that that's why I delete everything." *Id.* Beliveau advised Francis that Misiewicz was the government's "lverage against" him, and unless he had a "life or death hold" on Misiewiecz and Aruffo, Francis was "vulnerable." Beliveaun also said that Haas and Sanchez could be a problem. *See id.* at 4-5. He advised Francis to "play Mike like a desperate CO you felt obligated to help out." *See* 4/17/13 Skype at 3 (Exhibit N). Beliveau reassured Francis, "But you know enough from I have bben getting you to play a goo ddefense and *offense*." *Id.* at 3 (emphasis added).

Finally, Beliveau advised Francis, "Remember . . . the amount of money to a federal prosecutor doesn't matter as much as how 'sexy' the case is." 4/17/13 Skype at 1 (Exhibit M). That was useful advice for Francis, because he knew, if all else failed, he could cut a good deal for himself with a federal prosecutor by constructing an especially sexy case. He later found a receptive audience and did that , using his manipulated "business records."

These chats, like the Wright interviews, show that Francis's paramount concern in GDMA's record-keeping was manufacturing a "good defense and an offense." That casts a long shadow over the reliability of the records, and Francis as their certifier. One would think this and other evidence would convince the prosecutors not to submit Francis's certification for thousands of records to this Court, knowing full-well they had no plan to call Francis. After all, they have an obligation to protect the truth-seeking function of trial, one they violated in this and many other contexts.

**III.    The Source Of Many Of The Exhibits Introduced At Trial Is Unknown, And The Exhibits Were Not Properly Authenticated**

The government represented to this Court and the defense that Esteban Hernandez, Francis' investigator, would testify about the retrieval of the "Covington" documents from Singapore. *See* 2/17/22 Rep. Tr. at 22. Those were the documents that Francis arranged to have delivered to his lawyers' office when he was negotiating

a deal with the government. *See* Trial Exh. DO-456. Mr. Hernandez, like many other promised witnesses, never materialized. Given all that has happened in this case, one can fairly that there was some issue with Mr. Hernandez and/or his collection of the records that would harm the government's case. This seems a likely area where there might be additional suppressed *Brady* material.

Instead of Mr. Hernandez, the government threw De La Pena, the "every witness," on the stand to testify about the documents. But the agent could only make an "educated guess" as to their source. *See* 4/12/22 TT 3631. He also was not present during Francis's arrest, when Francis's electronic devices were seized. *See* 4/4/22 TT at 2712; 4/12/22 TT at 3621.

These documents were not properly authenticated by De La Pena's testimony. Defendants argued in the Renewed Motion Regarding the Government's Certification that no witness with personal knowledge testified about how hundreds of documents Francis cherry-picked for the prosecutors ended up at Francis' lawyers' office, years after his arrest, when Francis was trying to obtain, or had already cut, a deal with the prosecutors. *See* Docket #956, at 3-4; *see also* Docket #1050, at 15-17. Those arguments will not be repeated, but are incorporated here.

## IV. The Admission Of The Records Violated The Defendants' Confrontation and Due Process Rights

Submitting Francis's attestation under oath that these were genuine records shielded Francis and his certification from constitutionally compelled scrutiny and deprived the defense of the right to confront this "record keeper" and "certifier."

Business record certifications are generally made by a disinterested clerk or records official who can ''certify to the correctness of a copy of a record kept in his office, but had no authority to furnish, as evidence for the trial of a lawsuit, his interpretation of what the record contains or shows, or to certify to its substance or effect.'" *United States v. Anekwu*, 695 F.3d 967, 974 (9th Cir. 2012) (quoting *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 322 (2009)). Francis is not a

disinterested clerk or employee with no motive to lie and "no authority to furnish, as evidence for the trial of a lawsuit, his interpretation of what the record contains or shows," and his authority was not "narrowly circumscribed." *Melendez-Diaz*, 557 U.S. at 322. He was the central figure in this far-ranging bribery conspiracy, a forger who admitted to deleting GDMA records before his arrest to shield himself from prosecution, not a neutral clerk whose job is to catalog records routinely made in the ordinary course of the entity's affairs.

Business record certifications are not testimonial because they *usually* – but not here – are the product of "routine cataloguing of an unambiguous factual matter," and *usually* – but not here – requiring records custodians to make themselves available for cross-examination presents "a serious logistical challenge without any apparent gain in the truth-seeking process." *United States v. Weiland*, 420 F.3d 1062, 1077 (9th Cir. 2005) (quoting *Crawford v. Washington*, 541 U.S. 36, 76 (2004) (Rehnquist, C.J., concurring in the judgment), and *United States v. Bahena-Cardenas*, 411 F.3d 1067, 1075 (9th Cir. 2005)).

There was no "logistical challenge" presented, and there was much to be gained in the truth-seeking process by having Francis, not a government agent, testify about these emails and other foreign records. Nor did this situation reflect a "routine cataloguing of unambiguous factual matter." These were hundreds of ambiguous emails and receipts that Francis cherry-picked from millions of records to make his case against the defendants, a "get out of jail free" contingency plan that Francis likely concocted after obtaining Agent Beliveau's advice on how to prepare his "defense and offense."

Rules 803(6) and 902(11) are rules of convenience designed to "streamline[] the admission of certain *inherently reliable* documents by allowing a party to introduce a record of regularly conducted activity without the live testimony from a records custodian . . . ." *United States v. Green*, 648 F.3d 569, 579 (7th Cir. 2011) (emphasis added). "[T]he Rule does not give a party license to dump business records

into evidence without giving an adverse party an opportunity to question the certificate's signer where such questioning may be warranted." *Id*. at 580. In *Green*, the court warned that the government was "treading on dangerous ground" by using Rule 902(11) to introduce hundreds of records for the truth of the matter asserted without regard for the Confrontation rights implicated by the records. *Id.*

The government in this case used Rule 902(11) to dump into the record hundreds of ambiguous emails and other documents selectively produced by Francis to support accusations against the Defendants, depriving them of their ability to effectively challenge the government's narrative. The government in this case was not just "treading on dangerous ground," it stepped into a landmine that requires reversal of the convictions they unlawfully obtained in violation of the Defendants' Sixth Amendment rights and due process.

Any argument that the error here was harmless beyond a reasonable doubt, which is the governning standard, is specious. The Francis-certified records made up almost half the government's trial exhibits. *See* 9/28/22 Burns Dec. at ¶11 (filed separately at Docket #1155). Over half (53%) of the exhibits that are not of an ancillary or background nature were admitted through the Francis certifications. *See id.* at ¶14. And 62% of the government email exhibits were admitted through the Francis certifications. *See id.* at ¶18.

The government led the witnesses with these emails. Many witnesses had no independent recollection of these emails given the passage of time. Because the documents had already been admitted as business records, the defense mostly did not question the witnesses' ability to recall events the emails described, or the government's use of the emails in questioning these witnesses. The prosecutor's entire argument focused on these emails and the third-party foreign records. The admission of the documents is not harmless, and warrants a new trial.

//

//

**V.    Conclusion**

Federal Rule of Evidence 803(6) excludes from its exception to the hearsay rule business records for which "the source of information or the method or circumstances of preparation indicate a lack of trustworthiness."  If that does not apply to Francis and the circumstances presented here, it's a dead letter.  Furthermore, allowing Francis to serve as a certifier violated the Defendants' rights to confrontation and due process.  Accordingly, and in light of the number and nature of those documents, their admission warrants vacating the Defendants' convictions.  That is even more evident when considered cumulatively, with all of the other issues and government misconduct raised herein, and that otherwise arose in this case.

**THE PROSECUTORS INDUCED AND PREPARED THEIR
COOPERATING WITNESSES TO TESTIFY FALSELY**

**I.    Introduction**

The government may not knowingly, recklessly, or even negligently present false testimony.  Accordingly, it may not spend hundreds of hours preparing witnesses to present scripted testimony while ignoring that large parts of that testimony may be, or are, false.  But that is what the government did with its cooperating witnesses in this case.

Below, the Defendants first summarize the controlling case law.  Then they address several examples of obviously false testimony that the government's cooperating witnesses gave during their scripted testimony.

**II.    Relevant Law**

It is a "bedrock principle" that prosecutors "may not use false evidence to obtain a criminal conviction," "whether through direct presentation or through covert subornation of perjury."  *Hayes v. Brown*, 399 F.3d 972, 978, 981 (9th Cir. 2005) (*en banc*) (citing *Napue v. Illinois*, 360 U.S. 264, 269 (1959)).  Even if a prosecutor does not deliberately solicit false evidence, s/he must correct it when it appears at trial. *See Hayes*, 399 F.3d at 978, 988.

These principles apply with special force to cooperating witnesses to whom the government has offered rewards for their testimony. As the Ninth Circuit has explained:

> The use of informants to investigate and prosecute persons engaged in clandestine criminal activity is fraught with peril. . . . By definition, criminal informants are cut from untrustworthy cloth and must be managed and carefully watched by the government and the courts to prevent them from falsely accusing the innocent, from manufacturing evidence against those under suspicion of crime, and from lying under oath in the courtroom. . . . A prosecutor who does not appreciate the perils of using rewarded criminals as witnesses risks compromising the truth-seeking mission of our criminal justice system. . . . Because the government decides whether and when to use such witnesses, and what, if anything to give them for their service, the government stands uniquely positioned to guard against perfidy. By its actions, the government can either contribute to or eliminate the problem. Accordingly, we expect prosecutors and investigators to take all reasonable measures to safeguard the system against treachery.

*United States v. Bernal-Obeso*, 989 F.2d 331, 333–34 (9th Cir. 1993) (citations omitted); *see also id.* at 334 (stating that as a counter-balance to the risks of allowing the government to offer rewards to its witnesses, "we have chosen to rely on the integrity of the government agents and prosecutors not to introduce untrustworthy evidence into the system").

As indicated in the language from *Bernal-Obeso* quote above, a prosecutor's duties in this regard extend beyond not presenting perjury and correcting it when presented – a prosecutor must also investigate when it appears a witness might commit perjury. *See Northern Mariana Islands v. Bowie*, 243 F.3d 1109, 1111 (9th Cir. 2001). As the Ninth Circuit has explained, the "ultimate mission of the system upon which we rely to protect the liberty of the accused as well as the welfare of society is to ascertain the factual truth, and to do so in a manner that comports with due process of law as defined by our Constitution. This important mission is utterly derailed by unchecked lying witnesses, and by any law enforcement officer or prosecutor who finds it tactically advantageous to turn a blind eye to the manifest potential for malevolent disinformation." *Id.* at 1114. Instead of "turning a blind eye," a prosecutor must "act when put on notice of the real possibility of false

testimony. This duty is not discharged by attempting to finesse the problem by pressing ahead without a diligent and a good faith attempt to resolve it. A prosecutor cannot avoid this obligation by refusing to search for the truth and remaining willfully ignorant of the facts." *Id.* at 1117-18; *see also id.* at 1124.

In short, a prosecutor has a "free standing constitutional duty . . . to protect the system against false testimony," *id.* at 1118, and that requires her/him to "tak[e] whatever action is reasonably appropriate given the circumstances of each case." *Northen Mariana Islands*, 243 F.3d at 1125. Consistent with that duty, s/he may not "knowingly, recklessly, or negligently use false testimony." *United States v. Duke*, 50 F.3d 571, 576 (8th Cir. 1995). Of course, preparing witnesses to follow scripted testimony that is not truthful is inconsistent with the duties discussed here. But, as discussed below, that is exactly what the prosecution did in this case, with all of its cooperating witnesses.

## III. The Government Prepared Its Cooperating Witnesses To Testify Falsely

The prosecutors' presentation of false testimony from their cooperating witnesses was foreshadowed in statements that Leonard Francis made to journalist Tom Wright shortly before trial. During those interviews, Francis repeatedly said he intended to lie during his trial testimony to secure the benefits of his bargain with the government, and to avoid the prosecutors' wrath.[23] *See* 1/13/22 Def. Memo. at 1-4 (Docket #662). It is evident that the same dynamics underlaid the testimony of all the government's cooperating witnesses. Before turning to specific examples that support that conclusion, however, a few broad points bear making.

//

---

[23] Defense counsel had hoped to interview Francis after his sentencing, to learn more about his statements to Wright and thus potentially support the claims of government misconduct. The fact that the Defendants have been deprived of that opportunity by Francis's flight is one of many things the Court should consider in granting their motion for a new trial.

86

First, much of the cooperator testimony was implausible and obviously scripted over the course of hundreds of hours of "preparation" with the prosecutors and agents. Among other things, that was evident from witnesses frequently claiming to have clear memories of events that occurred more than ten years prior. Common sense, and cross, showed the witnesses' "memories" were not so clear. Instead, it was obvious that they'd been coached over hundreds of hours to follow a script that the government had built largely around the email evidence. That allowed the government to claim that the witnesses' testimony was corroborated by the emails, when, in fact, the witnesses' testimony was scripted by the government based on the emails.

Second, the Court has already remarked about the government's "preparation" of its cooperating witnesses' testimony, and it bears repeating some of those remarks here. For example, on April 21, 2022, the Court said to AUSA Michelle Wasserman:

> As far as witness preparation, I tend to agree that the best witness preparation is "tell the truth. Tell exactly what happened." Hours and hours and hours and hours and hours of preparation, I don't think are necessary. I don't think anything's necessary. "Just tell us what happened as best you can," and bring it forward, the good, the bad. Whatever happened here, I think the five individuals on trial here, for extraordinarily serious offenses, have a right to know.

4/21/22 TT at 4418-19. Later, the Court said to Ms. Wasserman:

> "Prepared to testify" means to tell the truth. It's getting me more and more concerned, ma'am, "Tell us the truth. Tell us what happened." I don't mean any disrespect, but I've done this a number of years and that's all you need, and we have heard hundreds and hundreds of hours spent with people preparing them for trial, "Just tell us what happened."

*Id.* at 4422. As anyone who watched the testimony of the cooperators could see, they didn't tell the truth based on their recollections. Instead, they parroted the prosecutor's scripted narratives so they could collect on the benefits in their plea agreements. And, fearful of the government's wrath (like Francis), they stuck to the script even when their testimony was shown to be incredible.

By preparing and presenting such testimony, the prosecutors blatantly violated their constitutional duties. They can hardly claim to have been blind to the perjury

they scripted and caused, because the falsity of the testimony was not just obvious from a big-picture perspective, it was obvious in several of the particulars of the testimony.  Some such examples from the cooperating witnesses' testimony are set out below.

## A.    Steven Shedd

There is an especially compelling and straightforward example from Steven Shedd's testimony.

Shedd testified that during a May 2008 port visit to Jakarta, Indonesia, "there was a directive put out by both the ship's Captain and the Seventh Fleet Chief of Staff that only supported going off the ship for some organized sporting events with the Indonesian Navy and some morale, welfare and recreation tours.  It was not open for general overnight liberty and general recreation for sailors to go out and do anything they wanted."  5/5/22 TT at 5072-73.  Shedd claimed that, nonetheless, he and Captains Dolan, Hornbeck, and Loveless went off the ship to meet Francis at a hotel in Jakarta on May 14, 2008, and that Seventh Fleet Admiral Crowder was staying at the same hotel.  Shedd claimed that Admiral Crowder "had no reason to suspect that we would be out.  And being out would have been looked unfavorably upon because there was no official reason for us to be out.  So I was in coordination with the Admiral's aide, Lt. Commander Dave Snee, who is also part of our inside group, and we were coordinating where he was with the Admiral in relation to where I was with the [Captains] so we didn't cross paths."  5/5/22 TT at 5078.

It is not clear where this Snee-as-lookout story originated, but the prosecutors were hell-bent on jamming it into their case.  Shortly before trial began, agents unsuccessfully attempted to get Snee (who was not charged) to endorse this story, and he "stated that:"

> [H]e did not recall if this port visit to Indonesia was a no-liberty port. He also said he did not recall seeing any other officers from the USS Blue Ridge off the ship during that visit.  Snee stated he did not know if any of the named individuals in the above referenced indictment had stayed off or snuck off the ship during this visit.  Specifically, Snee

stated he did not remember seeing or coordinating with James Dolan, Hornbeck, or Loveless.

12/15/22 Report at 3 (Exhibit E). In a trial preparation session that occurred eight days later, investigators also asked Shedd about this Snee-as-lookout claim and he "stated he did not recall if the Seventh Fleet Admiral was in the area, or if there had been any efforts to avoid running into the Admiral." 1/6/22 Report at 3 (Exhibit F).

Further supporting that Snee didn't act as a lookout for the Admiral on the date in question is: (1) Hornbeck's March 7, 2017, statement to agents that he never went to Indonesia for a port visit, *see* 3/7/17 Report at 7 (Exhibit G); and (2) emails and photographs that show Hornbeck and Francis were in Kuala Lumpur at a Royal Malaysian Navy event on the day in question. *See* 4/14/22 TT at 3923-28 (Agent De La Pena admitting that emails and photos showed Francis and Hornbeck were in Kuala Lumpur on the date in question, and that Hornbeck told investigators he was never in Jakarta).

Nonetheless, the prosecutors willfully had Shedd deliver the false Snee-as-lookout testimony – indeed, they induced Shedd to change his unequivocal statement to the contrary.

### B.    Jesus Cantu

Perhaps the most bumbling cooperator testimony was from Jesus Cantu, who could not pull off his scripted testimony with any degree of credibility. Though this was evident in his demeanor and several particulars of his testimony, one example is especially telling.

As the Court will recall, Cantu entered into a plea agreement with the government in which he agreed to plead guilty to being in a bribery conspiracy with Francis from May 2012 until September 2013, while he was a deputy commander with the Military Sealift Command Far East in Singapore. *See* Gov't Trial Ex. 5-8 at 3. That offense was supported by several specific facts in his plea agreement. *See id.*; *see also* 3/28/22 TT at 2179-82. The agreement also included a paragraph titled

"other relevant conduct," which stated that Cantu was involved in a bribery conspiracy with Francis and others from February to July 2007, while he was the Seventh Fleet's N4. *See* Gov't Trial Ex. 5-8 at 3; *see also* 3/28/22 TT at 2182-83. The plea agreement did not have any factual support for that claim, however. *See* Gov't Trial Ex. 5-8 at 11; *see also* 3/28/22 TT at 2183-84. And during Cantu's cross it became obvious that he was not involved in any such conspiracy while he was with the Seventh Fleet, much less was he part of Francis's "inner circle," as he testified.[24]

For example, during his direct Cantu claimed he entered into the Seventh Fleet conspiracy a year earlier than what was stated in his plea agreement, even though email evidence blew that claim out of the water. *See* 3/28/22 TT at 2184-87. Furthermore, although Cantu testified that his position as N4 made him very important to Francis, he could not point to anything he did for Francis until a few weeks before he left the Seventh Fleet, and his claims in that regard were also refuted by the email evidence. *See* 3/28/22 TT at 2192-2205. After being confronted with that email evidence, Cantu admitted that his direct testimony did "not make sense." *See id.* at 2208. With nothing more left to say, Mr. Dolan concluded Cantu's cross at that point. Moments later, the prosecutor declined to even try to rehabilitate Cantu on re-direct.

In sum, it is evident that: (1) in 2017, the prosecutors told Cantu (or more likely his attorney) that if he wanted to enter into a plea agreement to dispose of his case with respect to his criminal conduct in 2012-13, he'd also have to "admit" to being involved in a conspiracy in 2007 while he was at the Seventh Fleet; (2) Cantu agreed to including such a barebones "admission" in his plea agreement, because he

---

[24] Though if Cantu had been part of Francis's inner circle, it was especially curious that he did not know anything about the government's claim that Jim Dolan, his successor, was recruited for, and joined, the alleged conspiracy. *See* 3/28/22 TT at 2177.

wanted to settle his case and thereby avoid a longer prison term;[25] but (3) when it came time for trial years later, Cantu couldn't support that "admission" because it obviously wasn't true, and the prosecutors knew, or should have known, that.

Notably, defense counsel pointed out the implausibility of Cantu's testimony about the Seventh Fleet conspiracy after Cantu testified, and the Court seemed to agree. *See* 4/5/22 TT at 2757-58, 2766. As for the government, it did not dispute the obvious at that time, nor, as mentioned, did it seek to rehabilitate Cantu on re-direct.

## C. Edmond Aruffo

As a close review shows, the Aruffo situation looks a lot like the Cantu situation.

The government spent about forty sessions preparing Edmond Aruffo to testify against David Lausman, David Newland, and others. The contrast between that trial testimony and what Aruffo later told Judge Moskowitz at his sentencing is, to put it mildly, stark – it shows that Aruffo committed a large-scale fraud on the justice system. AUSA Valerie Chu, who handled Aruffo's sentencing, did not alert Judge Moskowitz to that fraud because Aruffo lied for the government during trial, and calling attention to his inconsistent claims during sentencing would highlight that fact and risk harsh blowback on the prosecutors.

During trial, Aruffo testified that while he was in the Navy he joined Francis's bribery conspiracy and became a member of Francis's "inner circle." 3/10/22 TT at 578-580; 3/16/22 TT at 1079; 3/21/22 TT at 1452-1453; 3/22/22 TT at 1530. He claimed that one of his functions in the conspiracy was to send Navy proprietary information to Francis. *See* 3/10/22 TT at 589-590, 595, 597-599, 604; 3/14/22 TT at 772. He also said he was guilty of espionage because he gave Francis classified

---

[25] Sadly, this dynamic is not rare, as any attorney who has had a lengthy criminal defense practice can attest. It is not unusual for a defendant to eat inaccurate claims made by prosecutors when there is no evident upside to fighting them.

ship schedules, and that he attempted to influence Navy officials to resolve issues in GDMA's favor. *See* 3/9/22 TT at 357-363; 3/15/22 TT at 935, 937, 988; 3/16/22 TT at 1006-1007, 1027-1028, 1089. Aruffo also claimed that he was instrumental in Francis's selection and recruitment of new members to his "inner circle" (including Robert Gorsuch and Steven Shedd), and that he indoctrinated those new members into the group's criminal conduct. *See* 3/14/22 TT at 776-778, 780-781, 791, 793, 795; 3/15/22 TT at 985, 987-89.

Aruffo testified that his conspiratorial conduct continued after he left the Navy, when he went to work for GDMA. There, he said, he was involved in a business scheme that defrauded the U.S. government of millions of dollars, *see* 3/16/22 TT at 1105, and that he personally defrauded the Navy out of "a couple million [dollars], at least." 3/9/22 TT at 371, 374. He claimed he did that by creating false invoices for the Navy, and by "manag[ing]" the Japan kickback scheme. 3/15/22 TT at 946; 3/16/22 TT at 1089. He also testified that he accepted prostitutes from Francis, *see* 3/9/22 TT at 367, that he led Naval officers to believe they could get discounted hotel rooms through Francis, and that he collected money from them for those rooms. *See* 3/16/22 TT at 1063, 1065-1066. And he said he continued his recruiting efforts for Francis's "inner circle" up until December 2009. *See* 3/15/22 TT at 852-853; Govt. Trial Exh. 2-623, 2-624. Aruffo capsulized his criminal conduct at GDMA as "similar to the role I had when I was in the 7th Fleet staff." 3/9/22 TT at 368.

In sum, during trial Aruffo portrayed himself as a person with intimate involvement with, and knowledge of, the Francis conspiracy, both while in the Navy and during his employment at GDMA. That portrayal was necessary to establish a foundation for his testimony implicating Mr. Newland and Mr. Lausman.

At his sentencing hearing in front of Judge Moskowitz, Aruffo told a very different story. With respect to his time in the Navy, he claimed that in twenty-plus years of service he did nothing more culpable than failing to pay "his fair share" for dinners and hotels, and he said he was required by his superiors to arrange for, and

attend, dinners hosted by Francis. *See* 10/26/22 Aruffo Sent. Hrg. Tr. at 35 (Exhibit K). As for his time working for GDMA, he testified that he "unwittingly" joined Francis's conspiracy there, and his "only crime" was "not quitting" sooner, after he learned about the conspiracy. *See* 10/19/22 Aruffo Sent. Memo. at 1, 15 (Exhibit L); 10/26/22 Aruffo Sent. Hrg. Tr. at 7, 13, 40 (Exhibit K). He also claimed that while working at GDMA, he "independently took steps to save the Navy money on subcontractors." 10/19/22 Aruffo Sent. Memo. at 15 (Exhibit L). And he claimed – thrice for good measure – that he "did not receive . . . prostitutes from Mr. Francis like other defendants."[26] *See* 10/19/22 Aruffo Sent. Memo. at 1, 14 (Exhibit L); 10/26/22 Aruffo Sent. Hrg. Tr. at 35 (Exhibit K).

During the sentencing proceedings, AUSA Valerie Chu did nothing to alert Judge Moskowitz to the glaring inconsistencies between Aruffo's trial testimony and his claims in his sentencing papers. Indeed, Ms. Chu smoothed the way for Aruffo's fraud on the court. For example, when Judge Moskowitz asked her about Aruffo's "malfeasance in the Navy," she said Aruffo was an (1) "observer of bribes" paid by Francis, (2) that in his job as protocol officer he "assisted Mr. Francis in setting up paid vacations, meals, hotel arrangements for his boss, Capt. Newland, as well as others," and (3) that he "enjoyed the benefit of some of those fancy meals, the hotel accommodations, these very lavish events." 10/26/22 Aruffo Sent. Hrg. Tr. at 33 (Exhibit K).

Aruffo's claims in court were unhinged from the truth – they depended on what he wanted to get and who he wanted to please. Notably, Aruffo was first questioned

---

[26] Aruffo provided Judge Moskowitz with the same version of his (lack of) involvement in Francis's conspiracy that he did on his law school application. That is, Aruffo told Judge Moskowitz, and his future law school, that he had a lengthy, storied military career and, aside from a couple traffic tickets, his only crime was not quitting his job with GDMA soon enough after learning they were committing fraud. *See* Trial Exh. NE-81.

by federal agents in September 2013, days after he was caught having a lavish dinner with Leonard Francis, where the two discussed future "business." 3/15/22 TT at 975; 3/21/22 TT at 1409-1410; 3/22/22 TT at 1534-1535. During those first interviews with agents and prosecutors, which lasted several hours over multiple days, Aruffo made no mention of David Newland, *see* 3/15/22 TT at 977-981, and said nothing about David Lausman, except that he considered the Lausmans friends from his Navy days and had dinners with them. *See* 3/21/22 TT at 1413. This changed dramatically after Aruffo signed a cooperation agreement and spent about forty sessions with government agents and prosecutors.

After all that "preparation," the government presented highly-scripted trial testimony from Aruffo, structured on email evidence, in which he claimed that Mr. Lausman and Mr. Newland were guilty of the charged bribery and conspiracy offenses. The foundation for Aruffo's testimony was his intimate familiarity with Francis and his extensive involvement in the alleged conspiracy. But that is a foundation that he rejected at his sentencing hearing. And without that foundation, the email evidence that Aruffo spun with respect to Messrs. Lausman and Newland was innocent or, at worst, ambiguous. That is, the emails depended on Aruffo's interpretation and credibility, which in turn depended on his later-rejected foundational testimony that he was intimately involved with Francis's criminal conduct over several years.

As mentioned, this looks a lot like the Cantu situation – that is, a witness who is coerced into making a raft of false statements at trial about his involvement in Francis's conspiracy to please the prosecutors and thus avoid their wrath at sentencing. In that light, it is obvious why Ms. Chu didn't intercede during Aruffo's sentencing to stop the fraud on the court. Had Ms. Chu done so – as she was ethically required – she risked Aruffo responding that it was she and the other prosecutors who put him up to that fraud. While this all appears obvious from the record, the Court should allow Ms. Chu to explain herself under oath at an evidentiary hearing.

## D. Conclusion

In addition to the examples above, there was countless other instances where it was obvious that the witnesses made up their testimony to appease the prosecutors, and that they didn't recall events as they claimed, or were flat-out lying. The Defendants don't catalogue all of that testimony here, but there are three additional points that bear making in this regard.

First, the corrupting effect of the government's "preparation" of witnesses didn't just impact witnesses it called, it also impacted potential defense witnesses. Thus, for example, the Defendants couldn't call Francis or Sanchez and hope to get truthful testimony because they had been steeped in the government's false claims during countless hours of "preparation," and knew that if they didn't repeat those claims on the stand they risked a harsh government sentencing recommendation and sentence – indeed, Francis said exactly that to Wright, repeatedly. *See* 1/13/22 Def. Memo. at 1-4 (Docket #662). Considering this, the government's burden-shifting argument in its rebuttal closing, in which it said the Defendants were free to call such witnesses, *see* 6/7/22 TT at 7193 (Docket #1131), was especially corrupt, and that corruption was supported by De La Pena's false, and non-responsive, statement on cross that "anyone that gets subpoenaed is required to testify." *See* 4/13/22 TT at 3757. Having bolted down such witnesses with cooperation agreements, and taught them the song they were expected to sing, the government could not truthfully claim they would provide trustworthy – or any – testimony if the Defendants called them at trial. To claim otherwise was misconduct. *See United States v. Kojayan*, 8 F.3d 1315, 1318 (9th Cir. 1993) (finding misconduct in government argument that it could not call cooperator at trial because "the whole point of the cooperation agreement" was that the witness "would sing like a nightingale whenever [the government] whistled the tune").

Second, the government's corruption of witnesses wasn't limited to its cooperators. Instead, whenever a potential witness said anything helpful for a

Defendant, investigators drowned that witness in the government's spin and tried to turn their testimony. That polluted countless witnesses, such that the Defendants faced substantial risk by calling them, especially in light of the no-holds-barred questioning of Mr. Pletcher. *See, e.g.*, 12/6/21 Report (indicating that former Lt. Commander Scott Kight made favorable comments with respect to Mr. Dolan, which the investigators then tried to turn by showing him several emails and documents about which he had no knowledge) (Exhibit H). Or the government oftentimes succeeded in turning the witness's testimony 180 degrees. *Compare* 3/23/15 Report at 5 (Exhibit I) (documenting that Captain Rathbun from FISC made several helpful and exculpatory statements about Mr. Dolan), *with* 12/9/21 Report at 2 & 1/12/22 Report at 2 (Exhibit J) (indicating that during trial preparation sessions, the government was able to dramatically turn Rathbun's statements in favor of Dolan).

That dynamic was glaringly evident with the government's last trial witness, Eric Law. Law testified on direct that in September 2013, David Lausman telephoned him asking for advice about what he/Lausman should do with a hard drive that contained classified information which Lausman had just found in his closet at home. *See* 5/17/22 TT at 6078-79. AUSA Valerie Chu prompted Law to testify that this conversation was especially memorable to him, thus he could recall the details nine years later, because Mr. Lausman had asked him/Law "to do something unlawful" and "violate [his] oath and dispose of classified information." *Id.* at 6088-89. In the face of repeated objections, Ms. Chu sought to milk this testimony, stating to Law, "And again this is just how you remember this, why it's memorable to you." *Id.* at 6089. Law replied:

> Uh-huh. It's pretty unusual. You know, you don't get called up every day to – when there's a security violation, a compromise, potential compromise of classified information, and instead of following all the procedures, someone's asking you to do something different than what's in the instructions, what's in the, what's in the law.

*Id.*

//

The "problem" with Ms. Chu's scripted narrative about Law's stark "memory" is that it is baldly contrary to Law's contemporaneous statements to NCIS agents in September 2013, which he made just a few days after Mr. Lausman called him. At that time, Law told the agents that Mr. Lausman "contacted me for advice. It's basically you know what to (unintellgible) do. . . . It seemed natural you know, I live a few doors down to him. I've known him for a while. The only intel officer that he's had close contact with for, since he got there. . . . [S]o I didn't think it was unusual that he contacted me," and "I said I'd make a couple calls." Trial Exh. LA-141. When Mr. Lausman's counsel sought to introduce a video-recording of these prior inconsistent statements by Law, Ms. Chu objected and tried to preclude the most reliable, and truthful, evidence on the subject. *See* 5/17/22 TT at 6097-6100. The Court rejected that effort and admitted the video-recording, after which Law admitted that he'd had no other involvement with the hard drive situation since 2013, other than his trial preparation sessions with the prosecutors.[27] *See id.* at 6100-02.

Ms. Chu's presentation of Law's testimony about a "memory" she cooked up with Law during trial preparation sessions, and her attempt to preclude the recorded evidence of Law's mindset in September 2013, is appalling. It evidences a "glaring lack of integrity," "playing fast and loose with the evidence, and not attending to its

---

[27] When they could, the prosecutors preempted this sort of "problem" by (1) not recording cooperating witnesses' statements, (2) telling those witnesses not to put any statements in writing, and (3) failing to discover to defense counsel the massive amount of documents they gave those witnesses to "prepare" their trial testimony. *See, e.g.*, Trial Exh. DO-459 (AUSA Valerie Chu writing to Alex Gillett, "Please refrain from writing substantive emails about your testimony, so that we can have a chance to talk through any questions you may have"); *see also* 5/3/22 TT at 4760-62, 4766; 4/19/22 TT at 4044, 4047-49 (De La Pena admitting that there was scant information in reports relating to Shedd's trial preparation sessions, and conspicuously absent from those reports was any mention of the documents prosecutors used to prepare Shedd).

implications with the seriousness demanded by the Constitution." *Northern Mariana Islands v. Bowie*, 243 F.3d 1109, 1120-21 (9th Cir. 2001) (finding misconduct when prosecutor objected to introduction of evidence "in a transparent tactical move" intended to prevent the defendant from refuting a false narrative offered by the government). The prosecutors in this case fail to understand that their "job isn't just to win, but to win fairly, staying well within the rules." *Kojayan*, 8 F.3d at 1323. "As Justice Douglas once warned, '[t]he function of the prosecutor under the Federal Constitution is not to tack as many skins of victims as possible to the wall. His function is to vindicate the right of people as expressed in the laws and give those accused of crime a fair trial.'" *Id.* (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 648-49 (1974) (Douglas, J., dissenting)). The Court repeatedly warned the prosecutors about this duty, but those warnings fell on deaf ears.

Finally, the case agent also demonstrated this win-at-all costs mentality, figuratively and literally. Though this was evidenced throughout his testimony, it was also shown by his willingness to unlawfully pay witnesses $5,000 to $10,000 bribes to come testify *for* the government. *See* 5/3/22 Def. Memo. at 41-46 (Docket #873). As the Ynah events showed, that money was only for witnesses who would testify as the government wished – contrary witnesses need not apply. Truth-seeking this was not.

## IV. Vacating The Defendants' Convictions Is Warranted Based Solely On The Government's Preparing Its Cooperators To Lie

As the ensuing discussion shows, it is evident that the prosecutors and agents repeatedly acted contrary to their duty to safeguard the trial's truth-seeking process. Instead, they prepared witnesses to say what the prosecutors wanted, regardless of the reliability of that testimony, or its truth. To warrant reversal on that basis, generally a defendant must show the false evidence was material to his conviction, but that materiality test is different than *Brady's*:

//

98

Whereas a *Brady* violation is material when "there is a reasonable probability that . . . the result of the proceeding *would* have been different," *Bagley*, 473 U.S. at 682 (emphasis added), a *Napue* violation requires that the conviction be set aside whenever there is "*any* reasonable likelihood that the false testimony *could* have affected the judgment of the jury." [Citing *Hayes*, 399 F.3d at 985.]

*Jackson v. Brown*, 513 F.3d 1057, 1076 (9th Cir. 2008). This standard applies if the government knew or should have known the testimony was false when given. *Id.* at 1071. However, "if it is established that the government knowingly permitted the introduction of false testimony reversal is virtually automatic." *Hayes*, 399 F.3d at 978.

If the government didn't know the testimony was false when given, a *Napue* claim still lies but materiality is assessed under the *Brady* standard:

A conviction based in part on false evidence, even false evidence presented in good faith, hardly comports with fundamental fairness. Thus, even if the government unwittingly presents false evidence, a defendant is entitled to a new *trial "if there is a reasonable probability that [without the evidence] the result of the proceeding would have been different."* *Endicott*, 869 F.2d [452, 455 (9th Cir. 1989)] (citing *United States v. Bagley*, 473 U.S. 667, 678-80 (1985)).

*United States v. Young*, 17 F.3d 1201, 1203-04 (9th Cir. 1994) (emphasis added); *see also Maxwell v. Rose*, 628 F.3d 486, 506 (9th Cir. 2010); *Killian v. Poole*, 282 F.3d 1204, 1208 (9th Cir. 2002).

There is no gainsaying that there is a "reasonable likelihood that the false testimony could have affected the judgment of the jury," thus the Defendants convictions should be vacated and, at the least, a new trial should be ordered. *See, e.g., People v. Garrett*, 27 Cal. App. 2d 249, 252 (1938) ("[w]ith the testimony in the record showing that the prosecuting witness was coached, we cannot hold that the defendant has had a fair and impartial trial"). Furthermore, considering that the government's conduct in preparing its witnesses to give false testimony was willful and pervasive, "reversal is virtually automatic." *Hayes*, 399 F.3d at 978.

//

//

# CUMULATIVE ERROR AND PREJUDICE

In light of all of the issues and misconduct addressed above, and which otherwise occurred in this case, the Court should vacate the Defendants' convictions based on cumulative error and prejudice. *See, e.g., United States v. Preston*, 873 F.3d 829, 844-46 (9th Cir. 2017); *Parle v. Runnels*, 505 F.3d 922, 927-28 (9th Cir. 2007); *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996). And because constitutional error was involved, the "aggregate error should be reviewed under [the] harmless beyond a reasonable doubt standard." *United States v. Necochea*, 986 F.2d 1273, 1283 (9th Cir. 1993). Regardless of the standard, however, vacating the Defendants' convictions is well-warranted.

In light of everything that occurred, if the Court imposes any lesser remedy than ordering a new trial the prosecutors in this case will continue to misbehave with impunity, and the message sent will embolden other prosecutors to do likewise. Just as destructive would be the signal sent to the public. "If the government becomes a lawbreaker, it breeds contempt for the law; it invites every man to become a law unto himself." *Northern Mariana Islands v. Bowie*, 243 F.3d 1109, 1124 (9th Cir. 2001) (quoting *Olmstead v. United States*, 277 U.S. 438, 485, 48 S.Ct. 564, 72 L.Ed. 944 (1928)). The only antidote for such contempt here is to hold the prosecutors accountable by relieving them of their fraudulently obtained convictions. Sadly, that may be the only "consequence" they suffer, because, despite this Court's finding that Mr. Pletcher committed "flagrant misconduct," the DOJ's Office of Professional Responsibility won't investigate, much less impose discipline. *See* 7/13/22 Order at 12 (Docket #1009). In light of the actions of the prosecution team, and the breakdown in supervision at the USAO and OPR, if the Court orders a new trial it should require it to be conducted by different prosecutors, from a different office.

The Defendants submit, however, that the vastly more appropriate remedy is vacating the convictions and dismissing the indictment. An indictment may be dismissed to protect a defendant's constitutional rights or as an exercise of the

Court's inherent supervisory powers. *See United States v. Bernal–Obeso*, 989 F.2d 331, 337 (9th Cir. 1993); *United States v. De Rosa*, 783 F.2d 1401, 1404 (9th Cir. 1986). "In determining the proper remedy, [a court] must consider the government's willfulness in committing the misconduct and its willingness to own up to it." *Kojayan*, 8 F.3d at 1318. However, the supervisory authority of the court to dismiss does not require a finding of intentionality. Rather, a finding of a "reckless disregard for the prosecution's constitutional obligations" satisfies the standard for dismissal. *United States v. Chapman*, 524 F.3d 1073, 1084 (9th Cir. 2008); *see also United States v. Bundy*, 968 F.3d 1019, 1038 (9th Cir. 2020) (same). A court may also take into account the failure to accept responsibility shown by the prosecutors and their supervisors. *See Kojayan*, 8 F.3d at 1320.

By all of those measures, dismissal is appropriate. "In a situation like this, the judiciary – especially the court before which the primary misbehavior took place – may exercise its supervisory power to make it clear that the misconduct was serious, that the government's unwillingness to own up to it was more serious still and that steps must be taken to avoid a recurrence of this chain of events." *Id.* at 1325; *see also United States v. Bundy*, 968 F.3d 1019, 1045 (9th Cir. 2020) (noting that dismissal with prejudice to remedy a *Brady* violation was warranted because of (1) the "need to impose a sanction that will serve to deter future prosecutions from engaging in the same misconduct as occurred here," and (2) "the government's failure to acknowledge and confess any wrongdoing during the course of this case – especially as to material misrepresentations to the district court").

//
//
//

**CONCLUSION**

For the foregoing reasons, and any others that the Court finds relevant, the Defendants request that the Court vacate their convictions and either (1) order a new trial, to be conducted by different prosecutors, from a different office, or (2) dismiss the indictment.

Respectfully submitted,

Date: March 31, 2023

*/s/ Todd W. Burns*
Counsel for James Dolan

*/s/ Joseph Dominic Mancano*
Counsel for David Newland

*/s/ Robert E. Boyce*
Counsel for David Lausman

*/s/ Michael Crowley*
Counsel for Mario Herrera