ROBERT E. BOYCE
State Bar No. 79806
email: rb@boyce-schaefer.com
LAURA G. SCHAEFER
State Bar No. 138801
email: ls@boyce-schaefer.com
BOYCE & SCHAEFER
Attorneys at Law
934 23rd Street
San Diego, CA 92102
619/232-3320

Attorneys for Defendant
DAVID LAUSMAN (6)

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### (Honorable Janis L. Sammartino)

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 17CR0623-JLS-6 |
| Plaintiff, | **DEFENDANTS' JOINT SUPPLEMENTAL MOTION FOR DISMISSAL OR A NEW TRIAL BASED ON *BRADY* AND *NAPUE* VIOLATIONS** |
| v. | |
| DAVID NEWLAND, et.al. | |
| DAVID LAUSMAN, (6) | |
| Defendant. | |

**DEFENDANTS[1] JOINT SUPPLEMENTAL MOTION FOR DISMISSAL OR A NEW TRIAL BASED ON *BRADY* AMD *NAPUE* VIOLATIONS**

Defendants, David Newland, through his counsel, Joseph Dominic Mancano, James Dolan, through his counsel, Todd W. Burns, David Lausman, through his counsel, Laura Schaefer and Robert Boyce, and Mario Herrera, through his counsel, Michael Crowley, submit the following Joint Supplemental Motion for Dismissal or New Trial based on *Brady* and *Napue* violations. The

---

[1]This Motion is being filed jointly by Defendants David Newland, James Dolan, David Lausman, and Mario Herrera.

Defendants request that the claims raised in this supplemental motion be assessed cumulatively with the other significant claims raised in the new trial motions filed on March 31 and April 4, 2023, and the Defendants request those arguments be incorporated by reference here. (Dkt.## 1056, 1065.)

# Table of contents

THE GOVERNMENT SUPPRESSED FAVORABLE EVIDENCE IN VIOLATION OF *BRADY* AND *GIGLIO* AND PRESENTED FALSE EVIDENCE. THESE VIOLATIONS, ALONE OR IN CONJUNCTION WITH THE OTHER CONSTITUTIONAL VIOLATIONS, COMPEL DISMISSAL OR A NEW TRIAL.................................................................... 4

I.      Introduction................................................................. 4

II.     Relevant Procedural and Factual Background. ......................... 6

        1.      Mr. Pletcher represents that he will call Francis' investigator Esteban Hernandez to testify regarding how he obtained the Covington hard drives................................................................. 7

        2.      Mr. Pletcher tasks Agent DeLaPena with obtaining a declaration from Mr. Hernandez to try to link the Covington hard drives to GDMA. Hernandez tells DeLaPena that he retrieved the hard drives from Francis' former IT manager in Malaysia. ..................... 10

        3.      The government unsuccessfully opposes the defense introduction of Francis' podcast statements that he had his "IT people" clean up his servers................................................................. 12

        4.      Mr. Pletcher denies that he promised to call Mr. Hernandez to link the documents to GDMA, takes Hernandez from the witness line up and substitutes in Agent DeLaPena, the "everyman witness" to authenticate the Covington documents.............................. 13

        5.      Agent DeLaPena dissembles on the witness stand................ 15

III.    The Agent's False Testimony Violated the Defendants' Fifth and Sixth Amendment Rights of Due Process and Confrontation and Deprived the Defendants of a Fair Trial............................................... 21

IV.     The Prosecution Violated Brady/Giglio in Failing to Turn Over Evidence that Mr. Francis' IT Manager Was the Source of the Hard Drives. ...... 27

V.      The Government Deprived the Court of Information Relevant to the Admissibility of the Covington Documents; Any Doubt as to the Documents' Admissibility Is Extinguished. ........................ 29

VI.     An Evidentiary Hearing Is Required.............................. 30

VII.    Conclusion.................................................... 31

**THE GOVERNMENT SUPPRESSED FAVORABLE EVIDENCE IN VIOLATION OF *BRADY* AND *GIGLIO*[2] AND PRESENTED FALSE EVIDENCE. THESE VIOLATIONS, ALONE OR IN CONJUNCTION WITH THE OTHER CONSTITUTIONAL VIOLATIONS, COMPEL DISMISSAL OR A NEW TRIAL.**

## I.   Introduction.

A major issue in this case was the source of documents Leonard Francis and his surrogates provided to the government, and whether they were properly authenticated and reliable. Of particular concern were documents from hard drives the government obtained from the Covington law firm, claimed to be from a server at GDMA's Singapore headquarters. This Court articulated the defense position: "I've always known the defense's concern about where the documents came from. How did they get to Covington? Who had access? What was done? ¶ The podcast then caused us further concerns based on what Mr. Leonard Francis represented." 4/21/22 TT 4390.

During a motions in limine hearing on February 17, 2022, the Court ruled that the government's certification of documents copied from hard drives was inadequate because it did not provide any information about whether or how the hard drives were obtained from GDMA. 2/17/22 Hearing Tr. 12, 39. Mr. Pletcher responded that he would solve that problem by calling Esteban Hernandez, a private investigator who worked for Mr. Francis and who allegedly obtained the hard drives from GDMA's Singapore headquarters. 2/17/22 Hearing Tr. 22.

Immediately after that hearing, Mr. Pletcher and Agent DeLaPena contacted Francis' counsel and Mr. Hernandez to gather the relevant information and solve their foundation problem. What they learned within the next week, however, was that Mr. Hernandez did not obtain the hard drives from GDMA's headquarters in Singapore, he instead obtained them from Richard Ng, GDMA's information

---

[2] *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150 (1972).

technology manager, in Malaysia, under circumstances that still remain unclear, at least to defense counsel. The government did not provide this information to defense counsel or the Court, however, and defense counsel first learned about it from government-produced discovery provided two weeks ago.

The government's problems with the Covington exhibits were compounded early in the trial when the Defendants introduced a recording of Francis telling journalist Tom Wright that he'd anticipated his arrest and thus doctored evidence on GDMA's server, with the help of his "IT people." In light of this development and after learning that Hernandez obtained the hard drives from Francis' IT manager, the government was undoubtedly loathe to call Mr. Hernandez at trial. Instead, the government called Agent DeLaPena to lay the foundation for introduction of the evidence from the hard drives.

Defense counsel objected to this, and pointed out that Mr. Pletcher represented during the in limine hearing that he would call Mr. Hernandez to testify about his obtaining the hard drives. Mr. Pletcher falsely told the Court that he had never promised to call Mr. Hernandez for that purpose. Defense counsel were perplexed by this misrepresentation at the time, because it was belied by the Court's transcript, but it makes sense now in light of the newly-produced discovery: the government could not call Mr. Hernandez because he would not be able to lay a proper foundation for the introduction of documents from the hard drives, and, even worse for the government, he received the hard drives in Malaysia from Mr. Ng, the manager of the "IT people" who helped Francis doctor evidence on those hard drives. Faced with these problems, Mr. Pletcher lied to the Court about having promised to call Mr. Hernandez.

When defense counsel cross-examined Agent DeLaPena about the source of the Covington hard drives, he also lied, lest defense counsel learn about the government's problems in this context. Among other things, he testified Mr. Hernandez "pulled" the nine hard drives from Singapore, disclaimed any

knowledge about how this retrieval occurred and who other than Hernandez, if anyone, was involved, and claimed he could not know what Mr. Hernandez did because it was shielded by the attorney client privilege. 4/12/22 TT 3628-29; 4/19/22 TT 40646-4070. None of that was true.

The recently-produced discovery shows that Agent DeLaPena had defense counsel and Mr. Hernandez at his beck-and-call with respect to obtaining this information. He knew that the hard drives were provided by Mr. Ng, the IT manager, in Malaysia. As Agent DeLaPena gave this false testimony, Mr. Pletcher sat silent and allowed the testimony to go uncorrected, not only to prevent the jury from learning about evidence that was obviously harmful to the prosecution's case, but also to avoid impeachment of Agent DeLaPena, the government's central witness.

These events alone warrant vacating the convictions in this case, under *Napue*, as well as *Brady* and Federal Rule of Criminal Procedure 16. This recently-produced discovery adds to a mountain of evidence showing that the lead prosecutor, Mr. Pletcher, and the lead agent, DeLaPena, were willing to withhold evidence and present false testimony if they believed it would give them an "advantage." Given what has occurred, it is impossible to trust either of them, or the government's case. Accordingly, either standing alone or when added to the Defendants' already-filed cumulativeness claim, these new claims warrant vacating the Defendants' convictions, and the grant of a dismissal or new trial.

## II.    Relevant Procedural and Factual Background.

A timeline of events leading up to the admission of the Covington documents into evidence reveals that 1) Mr. Pletcher represented before trial that he would present evidence from Francis' investigator Hernandez that he obtained the Covington hard drives from GDMA; 2) Mr. Pletcher then learned that Hernandez obtained the hard drives from Richard Ng, Francis' former IT manager, in Malaysia, not Singapore where GDMA was located; 3) and, after the defense

played Francis' podcast statements that he had his "IT people" "follow through" with cleaning up his servers, Mr. Pletcher falsely claimed he had *not* promised to call Hernandez, and introduced documents from the hard drives through Agent DeLaPena. Agent DeLaPena then falsely testified on cross-examination that he did not know who assisted Hernandez in obtaining the hard drives from GDMA, while Mr. Pletcher stood mute.

> **1.    Mr. Pletcher represents that he will call Francis' investigator Esteban Hernandez to testify regarding how he obtained the Covington hard drives.**

In October 2021, the defense filed a motion in limine arguing that the government could not establish an evidentiary foundation for the numerous documents selected from nine hard drives retrieved from Singapore, later provided to the government by the Covington law firm while Mr. Francis cooperated. Dkt.# 603, pp. 21-23.

In January 2022, the government filed a "Notice and Motion Regarding Rule 902 (14) Certification" seeking to admit electronic files imaged from hard drives seized by Singapore law enforcement, and electronic files imaged from six of the nine the hard drives provided by the Covington law firm. Dkt.# 686. The government attached a certification for hard drives the government received from the Singaporean Corrupt Practices and Investigations Branch (CPIB) as Exhibit B (Dkt.# 686-2), and a certification by Mark Luque, an NCIS forensic digital examiner, of six of the nine hard drives received by Special Agent Jill Kelley from the Covington law firm as Exhibit C (Dkt# 686-3). The certifications simply stated that the hard drives received were copied. Dkt.# 686-2, 686-3.

The defense filed its opposition to the motion, explaining that the certifications did not establish a link between the hard drives in exhibit C and GDMA: "Significantly, there is no certification from Covington & Burling **as to what the devices contain or how the devices relate (if at all) to the GDMA Server**." [Emphasis in original.] Dkt.# 705, p. 11. The same was true for the

Singapore CPIB certification. Dkt.# 705.

At the February 17, 2022, in limine hearing, the Court tentatively rejected both certifications, in part because the government failed to establish a link between the hard drives imaged and their alleged source, GDMA:

> Eleventh motion, the government's notice and motion regarding rule 902(14) certifications. Given the discrepancies pointed out in the defendants' briefing, *the court is not inclined to accept either certification set forth in government's Exhibits B and C.* As the court understands it, both purport to be certifications of authenticity associated with the GDMA server. Aside from the fact that *neither certification explains any connection with GDMA*, both appear to certify entirely different devices and neither match the device listed in the certification for the GDMA server which was provided to the defendants in October of 2021. [Emphasis added.]

2/17/22 Hearing Tr. 12.

After the Court issued its tentative ruling, Mr. Pletcher represented that investigator Hernandez would testify regarding his retrieval of the six hard drives from GDMA listed in Exhibit C to the government's motion to admit documents in order to establish the missing link:

> I will say that there is one aspect of their motion which is absolutely correct, and the United States does not claim otherwise, which is with respect to Exhibit C. Remember, 902(14) certification speaks only to the copying from one to the next, right, was x copied to y through a process of digital authentication? Each one of the certifications that we submitted to the court establishes that x was copied to y. And so if there's a question as to what was x, where did the original media come from, right, we have described that to the court.
> *With respect to Exhibit C, that media was handed to us by Mr. Francis's private investigator*, which we then copied through a process of digital authentication into what was then produced. *Absolutely, we agree that that investigator would have to testify as to his efforts to secure that information from GDMA* and bring it to us to copy, so that is correct. And to the extent that that was left uncertain, I don't know how it could be, but to the extent it was that small aspect

of chain of custody is an appropriate issue to establish at trial.
[Emphasis added.]

2/17/22 Hearing Tr. 22.

Later in the hearing, Ms. Wang, Loveless' counsel, reiterated the key problem here, specifically that the government certifications failed to establish that the hard drives turned over by the Singapore CPIB (Exhibit B to Dkt.# 686) and Covington (Exhibit C to Dkt. #686) were in fact from GDMA's business:

> [T]he government's asking that we agree that these are self-authenticated as GDMA servers, and to date we still have not seen a linkup. We have not seen certifications by any individuals who have first person knowledge of which storage media comprises the GDMA server. What they need to do is provide that linkup, and once they provide that linkup, perhaps we can reach some sort of agreement, but they haven't done that.
> They have just shown that certain digital devices have been copied. We want certifications along the way where witnesses with first person, firsthand knowledge can say, "yes, this is what comprised the GDMA server or the storage devices on which the GDMA server sat, and this is how it was collected and transferred to this particular media" or "this is how these devices were then given to so someone else," but right now that linkup hasn't been made. We don't believe there's enough there for self-authentication, so we agree and think that the Court got that exactly right."

2/17/22 Hearing Tr. 37.

The Court ruled that the government needed to establish a link between the Covington hard drives and GDMA to admit documents from the hard drives:

> With regard to the certifications, I believe Ms. Wang said that, you know, if you present them and they can make the connection, they're being reasonable and we won't have this issue. If it's not presented or doesn't appear to solve the problem the defense is raising, then we'll have to renew the motion because right now I don't see it, and I need the same information, but maybe you'll agree. If you agree, that will go a long way with me. if you don't agree, then that's something you

can tell me on Tuesday, the 22nd, at 9:00 a.m., before we go over the 300-plus juror questionnaires.

2/17/22 Hearing Tr. 39.

> **2.    Mr. Pletcher tasks Agent DeLaPena with obtaining a declaration from Mr. Hernandez to try to link the Covington hard drives to GDMA. Hernandez tells DeLaPena that he retrieved the hard drives from Francis' former IT manager in Malaysia.**

After the in limine hearing, on February 21, 2022, Mr. Pletcher emailed Devin Burstein, Francis' lawyer, and told him he needed "a declaration/statement that the external storage media that Esteban [Hernandez] got from Singapore were taken from GDMA and contained the contents of its computer server," and told Mr. Burstein that "The judge and defense have said our 902(14) certifications are acceptable as long as we tie that together." Attached to this motion as Exhibit A are emails exchanged between Mr. Burstein, Mr. Pletcher, Covington lawyers and Agent DeLaPena regarding their attempts to determine when the hard drives were obtained by Hernandez; Ex. A, NTM 0009. Mr. Ko turned these emails over to the defense on June 15, 2023.

After communicating with defense counsel, Mr. Pletcher tasked the agent with contacting Hernandez. Ex. A, NTM 0008. On February 22, 2022, Mr. Pletcher told the Court that he was following up with the Singapore law enforcement authorities to obtain a certification for the hard drives identified in Exhibit B. 2/22/22 Hearing Tr. 5-6. Mr. Pletcher did not mention the certification for the Covington hard drives identified in Exhibit C. *Id*.

Between February 21 and 23, 2022, Agent DeLaPena contacted Mr. Hernandez regarding his retrieval of the drives; Mr. Hernandez was boarding a plane, could only talk to the agent briefly, and gave no specifics.[3] On February 23, 2022, Agent DeLaPena followed up with a text message asking Mr. Hernandez whether there was "any further specificity" on when Mr. Hernandez returned to

---

[3] This communication was relayed to the defense on June 15, 2023.

San Diego with the hard drives. Mr. Hernandez replied, "11 Feb 2015 I met with Richard in Malaysia." Attached as Exhibit B are text messages between Agent DeLaPena and Mr. Hernandez dated February 23 and 24, 2022. Mr. Ko told defense counsel that Agent DeLaPena identified "Richard" as Richard Ng, GDMA's IT manager.

Agent DeLaPena knew that Mr. Ng had long served as Mr. Francis' IT manager, dating to well before Francis' arrest. In a report prepared by Agent DeLaPena dated October 21, 2013, the agent noted that Mr. Francis identified Richard Ng as GDMA's IT manager; Mr. Francis said that the Chinese government courted Mr. Ng because he had access to GDMA's servers. Attached as Exhibit C is the first page of the report and the relevant portion of the October 2013, report prepared by Agent DeLaPena referencing Mr. Ng's employment as IT manager.

The prosecution never gave the defense any discovery related to Hernandez's retrieval of the drives. The information contained in the communications in Exhibits A and B was not divulged until June 15 and June 20,[4] 2023. The government did not tell the defense that Hernandez retrieved the hard drives from Richard Ng, Mr. Francis' IT Manager, or that Hernandez did not obtain the hard drives from GDMA headquarters located in Singapore. Instead, the Mr. Ng came into possession of the hard drives, at some unknown time under unknown circumstances, and he then handed them over to Hernandez in Malaysia, not Singapore. Exhibit B.

---

[4]The documents attached as Exhibits A and B were provided to defense counsel on June 15, 2023. In a June 20, 2023 follow up email in response to defense counsel's inquiry, Mr. Ko advised defense counsel that Agent DeLaPena identified "Richard" in the text message as Richard Ng, the IT manager.

Mr. Hernandez has refused to talk to the defense. Although Mr. Ko informed the defense that there were no other communications or follow up between Hernandez and the agent or the prosecutors, Mr. Ko obtains his information from Mr. Pletcher and Agent DeLaPena. Mr. Pletcher previously represented to the Court and defense counsel during trial that all the information regarding the sources of the evidence in this case was turned over: "The information, the reporting as to where all of the evidence came from, has been turned over." 4/11/22 TT 3481. This, of course, was false.

It seems unlikely that there are no additional communications with Hernandez or follow up because 1) DeLaPena seemed to know who "Richard" was and understood that the hard drives were obtained in Malaysia (not Singapore); and 2) Mr. Pletcher knew he needed to establish a link between the hard drives and GDMA to comply with the Court's in limine ruling, which would require some follow up conversation with Hernandez.

### 3. The government unsuccessfully opposes the defense introduction of Francis' podcast statements that he had his "IT people" clean up his servers.

On March 18, 2022, during Mr. Aruffo's testimony, before Agent DeLaPena testified, the defense sought to introduce Francis' statements to Mr. Wright, the podcast producer, that he had his "IT people" clean up his servers.

According to Francis, he was coached by the corrupt NCIS Agent Beliveau to delete emails and tamper with his servers:

WRIGHT:    And so Beliveau is telling you about [the government investigation] and this is around 2012, 13?

FRANCIS:   Yes.

WRIGHT:    And you know what's coming?

FRANCIS:   Oh yeah. I mean, I already knew that. And he warned me that don't go to United States because you know they can nab you, you know and he said, you know they already got a warrant for you, indictment, they can just nab you when you arrive there so you got to – if I was you, I wouldn't go.

WRIGHT:   And he tells you to delete your emails?

FRANCIS:   Oh yeah. He was giving (laughing) – he was advising me on how to evade and clean up all the servers and you know counter-intelligence on it, yes.

WRIGHT:   And did you follow any of that?

FRANCIS:   Well, you know I – basically kind of followed through with some things because you know I had my own IT folks working for me and then what we did was we just shifted to a Chinese server – a PRC server for protection for you know for all my back channel work that I was doing with all my moles.

3/21/22 TT 1313; Excerpt of Tr. Ex. DO- 415-1.

The government vehemently opposed the admission of this podcast clip. 3/19 /22 TT 1260-1280; 3/21/22 TT 1297-1300; Dkt.# 786. The clip was problematic for the government because it impeached Francis's certification, but (unbeknownst to the defense) it was even more so because Mr. Hernandez, who was on the government's witness list, would testify the hard drives were obtained from Francis' former IT manager, the same individual who assisted Francis to "evade and clean up his servers." Tr. Ex. DO-451-1. The Court overruled the prosecution's objection and permitted the defense to play the podcast clip during Aruffo's testimony. 3/21/22 TT 1302-03.

    **4.**     **Mr. Pletcher denies that he promised to call Mr. Hernandez to link the documents to GDMA, takes Hernandez from the witness line up and substitutes in Agent DeLaPena, the "everyman witness" to authenticate the Covington documents.**

On April 5, 2022, Mr. Pletcher sought to introduce the Covington hard drives and documents through Agent DeLaPena, the defense objected and confronted Mr. Pletcher with his in limine representation that he would call Hernandez, the witness who retrieved the Covington hard drives from Asia. 4/5/22 TT 2860-2862; 4/6/22 TT 2958. But Mr. Pletcher denied making any representation about calling Mr. Hernandez:

The second thing with respect to that is that the conversation that we were having in February of 2022 about an agent coming to bridge the gap and bringing certain things to court, that was in reference to the media received directly from the Singaporean authorities. That was not a discussion with respect to these 0895 hard drives. *So I did not make any representation to the court about bringing a particular witness or doing a particular thing with respect to these hard drives.* [Emphasis added.]

4/6/22 TT 2956-57.

The defense was somewhat mystified by Mr. Pletcher's reneging on his promise to call Mr. Hernandez to link the documents from the hard drives to GDMA. After all, Mr. Hernandez worked in San Diego and his testimony about his delivery errand would take less than an hour. Even this Court questioned why no witness would testify about the source of the Covington documents: "We have no idea what Covington got, or how they got it, or, more importantly, what was done to the situation before they got these things. . . Mr. Pletcher: Well we know a little bit, because -- The Court: Well, then, why can't we know it here?" 4/6/22 TT 2962-63.

The short answer to this question is that Mr. Pletcher did not want the Court, defense counsel or the jury to know that Hernandez retrieved the drives in Malaysia from Mr. Ng, Francis' former IT manager, who, according to Francis, supervised the people who helped clean up GDMA's servers. 3/21/22 TT 1313; Tr. Ex. DO-451-1. Mr. Pletcher did not advise the Court or defense counsel of

these facts.

Instead, Agent DeLaPena, who made false statements under oath on another occasion, testified he did not know who gave Hernandez the hard drives and Mr. Pletcher did not correct the agent, as explained in the following section.

### 5. Agent DeLaPena dissembles on the witness stand.

When Agent DeLaPena testified, he knew the defense had played Mr. Francis' podcast statements that NCIS agent Beliveau advised Francis "on how to evade and clean up all the servers" and conduct "counter-intelligence" on them, and that Francis acknowledged he "followed through" by having his "IT people" work on it. 3/21/22 TT 1313; Tr. Ex. DO 451-1. Mr. Dolan's counsel cross-examined the agent about the podcast statements. 4/13/22 TT 3765-66. Any person who attended this trial would know the source and reliability of the Covington documents was a significant issue for the defense. See, e.g., 4/11/22 TT 3345: Mr. Burns: I'm going to object to Covington. It came from Covington, from who knows where, right? The Court: Well, I think we've discussed it and the jury understands the course of this transition."

Yet when he was cross-examined about this critical issue, the agent dissembled. He testified he did not know whether GDMA staff coordinated with Hernandez in the retrieval process and disclaimed knowledge about how it occurred and who was involved. First, during cross examination conducted by Mr. Newland's counsel, Agent DeLaPena deliberately avoided any mention of Mr. Ng, and testified that Mr. Hernandez "pulled" the hard drives in Singapore:

> Q. [Newland's counsel] You received nine hard drives from someone who worked for Covington & Burling, right?
>
> A. [Agent DeLaPena] Yes.
>
> Q. An investigator who worked for Covington & Burling, right?
>
> A. The hard drives came from a paralegal.
>
> Q. A paralegal who worked for Covington & Burling.

| | | |
|---|---|---|
| 1 | A. | Yes. |
| 2 | Q. | Do you know that paralegal's name? |
| 3 | A. | Not off the top of my head. I would have to review the chain of custody document from Covington. Not off the top of my head, sir. |
| 4 | | |
| 5 | Q. | And that paralegal -- now, did that paralegal personally search a computer or computers or hard drives to produce that information? |
| 6 | | |
| 7 | A. | I don't believe she searched anything. And my understanding is that we received the entirety of the hard drives themselves, not a reproduction but the hard drives themselves. |
| 8 | | |
| 9 | Q. | *Because that's what the paralegal told you?* |
| 10 | A. | *No, sir, that's based on my review of that information.* |
| 11 | Q. | *Well, but where did those hard drives come from originally?* |
| 12 | A. | *My understanding is they came from Singapore.* |
| 13 | Q. | *Did you go to Singapore and pull those hard drives?* |
| 14 | A. | *No, sir.* |
| 15 | Q. | *Do you know who did?* |
| 16 | A. | *I believe I know who did, although I was not personally present.* |
| 17 | | |
| 18 | Q. | *So you were told the name of the person who did?* |
| | A. | *Yes.* |
| 19 | Q. | *Who was that, by the way?* |
| 20 | A. | *It was a private investigator named Esteban Hernandez.* |
| 21 | Q. | Again, a private investigator who worked for Leonard Francis, right? |
| 22 | | |
| 23 | A. | He worked overall for Leonard Francis. I'm not sure of the contractual arrangements, but he did overall work for Leonard Francis, yes. |
| 24 | | |
| 25 | Q. | *And is -- do you know this Mr. Esteban personally?* |
| 26 | | |
| 27 | | |
| 28 | | |

A.  *No, sir.*[5]

Q.  Do you know whether this Mr. Esteban is a forensic -- a digital forensic examiner?

A.  I don't know, but these weren't copies of drives is my understanding. They were the drives themselves.

Q.  *Do you know if anyone assisted Mr. Esteban in pulling the information off of these hard drives?*

A.  *We pulled the information off the hard drives ourselves.*

Q.  *So he got the hard drives and you pulled it off.*

A.  *Yes, sir.*

(4/12/22 TT 3627-3629)

Mr. Loveless' counsel cross-examined the agent about the hard drives, and the agent denied knowing anything about Mr. Hernandez's collection of the drives and documents. He testified the government did not know what Mr. Hernandez did vis-a-vis the collection process, he could not "specifically say what happened" when Mr. Hernandez went to Singapore and Malaysia, and he did not know whether Mr. Hernandez "coordinated with GDMA staff." This testimony is quoted at length because it very clearly conveys the impression that Agent DeLaPena disclaimed knowledge about who provided the hard drives to Mr. Hernandez.

Q.  [By Mr. Prince, Mr. Loveless's counsel] Okay. You mentioned and I think we've been talking about here a bit about the Covington documents, right? But that's a little bit of a misnomer, isn't it? Those documents weren't harvested by Covington lawyers, right?

A.  [Agent DeLaPena] So as far as where they came from, you know, we got them from Mr. Francis' attorneys. I have an understanding of where they came from, and I think I testified that my understanding is that at least some of them came from a private investigator that was hired -- I don't know the specific arrangement -- but that was hired by Mr. Francis.

Q.  And that would be Esteban Hernandez, right, his private investigator?

---

[5] In text messages provided by the government, Agent DeLaPena called Mr. Hernandez "bro." Exhibit B.

-17-

1    A.    Yes, sir.

2    Q.    *Okay. And did you ever have any conversations with Esteban Hernandez?*

3
4    A.    *Yes. He came with Leonard Francis on occasion when we – after Leonard Francis pled guilty.*

5    Q.    Did you direct Mr. Hernandez about what documents and what sources to gather information in Singapore?

6
7    A.    I did not. I believe there were some conversations between the lawyer teams. I did not specifically direct Esteban Hernandez.

8    Q.    Mr. Francis's lawyers and Mr. Francis' investigator coordinated about what to collect and from where.

9
10   A.    I -- specifically related to their relationship, I would be speculating about kind of how they arranged it. I don't think I can answer that question.

11
12   Q.    *So the government does not know what work Mr. Esteban Hernandez did vis-à-vis his collection of documents, right?*

13   A.    *Not in specific gory detail, no sir.*

14   Q.    *Any detail?*

15   A.    *I have an understanding that he went to Singapore and there was -- this is my understanding.* I'm not saying this is exactly
16         what happened, because I don't, I don't –

17   Q.    You weren't there.

18   A.    I wasn't there. But my understanding is he went to Singapore; he went to Malaysia. Two different places. *He got hard drives.*
19         *He got documents. My understanding is there was two trips in late 2014 and maybe mid-2015, but again that is, that is not*
20         *based on firsthand knowledge, and I can't specifically say what happened.*
21
22   Q.    Because no one from NCIS or DCIS hopped on a plane to go to Singapore or Malaysia to oversee this collection. Is that right?

23   A.    There's very good reasons for that, but no, we did not.

24   Q.    It didn't happen.

25   A.    We were there in 2013 for the search warrants. We were not there with Esteban Hernandez.

26
27   Q.    So the government was not there to collect documents. Instead, Leonard Francis' paid investigator was there to handle the
28         collection of the documents that the government's presenting in this case.

A.   For some of the documents and (pause) -- if I go to Singapore and do stuff, I'm a law-enforcement agent, and there's a lot of rules that govern that, and so no, I did not.

Q.   That's not my question, sir. The government is relying on Leonard Francis' paid investigator in this case to go collect documents, and *it's not clear, at least as you sit here today, you know, what direction that Esteban Hernández was given about the documents to collect and from what sources. Is that fair?*

A.   *I'm not privy to attorney-client privileged communications, so I can't say with specificity what happened behind the curtain of the attorney-client privilege.* I would not say that that's, that I'm relying on Esteban Hernández for any of the evidence that I've reported, so I would disagree with that characterization.

Q.   When you said the attorney-client privilege, though, that's the privilege that would exist as between Francis and his lawyers, right?

A.   *I guess if I'm wrong -- I assume that if his lawyer gave Esteban Hernández direction about what to do, that that would also be privileged.*

Q.   Sure. But what that's saying is Francis, his lawyers, and paid investigator, not the government.

A.   Not the government.

Q.   Esteban Hernández appears on the government's witness list. Are you aware of that?

A.   I have seen his name on the witness list.

Q.   Do you know whether he's going to come in here and tell us how he gathered documents?

Mr. Pletcher:   Objection, your honor. Relevance, outside his personal knowledge, foundation.

The Court:   Overruled.
He may answer if he knows.

A.   I don't know that, sir. I don't know one way or the other.

Q.   Do you know whether with Mr. Hernández -- or Mr. Hernández, as far as you know, is not law enforcement. Correct?

A.   He is not law enforcement.

Q.   He's a paid outside investigator.

A.   He's a private investigator.

-19-

Q.   Which means, presumably -- just tell me if you know – *he's not going in there and kicking in the doors at Leonard Francis' office overseas, right?*

A.   *I don't know. I would, I would make that assumption since Mr. Francis was paying him, but I can't specifically say that's true or not true.*

Q.   Well, he wouldn't want to damage Mr. Francis' property. Mr. Francis is the guy who's paying him. Right?

A.   I don't know.

Q.   Likely not.

A.   *I mean, it seems unlikely in my opinion, but I don't know. I wasn't there. I can't say what happened in Singapore.*

Q.   *Do you know whether Mr. Hernandez, then, would have had to coordinate with the GDMA staff to retrieve documents?*

A.   *I don't know if he would or not. It seems likely.*

Q.   *Some of the same individuals like Angie Kong whom you testified about, do you know whether she was involved with the collection of documents?*

A.   *My understanding is that she was not involved, but I don't know. I wasn't there. But that's not my understanding. My understanding, it was the finance personnel in Singapore.*

Q.   *Any other group in Singapore that would have assisted in this process?*

A.   *Not to my knowledge.*

[Emphasis added.] 4/19/22 TT 4064-4068.

Mr. Ng, Mr. Francis' long term IT manager, gave Mr. Hernandez the hard drives in Malaysia, but the Defendants still do not know how Mr. Ng came to possess the hard drives, where the hard drives came from or who had access to the hard drives, and Mr. Ko has advised defense counsel that there were no follow up communications between the agent and Hernandez on the subject.

Agent DeLaPena was also aware that the defense had not been provided with discovery revealing that Mr. Ng provided the hard drives; thus, the agent knew he could make these false statements without being impeached by defense counsel.

### III. The Agent's False Testimony Violated the Defendants' Fifth and Sixth Amendment Rights of Due Process and Confrontation and Deprived the Defendants of a Fair Trial.

The knowing presentation of false testimony is "inconsistent with the rudimentary demands of justice." *Mooney v. Holohan,* 294 U.S. 103, 112 (1935); *Napue v. Illinois,* 360 U.S. 264 (1959). The Due Process Clause of the Fifth Amendment to the Constitution "protects defendants against the knowing use of any false evidence by the state, whether it be by document, testimony, or any other form of admissible evidence." *Hayes v. Brown,* 399 F.3d 972, 981 (9th Cir. 2005) (en banc); *Donnelly v. DeChristoforo* 416 U.S. 637, 646 (1974) [due process "cannot tolerate" convictions based on false evidence].

"A claim under *Napue* will succeed when '(1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) the false testimony was material.'" *Jackson v. Brown*, 513 F.3d 1057, 1071-72 (9th Cir. 2008) (quoting *Hayes v. Brown*, 399 F.3d at 984.)

Agent DeLaPena's testimony that Mr. Hernandez "pulled" the hard drives, that he did not know what work Mr. Hernandez did vis-à-vis his collection of documents, that he did not know specifically what occurred in Singapore, that he did not know whether there was coordination with GDMA staff and that "no other group" was involved in the collection process was false. 4/6/22 TT 3628-29; 4/19/22 TT 4064-4068.

The agent also falsely claimed that Hernandez obtained the hard drives in Singapore, when Mr. Hernandez told him he obtained them in Malaysia. Ex. B; 4/12/22 TT 3628. The agent knew that Mr. Ng, the former IT manager, met Hernandez in Malaysia. Ex. B. The hard drives, located in Malaysia, can hardly be said to be kept "in the ordinary course of business" when GDMA is located in Singapore. All the defense knows is that Mr. Ng, the IT manager met Hernandez in Malaysia. The defense still does not know anything about the source of the hard

drives, whether they were actually from GDMA servers, who had access to them before Hernandez picked them up, or how they ended up in Malaysia with Mr. Ng.

Agent DeLaPena's improvised excuses for his feigned ignorance – that Hernandez's direction to retrieve materials was shielded from him by "the curtain" of the "attorney client privilege" – was false and highly misleading. 4/19/22 TT 4066. The emails exchanged between Mr. Burstein, Mr. Pletcher, the Covington lawyer Mr. Sprague, and Agent DeLaPena show that the agent and Mr. Pletcher had Mr. Francis' current and former attorneys at their disposal to assist in obtaining information concerning the Covington materials; no one told the agent or Mr. Pletcher that this information was privileged. Ex. A. Mr. Hernandez never told the agent that the information he sought was privileged; in the text messages he explained where he received the hard drives, showed him his passport stamps, and told him who gave them to him. Ex. B.

For reasons that are now obvious, the agent also tried to distance himself from Mr. Hernandez, first claiming he did not "personally know" him. 4/6/22 TT 3629 The agent knew Hernandez; he called Hernandez "bro" in the text messages and asked him when he was going to return "stateside." Ex. B. When Mr. Prince pointedly asked Agent DeLaPena whether he had any conversations with Mr. Hernandez in the context of his retrieval of the hard drives, Agent DeLaPena purposefully evaded the relevant question, and said he talked to Hernandez in meetings after Mr. Francis pled guilty, but did not reveal that he specifically reached out to Hernandez regarding the source of the hard drives. 4/19/22 TT 4064.

At best, the agent's testimony was grossly misleading, and created the false impression that the agent was not privy to who was involved in providing the drives to Mr. Hernandez, nor could he know. The Due Process right extends to situations in which the prosecution allows a witness to give a false impression of the evidence. *Alcorta v. Texas,* 355 U.S. 28, 31 (1957) (outright falsity need not be

shown if the testimony taken as a whole gave the jury a false impression).

As to the second prong, it is obvious the prosecutor knew that the agent's disclaimer was false. Mr. Pletcher originally assured the Court he would call Mr. Hernandez to close the loop on this "small aspect of chain of custody" with respect to the nine hard drives. 2/17/22 Hearing Tr. 21. The decision to call the agent and not Mr. Hernandez occurred after the defense played the podcast statements. One cannot help but conclude that this decision was calculated to mislead the jury and avoid having them learn that Mr. Ng, the long term manager of Mr. Francis' "IT people" was involved in sourcing the hard drives. This would not be the first time Mr. Pletcher opted to present evidence through the agent in lieu of percipient witnesses who had the potential to torpedo the government's case.

But even assuming Mr. Pletcher was not aware of the falsity of the agent's testimony (which is doubtful), for *Napue* claims, the Ninth Circuit does not define the limits of constitutional liability to the prosecutor's personal knowledge, and extends it to law enforcement officers who testify falsely. *Browning v. Baker*, 875 F.3d 444, 460 (9th Cir. 2017). As the court in *Browning* observed, "we applied the same principle to police officers with knowledge that trial testimony offered by the government was false, holding that '*Napue* and *Giglio* make perfectly clear that the constitutional prohibition on the "knowing" use of perjured testimony applies when *any* of the State's representatives would know the testimony was false.' " [Emphasis added]. *Id.* (quoting *Jackson v. Brown*, 513 F.3d 1057, 1075 (9th Cir. 2008)). Since the agent knew that Mr. Ng supplied the hard drives, Mr. Pletcher should have known that the agent's testimony disclaiming such knowledge was false.

As to the third prong, the *Napue* materiality standard is less demanding than *Brady*. Under *Napue*, a conviction must be set aside "whenever there is 'any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" *Jackson v. Brown*, 513 F.3d at 1076 (quoting *Hayes*, 399 F.3d at 985).

*"Napue's* materiality threshold is lower 'not just because [Napue cases] involve prosecutorial misconduct, but more importantly because they involve a corruption of the truth-seeking function of the trial process." *Dickey v. Davis*, 69 F.4th 624, 634 (9th Cir. 2023). Although "*Napue* does not create a 'per se rule of reversal[,]'" "[w]e have gone so far as to say that 'if it is established that the government knowingly permitted the introduction of false testimony reversal is virtually automatic.'" *Jackson,* 513 F.3d at 1076 (quoting *Hayes*, 399 F.3d at 978, 984).

Evidence that Mr. Ng supplied the hard drives was material, given the importance of this issue to the defense argument regarding the reliability of the documents sourced from Covington. The Defendants asserted that Mr. Francis' documents could not be trusted, and replayed and discussed the podcast statements in their closing arguments. 6/6/2022 TT 6951, 7028, 7070, 7014-15; 6/7/2022 TT 7177-78.

As this Court observed, the defense position was reasonable under the circumstances:

> The Court: And I know you think [the Covington documents are] reliable and trustworthy in every respect, but there's another side to this Mr. Pletcher –
>
> Mr. Pletcher: Yes.
>
> The Court: -- And it's not an unreasonable side given the individuals and the circumstances pursuant to which these things were gathered and transmitted and ended up with Covington.

4/6/22 TT 2960.

If the jury had known the truth, that Mr. Francis' IT manager sourced the hard drives for Covington, they likely would have viewed the government exhibits with a more jaundiced eye. It would be reasonable to conclude that Mr. Francis once again enlisted Mr. Ng to assist him to tamper with his hard drives before Mr. Hernandez retrieved them. Mr. Francis had significant resources, and Mr. Ng must have been on Francis' payroll when he provided the hard drives to Mr. Hernandez. There is a reasonable likelihood that the false testimony could have affected the

judgment of the jury, because the agent made it sound as if Mr. Hernandez, a licensed investigator subject to the laws of the United States, was responsible for pulling the hard drives at GDMA headquarters, not Mr. Ng, a resident of Malaysia and long term Francis employee who assisted him in cleaning up his servers in the past.

Mr. Pletcher had an obligation to correct the agent's false testimony. *Dickey v. Davis*, 69 F.4th at 644. As the Ninth Circuit observed in *Dickey*, when a central witness testifies falsely, and the falsity goes uncorrected by the prosecutor, there is "no room to doubt" that the *Napue* standard is met. *Dickey*, at 644. In *Dickey*, the court cited a number of Ninth Circuit cases that have held that "correcting a witness's false sworn testimony can make a powerful difference in the jury's assessment of the witness's trustworthiness." *Id.,* citing *Sivak v. Hardison*, 658 F.3d 898, 916 (9th Cir. 2011), *Jackson v. Brown*, 513 F.3d at 1077, and *Benn v. Lambert*, 283 F.3d 1040, 1056-57 (9th Cir. 2002). "If a witness's false testimony is corrected by the prosecution, his 'willingness to lie under oath' is exposed and his credibility is irreparably damaged. There is a substantial difference between 'general evidence of untrustworthiness and specific evidence that a witness has lied.'" *Dickey*, at 644, quoting *Sivak*, at 916; *Jackson,* at 1077, and *Benn*, at 1056-57.

As this Court has observed (Dkt.# 1020), and Defendants have extensively argued in their new trial motions (Dkt.# 1156, 1165), Agent DeLaPena was a critical prosecution witness. Even Mr. Pletcher recognized the agent's central role in the case: "Nobody is denying he's going to be a significant witness because of where we are in the trial, that's absolutely correct." 3/30/22 TT 2541. Under this Ninth Circuit authority, there is a reasonable likelihood that this central witness's "willingness to lie under oath," if exposed, could have affected the jury's verdict, requiring reversal under *Napue*.

Given that Agent DeLaPena made *other* extensive and significant false

statements under oath to advance a similar prosecution, there is no room to doubt that the credibility of the government's central witness, his investigation, and the documents he sponsored and vouched for in evidence would be "irreparably damaged" had the jury known the truth.

The source of trial exhibits admitted by the government was not always clear, but the defense has been able to identify at least 190 trial exhibits admitted that came from the Covington hard drives. Attached as Exhibit D is a partial list of the government exhibits sourced from the Covington hard drives. Evidence that cast doubt on the reliability of these exhibits was critical to the defense, since the government's case depended so heavily on them.

Agent DeLaPena's testimony regarding his comparison of the several "millions" of documents on the Covington hard drives to the "millions" of documents on the CPIB hard drives received from Singapore law enforcement is of no help to the government. 4/19/22 TT 4061-64. First, the government did not offer a single document from the CPIB hard drives into evidence (4/19/2022 TT 4061), and while there are likely good (but unknown) reasons for this, whatever may be on those drives is irrelevant to this case. Second, at this juncture, the agent's credibility is irreparably damaged; his competent examination of "millions" of documents for similarity does not inspire confidence, to say the least.

The agent's false testimony was material, and the government's failure to correct it violated the Defendants' right of Due Process and deprived them of a fair trial. The prosecution's failure to correct Agent DeLaPena's testimony also deprived the defense of the right to meaningful confrontation, which "means more than being allowed to confront the witness physically." *Davis v. Alaska*, 415 U.S. 308 (1974). As the Supreme Court has said:

> [A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby to expose to the jury the fact from which jurors . . . could appropriately draw inferences relating to the reliability of the witness.

*Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1986). The Defendants could not effectively cross-examine the agent because they did not know that he had testified falsely regarding what he knew about Hernandez's retrieval of the hard drives, violating the Defendants' Sixth Amendment right of Confrontation.

Finally, this claim should be assessed cumulatively with the other significant claims raised in the new trial motions filed on March 31 and April 4, 2023, and the Defendants request those arguments be incorporated by reference here. (Dkt.## 1056, 1065.)

**IV.    The Prosecution Violated Brady/Giglio in Failing to Turn Over Evidence that Mr. Francis' IT Manager Was the Source of the Hard Drives.**

If this Court concludes that the *Napue* violation creates a "reasonable likelihood that the false testimony could have affected" the jury's findings, then the Court need not separately address the *Brady* violation. *Jackson*, 513 F.3d at 1077.

There has been extensive briefing on the law under *Brady* and *Giglio* in this case. Briefly, to prove a *Brady/Giglio* violation, the defense must establish that: (1) the evidence is favorable to the accused, either because it is exculpatory or because it is impeaching; (2) the evidence must have been suppressed, either wilfully or inadvertently; and (3) the evidence must be material. *United States v. Kohring*, 637 F.3d 895, 901 (9th Cir. 2011).

Here, there is no doubt that the first two prongs are met. Given Mr. Francis' podcast statements, evidence that Mr. Hernandez retrieved the hard drives from Francis' IT manager was relevant to impeach the reliability of the Francis'

certification, the agent and the many exhibits sponsored by the agent. This information and the text messages were not disclosed to the defense, so it is deemed suppressed.

Evidence is material in the *Brady* context "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985). In making this determination, all the undisclosed evidence in this case must be considered collectively. *Kyles v. Whitley*, 514 U.S. 419, 436 (1995). This would include all the undisclosed evidence identified in the motions for new trial (Dkt. ##1156, 1165). The overriding question is whether the Defendants received a fair trial in the absence of the undisclosed evidence, understood as a trial resulting in verdicts worthy of confidence. *Kyles*, 514 U.S at 434.

Evidence that Mr. Ng was the source of the hard drives is material for all the reasons already noted. But there are other reasons why this information was critical to the defense. If the government only knew that Mr. Ng provided the hard drives in Malaysia, and admittedly failed to seek out any additional information about what occurred with respect to those drives, this raises very serious concerns about the thoroughness of the government's investigation and the reliability of the bulk of the government's exhibits. The Supreme Court explained that information which might "have raised opportunities to attack . . . the thoroughness and even good faith of the investigation . . ." constitutes exculpatory, material evidence. *Kyles v. Whitley,* at 443. "When, for example, the probative force of evidence depends on the circumstances in which it was obtained and those circumstances raise the possibility of fraud, indications of conscientious police work will enhance probative force and slovenly work will diminish it." *Kyles,* 514 U.S. at 446, n.15.

Here, the circumstances certainly raise the possibility of fraud, given that Francis reported that he had his "IT people" clean up his servers and the government failed to divulge that the source of the hard drives was Francis' IT manager, the person who would have assisted him.

The government's conduct in this case is also incompatible with Rule 16 of the Federal Rules of Criminal Procedure, which imposes on the government a continuing duty to disclose evidence relevant to developing a defense. *United States v. Muniz-Jaquez*, 718 F.3d 1180, 1183 (9th Cir. 2013). By withholding the information, the government not only deprived the defense of the use of the statement to impeach the agent, the documents he sponsored, and the government's investigation, it also prevented the defense from subpoenaing Mr. Hernandez as a favorable witness for the defense.

The absence of evidence of 1) Agent DeLaPena's false statements under oath in a similar prosecution, 2) the falsity of his statements *in this trial* disclaiming knowledge of the source of the documents he vouched for, and 3) the highly questionable source of numerous government exhibits work in synergy to undermine confidence in the verdicts.

**V.    The Government Deprived the Court of Information Relevant to the Admissibility of the Covington Documents; Any Doubt as to the Documents' Admissibility Is Extinguished.**

The prosecution did not just withhold this evidence from the defense, but also this Court. Evidence that Francis' IT manager delivered the hard drives to Mr. Hernandez in Malaysia was important to the determination of whether the documents were, as claimed by the government "kept in the ordinary course" of GDMA's business and, given the podcast statements, whether they were trustworthy. This new revelation casts serious doubt on both claims.

The Court originally ruled in limine that the government failed to link the documents from the Covington hard drives to GDMA. 2/17/22 Hearing Tr. 12, 39. Mr. Pletcher later convinced the Court that the source of the documents went to

the weight, not the admissibility of the documents. 4/6/22 TT 2959. But the
government deprived the Court of the information relevant to the significant
decision that had to be made in this complex case. Concealing this information
subverted the truth-seeking process and the administration of justice.

For this reason as well, a dismissal or, at the very least, a new trial is
required.

## VI.    An Evidentiary Hearing Is Required.

If this Court is not inclined to order a new trial, the Defendants request an
evidentiary hearing to shed light on the circumstances surrounding the retrieval of
the Covington hard drives, which, in the absence of testimony from Mr.
Hernandez, is still unclear. Although the defense now knows that Mr. Ng sourced
the hard drives, how this occurred is still not known because Mr. Hernandez has
refused to talk to the defense.

An evidentiary hearing is required because the agents and the lead
prosecutor in this case have eschewed report writing to memorialize important
favorable information received in this case. No report was prepared for the Ynah
contact, and absent intervention by counsel, the prosecution was set on a course to
violate *Napue* by introducing Mr. Lausman's incomplete and misleading statement
that Ynah spent the night in his room. 4/20/22 TT 4367. No report was generated
memorializing Agent DeLaPena's false statements under oath in a similar
prosecution. No report was generated regarding Agent Nash's visit to Mr. Francis
mansion to check on his "security" arrangement,[6] and the defense was led to
believe that Mr. Francis was living in cell-like sparsely furnished studio
apartment. The agent also told the jury Mr. Francis was living in an apartment.

---

[6]Mr. Ko produced an email from Agent Nash to Agent DeLaPena which
states that in or about January 2021, Agent Nash checked on Mr. Francis'
arrangements at his new residence. Attached as Exhibit E is a copy of Agent's
Nash's email regarding her inspection of Francis' residence.

False representations were made to the Court and the defense regarding Mr. Sanchez's and Mr. Francis' possession of child pornography. The only way to get to the truth in this case is to conduct an evidentiary hearing.

## VII.   Conclusion

Agent DeLaPena gave false and misleading testimony to the Defendants' jury on a critical issue. This fact alone warrants dismissal or a new trial. The defense was deprived of favorable evidence that cast doubt not only on many of the government's exhibits in this case, but also the veracity of the agent, who played a critical role in this case. This suppressed evidence and the agent's false statements under oath in a similar prosecution would have been devastating to the prosecution's case. The havoc that cross-examination of the agent would wreak would surely undermine the jury's confidence in the government's case, its central witness, the claims that the documents buttressing its case were reliable, and Mr. Francis' certification. Dismissal, or at least a new trial, is constitutionally compelled.

Respectfully submitted,

Dated: July 5, 2023

/s/ Laura Schaefer
/s/ Robert E. Boyce
Counsel for David Lausman

/s/ Michael L. Crowley
Counsel for Mario Herrera

/s/ Joseph Dominic Mancano
Counsel for David Newland

/s/ Todd W. Burns
Counsel for James Dolan